## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RONALD KRICK, Individually and on Behalf of the Estate of Oliver Krick; MARGARETA KRICK; CHRISTOPHER KRICK; DOUGLAS KEVORKIAN, Individually and on Behalf of the Estate of Ralph Kevorkian; LISA MICHELSON, Individually and on Behalf of the Estate of Yonatan Rojany; ERIC ROJANY; JODELLE GEARON, Individually and on Behalf of the Estate of Daniel Gaetke; TODD GAETKE; CRAIG GAETKE; WANDA KEMP, Individually and on Behalf of the Estates of O. Lamar Allen and Ashton Allen; CHRISTINE GROGAN; EILEEN ZAHARIOUDAKIS, Individually and on Behalf of the Estate of Donald Gough; and MICHAEL DETERESA, | Judge: Hon. Angel Kelley  Case No.: 1:22-cv-11032-AK  [Leave to File Granted on December 9, 2022] |
| Plaintiffs, | |
| vs. | |
| RAYTHEON COMPANY; LOCKHEED MARTIN CORPORATION; UNITED STATES; and DOES 1 through 20, inclusive, | |
| Defendants. | |

## DEFENDANT LOCKHEED MARTIN CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS

Defendant Lockheed Martin Corporation ("Lockheed Martin"), by and through its attorneys and pursuant to Fed. R. Civ. P. 12(b)(6), hereby files this Memorandum of Law in support of its Motion to Dismiss the Second Amended Complaint.

## INTRODUCTION

26 years ago, on July 17, 1996, Trans World Airlines Flight 800 ("TWA 800") tragically crashed into the Atlantic Ocean off the coast of Long Island, New York. After an extensive, yearslong investigation, the National Transportation Safety Board ("NTSB") determined that the

likely cause of the crash was an explosion of flammable vapors in the aircraft's center fuel tank. In the months and years that followed, the families of the victims brought wrongful death claims— all of which were settled decades ago. Notwithstanding, Plaintiffs now blame Defendants with nothing more than a recycled conspiracy theory that lacks logic or factual support.  Specifically, they claim—consistent with the cover-up theory that began circulating immediately after the crash—that TWA 800's explosion was not caused by any defect in the aircraft as determined by the NTSB, but instead by an errant missile launched from a United States Navy ship sitting in the waters off the coast of New York.  This Motion explains why the suit comes too late and is barred by the political question doctrine.

Lockheed Martin vehemently denies the allegations set forth in Plaintiffs' Second Amended Complaint. Although Lockheed Martin is required to accept Plaintiffs' allegations as true for the purposes of this Motion, it expressly preserves and does not waive its right to assert the appropriate denials and affirmative defenses to Plaintiffs' allegations in its Answer should the Court deny this Motion.

This Court should find that Plaintiffs' claims are unfounded and dismiss the Second Amended Complaint with prejudice. *First*, Plaintiffs commenced this lawsuit on June 28, 2022— 25 years, 11 months, 11 days after the tragic events of July 17, 1996. Pursuant to 46 U.S.C. § 30106, the statute of limitations ran on July 17, 1999, making this lawsuit over 22 years late. And while Plaintiffs allege that the statute of limitations was tolled due to an alleged cover-up, they allege no facts that would suggest that Lockheed Martin was involved in any such subterfuge that would justify tolling. For these reasons, dismissal with prejudice pursuant to Rule 12(b)(6) is appropriate.

*Second*, Plaintiffs' lawsuit raises a nonjusticiable political question, *i.e.* whether United

States' foreign policy and military decisions led to this tragedy. Plaintiffs' Second Amended Complaint implicates military decision-making regarding when and where to allegedly test new military weapons systems in the face of threats from hostile nations. Since the Court would inevitably have to question core military decision-making to adjudicate Plaintiffs' claims or the potential defenses, this case is nonjusticiable and should be dismissed pursuant to Rule 12(b)(6).

## STATEMENT OF FACTS

### I.   Background.

This case arises out of the crash of TWA 800 on July 17, 1996. (Doc. No. 33, Second Am. Compl. ¶ 1, Nov. 17, 2022.) On that day, TWA 800 departed from John F. Kennedy International Airport at around 8:20 p.m. destined for Paris, France. (*Id.* ¶ 2.) Approximately twelve minutes after takeoff, the aircraft exploded and crashed into the Atlantic Ocean off the coast of Long Island, New York. (*Id.*) All 230 passengers and crew members perished. (*Id.*) The NTSB determined after an extensive investigation that the likely cause of the crash was an explosion of flammable vapors in the aircraft's center fuel tank. (*Id.* ¶¶ 3, 51.) Nonetheless, Plaintiffs allege a vast government conspiracy to cover up the supposed true cause of the crash of TWA 800, *i.e.* Defendants, acting in concert, accidently shot down TWA 800 while conducting live-fire missile testing off the coast of New York. (*Id.* ¶ 5.) The Court may take notice of the fact that since the incident, this "missile strike theory" has been the fodder of media including journalism, websites, books, and even a documentary.[1] The Court may also take judicial notice that TWA 800 was the subject of a multidistrict litigation venued in the Southern District of New York, with Plaintiffs represented by counsel, and which was settled and dismissed with prejudice. *See In Re Air Crash off Long Island*, No. 96 Civ. 7986, MDL No. 1161 (S.D.N.Y. Oct. 24, 1996.)

---

[1] *See, e.g.,* Matthew Purdy, *Missile Theory Rebutted in TWA Flight 800 Crash*, N. Y. Times, March 12, 1997, at B2; TWA FLIGHT 800 (Epix 2013).

## II.   Genesis of the Live-Fire Missile Testing That Allegedly Caused the Crash of TWA 800.

Plaintiffs allege that on July 17, 1996, Defendants were testing the United States Navy's new Aegis Weapons System and SM-2 surface-to-air missiles with live warheads off the coast of New York, when TWA 800 was struck by one such missile, causing it to break apart and crash into the Atlantic Ocean. (Doc. No. 33, Second Am. Compl. ¶ 5.) According to Plaintiffs, testing missiles off the east coast of the United States was a departure from prior practices. (*Id.* ¶ 32.) Plaintiffs assert that the missile program that resulted in the crash of TWA 800 became a high priority for the U.S. Government in 1996 when then Secretary of Defense William Perry sought an increase in funding for the Navy's Aegis Missile System. (*Id.* ¶ 55.) The United States Department of Defense ("DOD") supposedly proposed that this missile system proceed "as quickly as possible to production and deployment" in order to increase defense capabilities against missiles from hostile countries. (*Id.* ¶ 56.) In a news briefing from the Missile Defense Agency and DOD, Plaintiffs alleged that Secretary Perry characterized the missile threat from rogue nations as "here and now." (*Id.* ¶ 57.) As a result, Plaintiffs aver that funding was approved and the Navy accelerated testing and development of the next-generation Aegis Missile System. (*Id.* ¶ 58.)

To address purported deficiencies in the Aegis Weapons System's radar, DOD allegedly directed Lockheed Martin and Raytheon Company ("Raytheon") to integrate a new radar (known as the SPY-ID(V) radar) and computer system (known as HIPER-D) into all new Navy ship designs. (*Id.* ¶ 61.) According to Plaintiffs, Lockheed Martin allegedly designed the SPY-ID(V) radar pursuant to design plans and specifications. (*Id.* ¶ 145.) Raytheon allegedly supplied the SM-2 missiles and other systems and technologies that were integrated with the SPY-ID(V) radar and Aegis Missile System. (*Id.* ¶ 112.) At that time, there were purportedly no Navy ships that could accommodate the new radar and computer systems, so Plaintiffs assert that the radar testing was

4

conducted from a New Jersey land-based testing site known as Combat Systems Engineering and Development Site ("CSEDS"). (*Id.* ¶¶ 63-64.) Plaintiffs also allege that instead of waiting five years for the ships to be constructed with the SPY-ID(V) radar so that testing could be conducted far from congested air corridors and at established test ranges, the SPY-ID(V) radar was tested on an expedited basis in and around CSEDS in New Jersey. (*Id.* ¶ 65.)

In 1996, Plaintiffs claim that Defendants began testing the SPY-ID(V) radar using simulated and actual targets in and around New Jersey. (*Id.* ¶ 69.) They further claim that on the night of the TWA 800 crash, witnesses saw a missile "rise off the ocean apparently heading toward something well behind TWA 800, but only to take a sharp turn toward the jetliner seconds before exploding into it." (*Id.* ¶ 73.) In the weeks, months, and years that followed, witnesses allegedly reported additional missile testing off the East Coast. (*Id.* ¶¶ 74-82.)

## III.   Plaintiffs' Causes of Action.

Plaintiffs assert three causes of actions: (1) Negligence and Gross Negligence (Against all Defendants); (2) Wrongful Death and Survivorship (Against all Defendants); and (3) Product Liability: Failure to Warn and Manufacturing Defect (Against Raytheon and Lockheed Martin). (*Id.* ¶¶ 105-148.) As to the negligence and gross negligence cause of action, Plaintiffs allege, *inter alia*, that Defendants negligently authorized and conducted the testing of missiles in commercial airspace; and as a result of these tests, an errant missile downed TWA 800. (*Id.* ¶ 108.) Plaintiffs allege that the United States "worked closely with all of the other Defendants in conducting the missile testing that caused the crash of TWA 800" and was "responsible for the decision to test missiles in the area where TWA 800 was downed." (*Id.* ¶¶ 114-16, 126-28.) The allegations with respect to the wrongful death and survivorship claims are substantively identical. (*Id.* ¶¶ 121-131.) With respect to the product liability claim, Plaintiffs allege that although Lockheed Martin

designed the relevant products, including the SPY-ID(V) radar, pursuant to specific design plans and specifications, these products were flawed due to manufacturing defects. (*Id.* ¶¶ 145, 146.) Plaintiffs aver that they are not alleging design defects. (*Id.* ¶ 134.)

## LEGAL STANDARD

A motion under Rule 12(b)(6) is an appropriate method of raising a statute of limitations defense. *Arivella v. Lucent Techs., Inc.*, 623 F. Supp. 2d 164, 172 (D. Mass. 2009).  "[W]hen the allegations in a complaint show that the passage of time between the events giving rise to the claim and the commencement of the action exceeds the applicable limitations period, a court should grant a 12(b)(6) motion by the defense if the complaint (and any other properly considered documents) fails to sketch a factual predicate that would provide a basis for tolling the statute of limitations." *Abdallah v. Bain Capital LLC*, 752 F.3d 114, 119 (1st Cir. 2014).

Likewise, a motion to dismiss based on the political question doctrine is analyzed under Rule 12(b)(6). *See, e.g., In re Refined Petroleum Prods. Antitrust Litig.*, 649 F. Supp. 2d 572, 579 (S.D. Tex. 2009) (concluding that the plaintiffs' claims were subject to dismissal under Rule 12(b)(6) because they posed nonjusticiable political questions). "A motion to dismiss pursuant to the political question doctrine is a motion to dismiss for failure to state a justiciable cause of action" and "it is appropriate to analyze it pursuant to Rule 12(b)(6)." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 438 F. Supp. 2d 291, 295-96 (S.D.N.Y. 2006). "[F]or a motion to dismiss on nonjusticiability to succeed, it must be clear from the Complaint that the case involves or requires determination of an inextricably linked political question." *Id.* at 295.

## ARGUMENT

Substantive maritime law controls here and the applicable statute of limitations has long since expired. As a result, the Second Amended Complaint is facially defective and should be

dismissed. The Second Amended Complaint is also devoid of any facts supporting tolling based on the discovery rule. And, there is no basis for tolling the statute of limitations for over 22 years pursuant to the fraudulent concealment doctrine. Equitable tolling, equitable estoppel, or laches, to the extent Plaintiffs also allege them in passing, are unavailing as well.

Furthermore, it is clear that the claims set forth in the Second Amended Complaint raise a nonjusticiable political question because (1) adjudicating Plaintiffs' claims would require this Court to second-guess military decisions that should be left to coordinate branches of government; and (2) Lockheed Martin's defenses would also require this Court to evaluate the military's decisions surrounding the alleged missile testing. The political question doctrine precludes this Court from adjudicating all of Plaintiffs' claims, including the product liability cause of action. This Court should dismiss all claims against Lockheed Martin with prejudice.

## I.    There Is Admiralty Jurisdiction and Maritime Law Governs this Case.

This Court has admiralty jurisdiction over Plaintiffs' claims and with admiralty jurisdiction comes the application of substantive maritime law. *See In re Air Crash at Belle Harbor*, 2006 U.S. Dist. LEXIS 27387, at \*21-39 (S.D.N.Y. May 9, 2006) (holding that cases involving the claims of the passenger decedents from the crash of American Airlines Flight 587 over Belle Harbor, New York fell within the admiralty jurisdiction of the federal courts); *see also Butler v. Am. Trawler Co.*, 887 F.2d 20, 21 (1st Cir. 1989). "[A] party seeking to invoke federal admiralty jurisdiction . . . over a tort claim must satisfy conditions both of location and of connection with maritime activity." *Bell Harbor*, 2006 U.S. Dis. LEXIS 27387, at \*25-6. In short, because the crash of TWA 800 occurred over navigable waters, *i.e.* the Atlantic Ocean, and because the flight had a disruptive impact on maritime commerce and a significant relationship to traditional maritime activity since it was a function traditionally performed by waterborne vessels, admiralty

jurisdiction applies here.  *See id.*  Furthermore, with admiralty jurisdiction comes the application of substantive admiralty law. *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 206 (1996); *Pope & Talbot, Inc. v. Heron*, 346 U.S. 406, 410-11 (1953) (substantive admiralty law follows from admiralty jurisdiction even if suit is filed under diversity jurisdiction).

**II.** **The Uniform Statute of Limitations for Maritime Torts Ran Decades Ago Barring Plaintiffs' Claims Against Lockheed Martin.**

**A.  Plaintiffs' Claims Are Barred by the Statute of Limitations.**

42 U.S.C. § 30106 sets forth the applicable statute of limitations for maritime actions and provides:  "Except as otherwise provided by law, a civil action for damages for personal injury or death arising out of a maritime tort must be brought within 3 years after the cause of action arose." 46 U.S.C. § 30106. Plaintiffs filed their original Complaint on June 28, 2022. The statute of limitations ran on July 17, 1999, making this Second Amended Complaint nearly 23 years late. In *Butler*, the First Circuit acknowledged the application of the 3-year federal statute of limitations and held that a court cannot impose its own statute of limitations upon an action based in maritime law. *Butler*, 887 F.2d at 22 (discussing 46 U.S.C. § 763a which is the predecessor of 46 U.S.C. § 30106 and which contained identical language and time limits).

**B.  Tolling of the Applicable Statute of Limitations Is Not Warranted by the Discovery Rule.**

Plaintiffs have not pled sufficient facts that establish grounds for the tolling of the statute of limitations under the discovery rule. Rather, Plaintiffs only vaguely describe "key facts" learned at a meeting in April of 2021. (Doc. No. 33, Second Am. Compl. ¶ 98.) Notably absent, however, is the requisite description of what these "key facts" are or why those facts were incapable of discovery within the statutory time period.  Pursuant to the discovery rule, an action accrues when the injured party knew, or, in the exercise of reasonable diligence, should have known the factual

basis for the cause of action. *Tagliente v. Himmer*, 949 F.2d 1, 4 (1st Cir. 1991). In order for the statute of limitations to toll under discovery rule, "the factual basis for the cause of action must have been inherently unknowable at the time of the injury." *Id.* (internal quotations omitted). The factual basis for a cause of action is "inherently unknowable" if it is "incapable of detection by the wronged party through the exercise of reasonable diligence." *Id.* (quoting *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 376 (1st Cir. 1991)). When considering whether a claim was inherently unknowable, a court will impute to the plaintiff an awareness of any knowledge that would have been uncovered through reasonable inquiry. *Skwira v. United States*, 344 F.3d 64, 77 (1st Cir. 2003). The standard is objective; Plaintiffs' individual state of mind is irrelevant. *Sanchez v. United States*, 740 F.3d 47, 52 (1st Cir. 2014).

Here, Plaintiffs make no attempt to explain why they did not discover these "key facts" previously through reasonable diligence, nor is there any description as to what the facts even are. As a practical matter, it is difficult to comprehend how any "key facts" were discovered 25 years after this incident in light of the scope of the NTSB investigation, international publicity, and prior litigation. Given the complete absence of foundational information, the discovery rule cannot apply and Plaintiffs claims are untimely.

**C. The Fraudulent Concealment Doctrine Is Not a Basis for Tolling the Statute of Limitations Because Plaintiffs Have Failed to Plead Fraud with Particularity and Did Not Exercise Due Diligence.**

Plaintiffs' attempt to invoke the fraudulent concealment doctrine to avoid the statute of limitations fails. "The doctrine of fraudulent concealment tolls the statute of limitations where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part." *Gonzalez v. United States*, 284 F.3d 281, 292 (1st Cir. 2002) (internal citations omitted). A court may toll the statute of limitations under this doctrine only where two

conditions are met: (1) the defendant raising the limitations defense must have engaged in fraud or deliberate concealment of material facts related to the wrongdoing; and (2) the plaintiff must have failed to discover these facts within the normal limitations period despite his or her exercise of due diligence. *Id.*

First, Plaintiffs failed to plead any allegations of fraud against Lockheed Martin, let alone plead such facts with particularity as required by the Federal Rules.  Under Federal Rule of Civil Procedure 9(b), "a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "Mere allegations of fraud or conspiracy, averments as to conditions of mind, or referrals to plans and schemes are too conclusional to satisfy the particularity requirement, no matter how many times such accusations are repeated." *Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir. 1985). Rule 9(b) requires specification of "time, place and content." *Id.* (citing *McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d 226, 228 (1st Cir. 1980)). "Supporting facts on which a belief is founded must be set forth in the complaint." *Id.* (citing *Wayne Investment, Inc. v. Gulf Oil Co*., 739 F. 2d 11, 13 (1st Cir. 1984)).

In this case, Plaintiffs do not plead that Lockheed Martin concealed anything in particular, how it was concealed, when it concealed, where it was concealed, that it was concealed deliberately, or how it was discovered. There is no allegation that Lockheed Martin had information that it intentionally and fraudulently hid which Plaintiffs have now discovered. Nowhere in their thirty-seven page Second Amended Complaint do they reference any specific information or materials from Lockheed Martin that form the bases for their claims. Plaintiffs offer no specific allegations of fraudulent concealment by Lockheed Martin. Plaintiffs do not allege anything that was recently discovered by them due to Lockheed Martin's actions. If there is evidence proving their allegations, Plaintiffs have not pled that Lockheed Martin had custody,

control, or ability to hide it. Because Plaintiffs have not sufficiently alleged fraudulent concealment by Lockheed Martin, the fraudulent concealment doctrine cannot toll the statute of limitations.

Second, as made clear in the Second Amended Complaint, Plaintiffs failed to exercise due diligence in attempting to discover any purported "new" evidence regarding the alleged cause of TWA 800's crash. "Allegations of fraudulent concealment do not modify the requirement that plaintiffs must have exercised reasonable diligence." *Gonzalez*, 284 F.3d at 292. "Irrespective of the extent of the effort to conceal, the fraudulent concealment doctrine will not save a charging party who fails to exercise due diligence, and is thus charged with notice of a potential claim." *Id.* Plaintiffs have asserted no efforts or diligence related to seeking information from Lockheed Martin to serve as a basis for tolling. Rather, according to the Second Amended Complaint, the alleged evidence regarding the "missile strike theory" was readily available through FOIA requests, etc. However, Plaintiffs never pursued any sort of investigation to find the so-called new evidence. Without pleading any facts showing that Plaintiffs have exercised due diligence, there is no basis to toll the statute of limitations here regardless of any purported fraud.

### D. Equitable Estoppel and the Doctrine of Laches Do Not Toll the Statute of Limitations in this Case.

Although Plaintiffs mention equitable estoppel and the doctrine of laches in passing as a basis to toll the statute of limitations, (Doc. No. 33, Second Am. Compl. ¶ 100), they do not allege a factual predicate to support either. "[F]ederal courts have allowed equitable tolling only sparingly." *Wilson v. United States Gov't*, 23 F.3d 559, 561 (1st Cir. 1994) (acknowledging that courts have allowed tolling where the claimant actively pursued a timely yet defective pleading, or where the complainant was tricked by his adversary's misconduct into allowing a deadline to pass). But, where the claimant fails to exercise due diligence in preserving his or her legal rights, "courts are reluctant to apply principles of equitable tolling to extend a federal limitations period."

*Id.* As discussed above, Plaintiffs have asserted no facts demonstrating that they exercised due diligence in preserving their legal rights.

And in regard to laches, 46 U.S.C. § 30106 has replaced that doctrine in maritime cases. *Ciolino v. Sciortino Corp.*, 721 F. Supp. 1491, 1494 (D. Mass. 1989) (holding that the predecessor statute of 46 U.S.C. § 30106 replaced the doctrine of laches in the context of maritime tort claims). Thus, the doctrine of laches is equally futile here.

In sum, Plaintiffs filed this lawsuit well after the applicable statute of limitations ran and there is no basis for tolling.  As such, Plaintiffs' claims are time-barred, and this Court should dismiss Plaintiffs' Second Amended Complaint with prejudice.

**III.     This Action Presents a Nonjusticiable Political Question and the Court Should Dismiss It.**

This case raises a nonjusticiable political question because it concerns military affairs and decision-making better left to the executive and legislative branch. The political question doctrine emerges out of Article III's case or controversy requirement and has its roots in separation of powers concerns. *Baker v. Carr*, 369 U.S. 186, 210 (1962). There is no justiciable case or controversy when a political question exists because deciding such a case forces the court to usurp the role of a coordinate branch of government and step outside the constitutional structure. *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1280 (11th Cir. 2009). Military matters "figure prominently among the areas in which the political question doctrine has been implicated." *Aktepe v. United States*, 105 F.3d 1400, 1403 (11th Cir. 1997).

The political question doctrine prohibits federal courts from evaluating questions committed exclusively to coordinate branches of government. *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986); *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 982 (9th Cir. 2007); *Carmichael*, 572 F.3d at 1280. In *Baker*, the Supreme Court identified six characteristics

of political-question cases:

(1)    A textually demonstrable constitutional commitment of the issue to a coordinate political department; or

(2)    A lack of judicially discoverable and manageable standards for resolving it; or

(3)    The impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or

(4)    The impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or

(5)    An unusual need for unquestioning adherence to a political decision already made; or

(6)    The potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217. While the analyses can overlap, these are six independent tests—if any one factor is inextricably present, dismissal is appropriate. *Alperin v. Vatican Bank*, 410 F.3d 532, 544 (9th Cir. 2005); *see also Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum etc.*, 577 F.2d 1196, 1203 (5th Cir. 1978). Similar to the many cases that directly implicate military affairs, this case raises a nonjusticiable political question and exhibits most, if not all, of the characteristics of political question cases as set forth in *Baker*.

**A.  Plaintiffs' Second Amended Complaint Raises a Nonjusticiable Political Question Concerning U.S. Military Decisions.**

As part of the federal architecture, the "Constitution commits the conduct of foreign affairs to the executive and legislative branches of government." *Aketpe*, 105 F.3d at 1403 (citations omitted). Indeed, military decisions are archetypal political questions, and "[t]he Supreme Court has generally declined to reach the merits of cases requiring review of military decisions, particularly when those cases challenged the institutional functioning of the military in areas such as personnel, discipline, and training." *Id.*; *see also Gilligan v. Morgan*, 413 U.S. 1, 10 (1973).

Since the judiciary is ill-suited to managing those cases, "matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." *Aketpe*, 105 F.3d at 1403, (citing *Haig v. Agee*, 453 U.S. 280, 282 (1981)).

The Eleventh Circuit's opinion in *Aktepe* is instructive here. In *Aktepe*, approximately 300 Turkish sailors filed a wrongful death and personal injury action against the United States arising out of a NATO training exercise in which two missiles inadvertently fired from the USS Saratoga ("Saratoga") struck their vessel. *Aktepe*, 105 F.3d at 1401. During the exercise, the missile crew of the Saratoga mistakenly fired the live missiles due to multiple miscommunications between the officers and the enlisted crew. *Id.* at 1402. More specifically, some of the enlisted crew did not know that the missile firing drill was a drill, but instead thought it was actual combat. *Id.* The United States filed a motion for summary judgment arguing that the case presented a nonjusticiable political question. *Id.* After reviewing the hallmarks of political questions under *Baker*, the court found that almost all were met and determined that plaintiffs' claims presented a political question and were nonjusticiable. *Id.* at 1404. The court reasoned that: (1) the Constitution reserved responsibility for developing military training procedures to the executive and legislative branch; (2) no judicially discoverable and manageable standards existed for resolving the questions raised by the suit, *i.e.* did the Navy conduct the missile firing drill in a negligent manner; (3) resolving the case would require the court to make initial policy decisions of a kind appropriately reserved for military discretion, *e.g.* whether the Navy was negligent in not telling the sailors that the exercise was just a drill as opposed to actual combat; and (4) adjudicating the case would express a lack of respect for the executive branch by subjecting their discretionary military and foreign policy decisions to judicial scrutiny. *Id.*

In this case, Plaintiffs' Second Amended Complaint contains a multitude of allegations that

place this matter squarely within the political question doctrine. For example, Plaintiffs allege:

- Testing missiles off the east coast of the United States was a departure from prior practices. (Doc. No. 33, Second Am. Compl. ¶ 32.)

- The missile program that resulted in the crash of TWA 800 became a high priority for the U.S. Government in 1996 when then Secretary of Defense William Perry sought an increase in funding for the Navy's Aegis Missile system. (*Id.* ¶ 55.)

- DOD proposed that this missile system proceed "as quickly as possible to production and deployment" in order to increase defense capabilities against missiles from hostile countries. (*Id.* ¶ 56.)

- In a news briefing from the Missile Defense Agency and DOD, Secretary Perry characterized the missile threat from rogue nations as "here and now." (*Id.* ¶ 57.)

- Funding was approved and the Navy accelerated testing and development of the next-generation Aegis Missile System. (*Id.* ¶ 58.)

- Lockheed Martin designed the SPY-ID(V) radar pursuant to design plans and specifications. (*Id.* ¶ 145.)

- At that time there were no Navy ships that could accommodate the new radar and computer systems, so the radar testing was conducted from CSEDS. (*Id.* ¶¶ 63-64.)

- Instead of waiting five years for the ships to be constructed with the SPY-ID(V) radar so that testing could be conducted far from congested air corridors and at established test ranges, the SPY-ID(V) radar was tested on an expedited basis in and around the CSEDS in New Jersey. (*Id.* ¶ 65.)

- The United States "worked closely with all of the other Defendants in conducting the missile testing that caused the crash of TWA 800" and was "responsible for the decision to test missiles in the area where TWA 800 was downed." (*Id.* ¶¶ 114-16, 126-28.)

Litigating this case thus requires consideration of the "foreign policy and national security" issues that courts recognize are outside of Article III's rightful purview. Adjudication of the claims and defenses regarding Lockheed Martin's alleged negligence or any alleged product defect will require reviewing, among other things: (1) the DOD's decisions to make the Navy's Aegis missile system a high priority in 1996; (2) the decision to proceed "as quickly as possible to production and deployment" in order to increase defense capabilities against missiles from hostile countries;

15

(3) the decision by the Navy to accelerate testing and development of the Aegis Weapons System; (4) the decision to conduct the SPY-ID(V) radar testing from CSEDS and off the East Coast near civilian air traffic (and the area where TWA 800 was allegedly downed) on an expedited basis instead of waiting five years for the SPY-ID(V) radar to be installed on Navy ships; (5) the decision to depart from prior practices and test missiles off the East Coast; (6) the DOD's procurement decisions related to the SPY-ID(V) radar; and (7) the design plans and specifications of the SPY-ID(V) radar. Plaintiffs put these decisions directly at issue in the Second Amended Complaint. As the Supreme Court stated in *Gilligan*, these are all complex, "subtle, and professional decisions as to the composition, training, equipping, and control of a military force" and therefore improper for judicial second-guessing. *Gilligan*, 413 U.S. at 10.

### B. Lockheed Martin's Defenses Will Raise the Same Nonjusticiable Political Question.

This case is also nonjusticiable because Lockheed Martin's defenses raise a political question. *Carmichael* demonstrates that even a case where likely defenses implicate military decision-making, the matter is nonjusticiable. In *Carmichael*, Army Sergeant Keith Carmichael suffered severe injuries when a fuel tanker truck driven by a contractor's employee overturned while travelling as part of a military convoy. 572 F.3d at 1278. Carmichael's wife sued the contractor and its driver, alleging that the driver negligently operated the tanker truck and that the contractor negligently trained and supervised its driver. *Id.* at 1278-79. The military, however, decided when the convoy departed, the route travelled, the speed travelled, the number of vehicles to be included in the convoy, the spacing maintained between the vehicles and the security measures to be employed, among other details of the mission. *Id.* at 1281-82.

The *Carmichael* court explained that if the case proceeded to trial, the contractor and its driver would defend themselves by arguing, among other things, that the military "was negligent

16

in setting too fast a pace along the particularly treacherous route for the convoy" and "would undoubtedly cite the military's orders as the reason why [the driver] did not reduce his speed." *Id.* at 1285–86. "[The contractor] would inevitably (and not without a substantial evidential foundation) try to show that unsound military judgments and policies surrounding every aspect of the [ill-fated] convoy were either supervening or concurrent causes of the accident." *Id.* at 1286. Since the contractor's defenses depended on second-guessing core military decisions, the Eleventh Circuit affirmed the district court's dismissal of the plaintiff's claims. *Id.* at 1285-86, 1296. Even though the *Carmichael* plaintiff alleged that a contractor's sole negligence caused his injury, because that contractor would inevitably question military decisions as part of its defense, the suit was nonjusticiable.

Similarly, even if the Second Amended Complaint did not already make this case a political question, the defenses that Lockheed Martin must raise will do so. As with any tort, causation is key here; Lockheed Martin would raise defenses and issues that directly call into question the military decision-making regarding the testing of the SPY-ID(V) radar as alleged by Plaintiffs. Just as in *Carmichael*, the Court would have to evaluate the other potential causes of the incident. As illustrated above, Lockheed Martin's defenses will require, among other things: (1) analyzing the SPY-ID(V) radar and other system specifications; (2) analyzing any decision-making by the United States with respect to when and where the testing was conducted; (3) subpoenaing all relevant military personnel records; (4) subpoenaing all relevant training manuals and documents for relevant military personnel conducing the alleged testing; (5) determining if operator error led to the alleged errant missile; and (6) determining if a product defect of another system not produced by Lockheed Martin was causal. Thus, Lockheed Martin's defenses in and of themselves raise a nonjusticiable political question.

### C.  Plaintiffs' Product Liability Claims Are Equally Nonjusticiable.

For the same reasons, product liability suits that require judicial inquiry into sensitive military choices—either as part of the claims themselves or as part of the defendants' likely defenses—are nonjusticiable. In *Amedi v. BAE Systems, Inc.*, the district court dismissed a product liability action arising out of a military convoy exercise in Iraq. 782 F. Supp. 2d 1350 (N.D. Ga. 2011). The *Amedi* plaintiffs were riding on a Mine Resistant Ambush Protected ("MRAP") vehicle—a specially armored convoy vehicle the military commissioned to protect against insurgent improvised explosive devices. *Id.* at 1352. The MRAP tripped a wire and triggered an explosive device, killing and injuring the passengers.  *Id.* at 1351–52.

The *Amedi* plaintiffs' claims were similar to the ones Plaintiffs bring here inasmuch as they claimed that the problem was manufacturing and that the MRAP "failed to meet the Government's specifications." *Id.* at 1356. Thus, they argued, there was no need to examine any military decisions to hold that the MRAP manufacturer made a defective product. *Id.* But as the district court recognized, "the matter is not so simple," *id.* at 1357, because the *Amedi* defendants would inevitably question the military decisions behind the fateful convoy: decisions about the formation, number of vehicles selected, route, and potential IED safeguards. *Id.* These questions went to whether a product defect was the sole cause of Amedi's death. *Id.* Importantly, the court also noted that the military decisions went as far back as when the military made decisions concerning the design and production of the vehicle/product in question, stating that "[i]n every aspect, even beyond the organization of the convoy on the day in question, this case would require the reexamination of military decisions." *Id.* It accordingly dismissed the nonjusticiable suit.

 Likewise, Lockheed Martin will have to question the military decisions behind the testing of the SPY-ID(V) radar—decisions regarding the location, timing, type of missile(s), which Navy

18

ships were involved, the Navy personnel involved, etc. These decisions would also go back to when the United States made choices concerning the design of the various systems operated with the SPY-ID(V) radar. These questions are relevant to whether the SPY-ID(V) radar was the proximate cause of TWA 800's crash. Ultimately, it would be impossible for the Court to decide the issues in this case without making an initial policy determination of a kind clearly for non-judicial discretion (the third *Baker* factor). And the court could not independently resolve these issues while simultaneously extending the Executive and Congress the respect due to a coordinate branch of government (the fourth *Baker* factor). The inextricable political question that Plaintiffs would force this Court to examine make this case nonjusticiable and subject to dismissal.

## CONCLUSION

For these reasons, whether based on the statute of limitations or the political question doctrine, Lockheed Martin respectfully requests that this Court dismiss all claims in Plaintiffs' Second Amended Complaint against Lockheed Martin in their entirety and with prejudice.

Dated this 16th day of December, 2022.

Respectfully submitted,

**WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER, LLP**

/s/ *William J. Katt*
William J. Katt (PHV)
william.katt@wilsonelser.com
John P. Loringer (PHV)
john.loringer@wilsonelser.com
David A. Frank II (PHV)
david.frank@wilsonelser.com
555 East Wells Street, Suite 1730
Milwaukee, WI 53202
414-276-8816

William T. Bogaert, BBO # 546321
william.bogaert@wilsonelser.com
260 Franklin Street, 14th Floor
Boston, MA 02110-3112
617-422-5300

Kathryn A. Grace (PHV)
kathryn.grace@wilsonelser.com
8444 Westpark Drive, Suite 510
McLean, VA 22102
703-852-7869

*Attorneys for Lockheed Martin Corporation*

## CERTIFICATE OF SERVICE

I, William J. Katt, hereby certify that, on, the foregoing document was filed through the ECF system, the document will be sent electronically to the registered participants, and paper copies will be served via first class mail on those indicated as non-registered participants.

/s/ *William J. Katt*
William J. Katt