UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RONALD KRICK, ET AL., | |
| Plaintiffs, | |
| v. | Civil Action No.: 1:22-CV-11032-AK |
| RAYTHEON COMPANY, ET AL., | |
| Defendants. | [Leave to File granted Feb. 2, 2023] |

**MEMORANDUM OF LAW IN SUPPORT OF THE
UNITED STATES OF AMERICA'S MOTION TO DISMISS**

The Court should dismiss Plaintiffs' Second Amended Complaint, ECF No. 33, for failure to state a claim. Plaintiffs' claims accrued the day Trans World Airlines Flight 800 (TWA 800) exploded in 1996 as it was objectively clear to a reasonable person that a wrongful act had occurred. At the latest, the claims accrued by the end of 1996 when the missile theory, with its potential connection to the Navy, circulated throughout the media and public. Plaintiffs, however, first submitted their administrative claim, a statutory prerequisite to filing suit, in October 2021, more than two decades after the expiration of the two-year limitations period in the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2401(b), 2675(a).

Plaintiffs plead no facts that justify tolling the two-year limitations period. Rather, the Second Amended Complaint establishes that Plaintiffs did nothing to pursue the missile claims for more than two decades until they were recently approached by Dr. Thomas Stalcup. Dr. Stalcup has long been skeptical of the government's conclusions regarding the cause of the explosion and has pursued

his skepticism through serial Freedom of Information Act (FOIA) litigation. As detailed below, Dr. Stalcup contended in various federal courts since at least June 2002 that a missile downed the aircraft and that numerous federal agencies conspired to cover it up. Dismissal is also warranted because, Plaintiffs' chosen venue is improper. *See* 28 U.S.C. §§ 1402(b), 1406(a).

## FACTUAL BACKGROUND

1. THE GOVERNMENT INVESTIGATION

On July 17, 1996, a Boeing 747 operated as TWA 800 exploded shortly after takeoff from New York's John F. Kennedy International Airport. Pls.' 2d Am. Compl. ¶¶ 2, 34, 36-37, ECF No. 33. On board were 230 passengers and crew en route to Paris, France; all of whom died. *See id.* ¶ 2; *see also Lahr. v. Nat'l Trans. Safety Bd.*, 569 F.3d 964, 969 (9th Cir. 2009). The National Transportation Safety Board (NTSB) and the Federal Bureau of Investigation (FBI) immediately launched an inquiry. Pls.' 2d Am. Compl. ¶¶ 38-39; *see also Stalcup v. C.I.A.*, No. CIV. 11-11250-FDS, 2013 WL 4784249, at *1 (D. Mass. Sept. 5, 2013), *aff'd*, 768 F.3d 64 (1st Cir. 2014). The NTSB's initial investigation focused on three possible causes: a bomb, *a missile*, or a mechanical failure; the FBI was involved because of potential criminal activity. *Stalcup*, 2013 WL 4784249, at *1; *see also Lahr*, 569 F.3d at 969.

As part of the investigation, the FBI spoke with 244 eyewitnesses. *Stalcup*, 2013 WL 4784249, at *1. These interviews were documented, *id.*, and eventually published on the NTSB's public docket on September 1, 2000.[1] Some

---

[1] Nat'l Transp. Safety Bd., Public Docket for DCA96MA070, https://data.ntsb.gov/Docket/?NTSBNumber=DCA96MA070

eyewitnesses reported seeing a "streak of light" rising up to the plane prior to the explosion, which led to the theory that a missile shot it down. *Id.*; *see also* Pls.' 2d Am. Compl. ¶¶ 41-43. Because of these reports, the FBI requested the assistance of the Central Intelligence Agency (CIA) to determine whether the observations supported a theory that a missile caused the crash. *Stalcup*, 2013 WL 4784249, at *1.

The CIA investigated and prepared an animation explaining its conclusions, which aired, in its entirety, on CNN on November 17, 1997. *Lahr v. Nat'l Transp. Safety Bd.*, 453 F. Supp. 2d 1153, 1163 n.5 (C.D. Cal. 2006), *aff'd in part, rev'd in part and remanded*, 569 F.3d 964 (9th Cir. 2009); *see also* Pls.' 2d Am. Compl. ¶¶ 47-49. The CIA concluded that what eyewitnesses perceived as a flare or streak of light was actually the aircraft in the process of crippled flight following an initial internal explosion. *Lahr*, 569 F.3d at 970. The CIA concluded that the explosion caused the front portion to separate from the aft majority of the plane. *Id.* The loss of mass dramatically lightened the weight on the engines, and propelled the already burning aircraft up into the sky. *Id.* The plane later erupted into a "fuel-fed fireball." *Id.*; *see also Stalcup*, 2013 WL 4784249, at *1. The CIA animation explicitly stated that what the eyewitnesses saw was "Not A Missile." Pls.' 2d Am. Compl. ¶ 49.

The government investigation continued through NTSB public hearings in December 1997 and August 2000. *Lahr*, 453 F. Supp. 2d at 1162. The latter coincided with the NTSB's release of its final report. Raytheon Company (RTX) Mot. Dismiss Ex. A, NTSB Rep., ECF No. 45-1. As Plaintiffs point out, the NTSB concluded that the explosion was caused by the ignition of flammable vapors

within the plane's center wing fuel tank. Pls.' 2d Am. Compl. ¶ 50. The "Factual Information" section of the report makes 97 references to the word "missile" or "missiles." RTX Ex. A, NTSB Rep. at 1 – 255. The report, and the almost 3,000 documents from the investigation are, and have been, publicly available, most since at least September 1, 2000.[2] *Lahr*, 569 F.3d at 971. This includes FBI summaries from over 700 eyewitness accounts. *Id*. The report includes multiple sections dedicated to recording and evaluating eyewitness statements, along with missile related information, and a missile visibility study. RTX Ex. A, NTSB Rep. 118-19, 237-54. Some of the witnesses whose statements were included in the report have publicly discussed how the CIA and NTSB conclusions do not accord with their memories. *Lahr*, 569 F.3d at 976.

2.  UNOFFICIAL INVESTIGATIONS AND EARLY FREEDOM OF INFORMATION ACT CASES ALLEGED A UNITED STATES MILITARY MISSILE DOWNED TWA 800 AND THE GOVERNMENT COVERED IT UP.

The Ninth Circuit, in an opinion from an early FOIA case, stated that the explosion sparked national and international media attention commensurate with such a dramatic and tragic event. *Id*. at 976-977; *see also* RTX Mem. Supp. Mot. Dismiss 14-15, ECF No. 44. The lower court that heard the initial case mused, "Of course there was an official investigation. And of course there was an official explanation. And of course there was an ensuing torrent of critics and skeptics who challenged the *bona fides* of the investigation and rejected the explanation." *Lahr*, 453 F. Supp. 2d at 1161. Along with the media coverage was

---

[2] Nat'l Transp. Safety Bd., Public Docket for DCA96MA070, https://data.ntsb.gov/Docket/?NTSBNumber=DCA96MA070

an ever increasing body of lawsuits and opinions, most of them FOIA related, publicly discussing theories about the explosion.

The first reported opinion discussing the activities of individuals outside of the government attempting to "learn the truth" about the cause of the explosion stems from a criminal case in the Eastern District of New York. *See United States v. Sanders*, 17 F. Supp. 2d 141 (E.D.N.Y. 1998). In that case two "journalists" were indicted for conspiring to remove parts of TWA 800 that were maintained in an evidence hangar during the government investigation. *Id.* at 143. From October 1996 through July 1997 the criminal defendants sought to obtain samples of a reddish-brown material from seat cushions which they believed would prove that "the *government was covering up* the fact that *the flight was downed by a Navy missile.*" *Id.* at 147 (emphasis added). Those assertions were published in April 1997 in a book by one of the criminal defendants called *The Downing of TWA Flight 800*. *Id.*; *see also* James Sanders, *The Downing of TWA Flight 800* (1997).

In September 1998, even before the NTSB Report was published, Graeme Sephton, an independent investigator, sent a FOIA request to the FBI for information related to foreign objects removed from the victim's bodies. *Sephton v. FBI*, 365 F. Supp. 2d 91, 93 (D. Mass. 2005), *aff'd*, 442 F.3d 27 (1st Cir. 2006). Sephton was part of an unofficial organization called the Flight 800 Independent Research Organization whose purpose was to conduct an "independent investigation into the crash." *Id.* at 92. Specifically, he was looking for information related to foreign bodies found in the victims that were of an "unknown origin," i.e., missile fragments. *Id.*

In May 2002, Accuracy in Media submitted FOIA requests to the NTSB in an attempt to find bad faith on the government's part in the conduct of the investigation. *Accuracy in Media, Inc. v. Nat'l Transp. Safety Bd.*, No. Civ. A.03-00024 (CKK), 2006 WL 826070, at *6 (D.D.C. Mar. 29, 2006). In court filings, the FOIA plaintiff was supported by a series of affiants, some of which were individuals associated with the government's investigation, along with eyewitnesses, who expressed the "collective opinion that there was an attempt to cover up the causes of the accident." *Id.* at *10.

In October 2003, Ray Lahr, a former airline pilot, filed over one hundred FOIA requests with the NTSB and CIA searching for information related to the animations aired on CNN in 1997. *Lahr*, 453 F. Supp. 2d at 1163. These were not Lahr's first FOIA requests. *Id.* Lahr's filings expressed his belief that TWA 800 was shot down by "an errant missile launched by the United States military." *Id.* at 1164; *see* Pls.' 2d Am. Compl. ¶¶ 4, 54 (referencing an "errant missile"). Further, Lahr contended that the investigation that followed was a "massive cover-up." *Lahr v. Nat'l Safety Trans. Bd.*, No. CV. 03-8023 AHM (AJWx), 2006 WL 2854314, at *2 (C.D. Cal. Oct. 4, 2006). The district court's minute entry on Lahr's fee petition noted that, by March 2007, TWA 800 had been the subject of nine books and over 2,000 newspaper articles. Ex. 1, *Lahr v. Nat'l Transp. Safety Bd.*, No. CV 03-8023 AHM (RZx) (C.D. Cal. Mar. 19, 2007), slip op. at 3. The court further noted that a Google search yielded over 147,000 webpage hits, and that Lahr intended on publishing the documents from his "investigation" on public websites. *Id.*

Lahr's lawsuit contains an itemization of the evidence he believed supported the missile and government cover-up theories: 1) evidence was withheld from the government probe; 2) the government altered evidence; 3) evidence was removed from the storage facility; 4) the government misrepresented radar data; 5) radar data and the flight recorder are missing; 6) underwater video of the evidence recovery has been altered; 7) the government concealed missile debris; 8) the NTSB did not permit eyewitness testimony at the public hearing; 9) eyewitnesses disagree with the CIA animation, and; 10) the FBI took over the investigation from the NTSB which should have been the proper lead agency. *Compare Lahr*, 453 F. Supp. 2d at 1164-66 *with* Pls.' 2d Am. Compl. ¶¶ 39-40, 42, 47, 84-85, 91-92.

Dr. Stalcup, whom the Second Amended Complaint extensively cites as the source of new evidence justifying this untimely lawsuit, submitted an affidavit in support of Lahr's litigation. He contended that the FBI admitted it recovered explosive materials in the aircraft debris and he alleged that four data points were deleted from radar where a missile trajectory should have been located. *Lahr*, 453 F. Supp. 2d at 1164 n.6, 1166 n.11.

3.  AS A FOIA PLAINTIFF IN HIS OWN RIGHT, DR. STALCUP ALSO ALLEGED THE GOVERNMENT COVERED UP A MISSILE STRIKE.

In March 2010, Dr. Stalcup issued a series of FOIA requests to the CIA, the Department of Defense (DoD), the Office of the Secretary of Defense, and the Missile Defense Agency. *Stalcup,* 2013 WL 4784249, at *2; *Stalcup v Dep't of Def.*, No. 13-11967-LTS, 2015 WL 5545059, at *1-2 (D. Mass. Sept. 18, 2015). In the FOIA cases that resulted, Dr. Stalcup argued that the government, and

specifically the CIA, NTSB, and FBI, were engaged in a cover-up and perpetrating a fraud on the public. *Compare Stalcup*, 2013 WL 4784249, at *5 *with* Pls.' 2d Am. Compl. ¶¶ 39, 47, 51.

The First Circuit, in the appeal of the CIA case, noted that Dr. Stalcup's arguments were "nearly identical" to the ones asserted by Lahr in the Ninth Circuit. *Stalcup v. CIA*, 768 F.3d 65, 69 (1st Cir. 2014). The First Circuit also noted that Dr. Stalcup was silent on how the documents requested "would shed any new light" on the alleged cover-up, and referenced an eyewitness who felt intimidated by investigators. *Id.* at 73; *see also* Pls.' 2d Am. Compl. ¶ 41 (witness allegedly threatened by FBI).

Dr. Stalcup's 2013 opposition to the CIA's motion for summary judgment demonstrates his long-held conviction—on which Plaintiffs now rely—that the government covered up evidence of a missile strike. Ex. 2, Pl. Op. Mot. Summ. J., Civ. No. 1:11-cv-11250. Dr. Stalcup claimed that he was already in the possession of enough information to produce a documentary concerning the explosion and the federal investigation that followed. *Id.* ¶ 1. Then he proceeded to lay out the breadth of his investigation which included reviewing the FBI interview summaries from the NTSB docket. *Id.* ¶ 5. His opposition continued with a lengthy explanation of the alleged conspiracy between the FBI and CIA in creating the animation that aired in 1997. *Id.* ¶¶ 7-12. It repeated statements and affidavits from eyewitnesses, including several with military backgrounds, regarding their observations of something rising up to meet TWA 800. *Id.* ¶¶ 19, 23-27, 29-30, 32-35. These eyewitnesses included Captain Chris Baur and Major Frederick Meyer, both of whom Plaintiffs' Second Amended Complaint explicitly

references. *See id.* ¶¶ 19, 35. In the later DoD case, Dr. Stalcup asserted that he had evidence regarding missile tests occurring off the East Coast. *Stalcup*, 2015 WL 5545059, at *4; *see* Pls.' 2d Am. Compl. ¶ 32.

In their Second Amended Complaint, Plaintiffs allege the following recently discovered evidence justifies their failure to timely file their administrative claim: 1) operational testing of a radar system was conducted in May 1996 which included firing a missile with a live warhead; 2) that a dozen missile tests were conducted off the East Coast in an unidentified location, during a poorly defined time period which appears to include the late 1990s; 3) FBI records discussing an original Navy radar tape existed; 4) a conversation with an unidentified alleged FBI official about aerial target drones operating in an unidentified area near TWA 800; 5) the FBI took custody of radar tapes from the Navy; and 6) the purported existence of another radar tape that showed details of the explosion. Pls.' 2d Am. Compl. ¶¶ 70, 82, 84, 86, 87, 89-92. As the above-stated facts demonstrate, and the below argument will support, none of this is actually "newly discovered" evidence; but rather is additional refinement of a theory that already existed in 1996 and that Dr. Stalcup advanced in FOIA cases during the 2000's and early 2010's.

**ARGUMENT**

1. THE SECOND AMENDED COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS' CLAIMS ARE BARRED BY THE FTCA'S TWO-YEAR STATUTE OF LIMITATIONS.

The United States, as sovereign, is immune from suit unless it has consented to be sued. *United States v. Mitchell*, 445 U.S. 535, 538 (1980). Conditions upon which the government consents to be sued must be given full force by a reviewing court. *Soriano v. United States*, 352 U.S. 270, 276 (1967); *see also Rakes v. United States*, 442 F.3d 7, 18 (1st Cir. 2006). Here Plaintiffs have pleaded the FTCA as their sole potential waiver of sovereign immunity.[3] *See* Pls.' 2d Am. Compl. ¶ 11.

The FTCA explicitly states that "[a] tort claim against the United States *shall be forever barred* unless it is presented in writing to the appropriate Federal agency *within two years after such claim accrues . . . .*" 28 U.S.C. § 2401(b); *see also Rakes*, 442 F.3d at 19 (emphasis added). Courts are free to neither extend nor narrow the authority provided in this provision. *Morales-*

---

[3] This Motion takes no position on whether Plaintiffs have pleaded the correct potential waiver of sovereign immunity. Codefendants' Motions both analyzed this issue under the Uniform Statute of Limitations for Maritime Torts, 46 U.S.C. § 30106, arguing admiralty jurisdiction applies. *See* RTX Mem. Supp. Mot. Dismiss 10-11, ECF No. 44, Lockheed Martin (LHM) Mem. Supp. Mot. Dismiss 7-8, ECF No. 42. If admiralty jurisdiction applies, the FTCA is not a proper waiver of sovereign immunity. *See Kozan v. United States*, 570 F. Supp. 1351, 1352 n.1 (N.D. Ill. 1983) (citing *Bearce v. United States*, 614 F. 2d 556, 558 n.4 (7th Cir. 1980)) (the FTCA and the Suits in Admiralty Act are mutually exclusive waivers of sovereign immunity); *see also* 46 U.S.C. § 30906, 28 U.S.C. § 2680(d). Even if analyzed under the Suits in Admiralty Act, 46 U.S.C. §§ 30901 – 30918, a waiver of sovereign immunity for certain admiralty claims, the Second Amended Complaint is untimely and should be dismissed. While the Suits in Admiralty Act lacks an administrative claim requirement it does contain a two-year statute of limitations. 46 U.S.C. § 30905; *Wilson v. United States Government*, 23 F.3d 559, 561 (1st Cir. 1994).

*Melecio v. United States (Dep't of Health & Hum. Servs.)*, 890 F.3d 361, 366-67 (1st Cir. 2018). Prior to the Supreme Court's ruling in *United States v. Kwai Fun Wong*, 575 U.S. 402 (2015), courts viewed the FTCA's statute of limitations as jurisdictional. *Morales-Melecio*, 890 F.3d at 367. However, since then, challenges based on the statute of limitations are viewed as an affirmative defense, and brought under Fed. R. Civ. P. 12(b)(6). *Id.*

The Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), mandate that, to survive a Rule 12(b)(6) motion, a complaint must state a "plausible" claim for relief. *Suren-Millan v. United States*, 38 F. Supp. 3d 208, 214 (D.P.R. 2013). The plausibility standard requires a complaint to contain factual allegations sufficient to support "the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Garcia-Catalan v. United States*, 734 F.3d 100, 103 (1st Cir. 2013)).

Under Rule 12(b)(6), the Court performs a two-step analysis in reviewing a complaint's sufficiency. *Ocasio-Hernandez v. Fortuno-Burset,* 640 F.3d 1, 12 (1st Cir. 2011). First, the Court must identify all legal conclusions or conclusory allegations, and disregard them. *Id.* Not all factual allegations should be given deference; factual allegations that are so "threadbare" that it is clear that the plaintiff is merely speculating about the fact are treated like conclusory allegations. *Suren-Millan*, 38 F. Supp. at 216 (quoting *Rodriguez-Vives v. Puerto Rico Firefighters Corps of Puerto Rico*, 743 F.3d 278, 286 (1st Cir. 2014)). Second, the Court must identify the non-conclusory factual allegations, and treat them as true even if seemingly incredible. *Ocasio-Hernandez,* 640 F.3d at 12. The

court then draws all reasonable inferences in the pleader's favor and determines whether the well-pled facts plausibly narrate a claim for relief. *Id.* In doing so, the Court must rely on "its judicial experience and common sense." *Id.* (quoting *Iqbal*, 556 U.S. at 679).

In reviewing a Rule 12(b)(6) motion, the Court may look beyond the complaint, to the "relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment." *Suren-Millan*, 38 F. Supp. 3d at 218 (quoting *Clorox Co. Puerto Rico v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 32 (1st Cir. 2000)). The Court may also include facts susceptible to judicial notice and concessions made in a plaintiff's response. *Id.* at 216 (citing *Arturet-Vélez v. R.J. Reynolds Tobacco Co.*, 429 F.3d 10, 13 n.2 (1st Cir. 2005)). Documents from prior judicial proceedings are public records, of which this Court can take judicial notice without converting a Rule 12(b)(6) motion into one for summary judgment. *Boateng v. InterAmerican Univ., Inc.*, 210 F.3d 56, 60 (1st Cir. 2000). This Court may also take judicial notice of the fact that a newspaper article was published. *In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, No. CIV.A. 14-13848-NMG, 2015 WL 3751422, at *3 (D. Mass. June 15, 2015) (citing *Garber v. Legg Mason Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009)).[4]

---

[4] The United States presents this Motion without the assistance of external facts that would necessitate review under Fed. R. Civ. P. 56. This Motion relies on facts 1) cited in the Second Amended Complaint, 2) documents integral to the complaint, i.e., the Factual Information section of the NTSB Report and CIA Animation that are mentioned several times in it, and 3) facts upon which the Court may take judicial notice. As to the latter, the United States requests the Court take judicial notice of the various plaintiffs' theories and facts expressed in

a.   Plaintiffs' claims accrued the day TWA 800 exploded.

Congress designed the two-year statute of limitations in the FTCA to
ensure that parties promptly present claims while evidence is fresh and so the
government may "rest easy after a period of time, knowing that suits for long-past
wrongs are barred." *Donahue v. United States*, 634 F.3d 615, 624 (1st Cir. 2011)
(quoting *Rakes*, 422 F.3d at 20). This protects the government from "the
unfairness of litigating stale claims encumbered by faded memories." *Sanchez v.
United States*, 740 F.3d 47, 57 (1st Cir. 2014).

Plaintiffs filed an administrative claim on October 4, 2021. *See* Ex. 3,
Admin. Claim. The claim was denied on December 28, 2021, *see* Ex. 4, Navy
Denial, and Plaintiffs filed suit exactly six months afterwards on June 28, 2022.
*See* Pls.' Compl., ECF No. 1; *see also Barrett ex. rel. Est. of Barrett v. United
States*, 462 F.3d 28, 37 (1st Cir. 2006) (plaintiff must file a complaint within six
months of final denial). Therefore, in order for Plaintiffs' Complaint to be timely,
Plaintiffs' cause of action must have accrued on or after October 4, 2019. As will
be shown, that is not the case.

Plaintiffs posit that they were not aware of the alleged connection between
their injury and the government misconduct until receiving a presentation from
Dr. Stalcup on April 15, 2021. *See* Pls.' 2d Am. Compl. ¶¶ 97-98. Plaintiffs allege
the information Dr. Stalcup presented was based on "hard-fought FOIA litigation,
which has now been pending for over ten years." *Id.* ¶ 96. While the Second

_____

documents previously filed with a court in prior TWA 800 cases, and court
opinions from those cases.

Amended Complaint alleges "newly discovered evidence," it is scant on details. *Id.* ¶¶ 5-6, 96-98. Completely absent are any factual allegations about what newly discovered evidence was presented to Plaintiffs that was inherently unknowable to them previously. Further, the Second Amended Complaint is silent as to steps taken by Plaintiffs to pursue their own investigations into the cause of this tragedy; rather, all that is discussed are the steps taken by non-related "experts." Plaintiffs omit the critical fact that, as stated by Codefendants, Plaintiffs previously sued Boeing, TWA, and Hydro-Aire (fuel system manufacturer) for the wrongful deaths of their decedents in a multi-district litigation venued in the Southern District of New York, where they were represented by counsel, and settled those actions decades ago. RTX Mem. Supp. Mot. Dismiss at 5-6, ECF No. 44; LHM Mem. Supp. Mot. Dismiss at 3, ECF No. 42.

> b. The general rule that claims accrue at the time of injury applies to airplane crash cases including this one.

Federal law determines when an FTCA cause of action accrues. *Rakes*, 442 F.3d at 19 n.7; *see also McLellan Highway Corp. v. United States*, 95 F. Supp. 2d 1, 11-13 (D. Mass. 2000). What constitutes the accrual of a cause of action is a question of law; however, when accrual occurs is typically a question of fact. *Duke v. Cmty. Health Connections, Inc.*, 355 F. Supp. 3d 49, 56 (D. Mass. 2019). Because the timing of accrual can be fact-intensive, courts typically resolve challenges based on the statute of limitations at summary judgment; however, a court can grant a motion to dismiss if "no set of facts would entitle a plaintiff to relief." *Id.* at 55-56 (quoting *Abdallah v. Bain Capital LLC*, 880 F. Supp. 2d 190, 198 (D. Mass. 2012)); *see also LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d

507, 509 (1st Cir. 1998) (granting a motion to dismiss on the basis of a limitations defense is appropriate when pleader's allegations leave no doubt claim is time-barred).

The general rule is that a tort claim accrues at the time of a plaintiff's injury. *Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir. 2002). Applied here, Plaintiffs' claims would have accrued the day of the explosion—July 17, 1996, meaning the statute of limitations would have run in 1998, approximately 23 years before Plaintiffs filed their administrative claims. Plaintiffs acknowledge this obvious challenge, but seek to extend the accrual date through application of the discovery rule, fraudulent concealment, equitable estoppel, or laches. *See* Pls.' 2d Am. Compl. ¶¶ 94-95, 100.

The Second Amended Complaint, however, does not plead facts that would establish the inapplicability of the general rule regarding accrual. The leading precedent concerning the accrual of claims under the FTCA comes from *United States v. Kubrick,* 444 U.S. 111 (1979). *See Hertz v. United States*, 560 F.3d 616, 618 (6th Cir. 2009). *Kubrick*, a medical malpractice case, applied an "inquiry-notice rule," which provides that an FTCA claim accrues when a plaintiff possesses enough information with respect to her injury that had she sought out expert advice at that point she would have been able to determine in the two-year period whether to file an administrative claim. *Id.* at 618. In medical malpractice (or other latent injury cases) where the actual injury, or its cause, may appear as simply natural, there is justification for the application of a discovery rule which would delay accrual beyond the date of the injury. *Id.* at 619. Where the event, such as a plane crash, would not so naturally occur there is no such basis. *Id.*

Airplane crash litigation does not turn on latent or unknowable causes, and it is almost always a result of negligence. For example, in *Hertz v. United States*, a case arising from the crash of an amateur-built aircraft, the plaintiff delayed filing a claim until two years and nine days after the accident. *Id.* at 617-18. The United States filed a motion to dismiss on statute of limitations grounds and the plaintiff opposed, arguing that her claim did not accrue until she was told by a government investigator, nearly a month after the accident, that there was likely air traffic controller negligence. *Id.* at 617. Had her claim accrued when she spoke with the investigator, rather than the day of the crash, the administrative claim would have been timely filed. *See id.* at 617-18. The Sixth Circuit found plaintiffs' delayed accrual argument unpersuasive and affirmed the district court's dismissal, reasoning that death caused by an airplane crash is categorically different from a latent injury/medical malpractice case as "[p]lane crashes by their nature typically involve negligence *somewhere* in the causal chain." *Hertz*, 560 F.3d at 619 (emphasis in original).

Likewise in *Ressler v. United States*, a case arising from a commercial airline crash, the district court dismissed plaintiffs' complaint as untimely. Civil Action No. 11-cv-02253, 2012 WL 4328662, at *3 (D. Colo. Sept. 20, 2012). In *Ressler*, the plane crashed in December 2008. The government received plaintiffs' claim two years and eight days after the crash. *Id.* at *2. Plaintiffs argued that their claim did not accrue on the day of the accident in 2008; but rather in April 2009 when they read in the NTSB factual report that the crash was caused by air traffic controller negligence; thereby making their claim timely. *Id.* The district court, favorably citing *Hertz*, concluded that the accrual did not await

16

Plaintiffs' awareness that their injury was suffered because of government negligence. *Id.* The district court charged plaintiffs with the responsibility of protecting themselves in a situation such as a plane crash, in seeking the advice of legal and subject matter experts to determine their rights. *See id.*

In yet another case, *Rademacher v. United States*, the district court was likewise unpersuaded by the proposed intervenors who argued that their claim did not accrue on the day of the accident but rather was delayed until later "discovery" of facts that only became apparent when the NTSB released transcripts of pilot-air traffic controller communications. Ex. 5, 3:19-cv-00157-TSL-RHW (N.D. Miss. Mar. 19, 2020), slip op. at 11-12. The proposed intervenors asserted that they conducted a "reasonable investigation" but detrimentally relied on a preliminary NTSB report, which stated that the pilot reported a mechanical problem prior to the crash and did not mention air traffic controller negligence as a potential cause. *Id.* at 3, 10. In denying their motion to intervene in an FTCA suit that other affected plaintiffs timely filed and which alleged air traffic control negligence, the district court observed that the proposed intervenors offered no factual evidence of the specific steps they took in conducting their investigation and concluded that they did little to no investigation at all. *Id.* at 10.

The explosion of TWA 800 was certainly no less apparent than the crashes in *Hertz*, *Ressler*, or *Rademacher*. Major networks broadcasted the explosion as breaking news and major newspapers headlined it the following day. The investigation that followed was documented step-by-step by journalists, with numerous press conferences held by the FBI and NTSB expressing information about it. Pl. 2d Am. Compl. ¶¶ 47, 50. The midflight explosion of a commercial

airliner cannot be classified as a latent injury that Plaintiffs were unaware of at the time. Any reasonable person would have concluded, as expressed in *Hertz, Ressler*, and *Rademacher*, that some form of negligence played a role in causing it. Therefore, Plaintiffs were charged on that day with the responsibility of obtaining legal and expert advice in order to protect their rights. Plaintiffs saw it this way as well, as all of the victims on whose behalf a claim is brought here, also retained counsel, sued other entities, and settled their claims decades ago. RTX Mem. Supp. Mot. Dismiss 5–6. Nowhere within the Second Amended Complaint do Plaintiffs state that they were dissatisfied with the service provided by their prior counsel or were ineffectively represented in the prior multi-district litigation. Therefore, Plaintiffs' October 4, 2021-submission of an administrative claim was untimely because their claims accrued in 1996, and the Second Amended Complaint should be dismissed.

c.  The discovery rule does not ameliorate Plaintiffs' failure to timely file an administrative claim.

The Second Amended Complaint lacks the factual basis to justify the extreme measure of delaying the accrual date of a very public tragedy by over 20 years. The First Circuit has ruled that the discovery rule may apply to wrongful death cases involving latent injuries, beyond medical malpractice, where the injury or its cause are inherently unknowable at the time. *Skwira v. United States*, 344 F.3d 64, 74 (1st Cir. 2003); *see also Donahue*, 634 F.3d at 623 (discovery rule protects plaintiffs who are blamelessly unaware, but when it applies the delay is not indefinite).

18

"The factual basis of a claim is inherently unknowable when . . . there are no facts discoverable through the exercise of reasonable diligence which would permit a plaintiff to reasonably believe that her injury is connected with some act of the government." *Skwira*, 344 F.3d at 81 (internal quotation omitted). A determination of whether something is inherently unknowable is an objective one. *Gonzalez*, 284 F.3d at 288-89.

When applying the discovery rule in an FTCA context, a court looks to a plaintiff's knowledge of 1) the fact of an injury; and 2) the injury's causal connection with the government. *Skwira*, 344 F.3d at 77. The explosion of TWA 800 was open and obvious. Therefore, Plaintiffs knew of their injury at the time of the explosion on July 17, 1996, and application of the discovery rule to that component is inappropriate. *Donahue*, 634 F.3d at 625–27 (murder committed by former FBI informants was open and obvious while causal connection to the government was revealed by widespread news coverage of testimony). To the extent the Second Amended Complaint asserts that Plaintiffs were unaware of their injury until April 15, 2021, those contentions strain credibility. *See* Pls.' 2d Am. Compl. ¶ 98. The focus must turn to the connection between the injury and the government.

Under the discovery rule, plaintiffs are required to be reasonably diligent in the pursuit of their case. Plaintiffs may not bury their heads in the sand—the law will impute awareness of knowledge that they would have uncovered had they undertaken an inquiry. *Skwira*, 344 F.3d at 77; *see also Gonzalez*, 284 F.3d at 289 (a limitation period begins to run regardless of whether a plaintiff makes an inquiry or whether they are correctly advised). A "hunch, hint, suspicion or

rumor" is insufficient to trigger accrual; however, such beliefs do give rise to a

duty to inquire further and to exercise due diligence. *Rakes*, 442 F.3d at 23. The

limitations period is not designed for a plaintiff to dither about the decision to

sue after learning negligence is present; but rather to gather evidence and confer

with experts to determine whether negligence is likely. *Morales-Melecio*, 890

F.3d at 369-70; *Donahue*, 634 F.3d at 626 (irrefutable proof is not required only

enough information to lead a reasonable person to seek professional advice);

*Skwira*, 344 F.3d at 75 (Congress did not intend "accrual of a claim must await

awareness by the plaintiff that his injury was negligently inflicted.") (quoting

*Kubrick*, 444 U.S. at 123).

Plaintiffs have a burden to investigate a matter if they have "some reason

to suspect foul play." *Camerano v. United States*, 196 F. Supp. 3d 172, 178 (D.

Mass. 2016), *aff'd*, 855 F.3d 15 (1st Cir. 2017). That burden is even greater in

wrongful death cases. *Id*. The First Circuit has charged the district courts with the

following analysis in evaluating a plaintiff's awareness: 1) determine what

generally available information about the relevant facts should a plaintiff be

charged with knowing; 2) if a plaintiff knew at least that much should they have

inquired further; and 3) what that further investigation would have revealed.

*Rakes*, 442 F.3d at 20. The United States is not entitled to expect Plaintiffs would

read every news story or watch every broadcast from every local media outlet;

however, "the government [is] entitled to expect that, through the channels of

communication that run among people connected through ties of neighborhood,

community, friendship, and family, the general purport of . . . important and

widely circulated articles would become known to people in [Plaintiffs']

positions." *Id. at 23*. This expectation is especially warranted when information achieves not just a local level but an international level of notoriety through its "headline-grabbing nature or its wide circulation." *Donahue*, 634 F.3d at 624. Under those circumstances, knowledge of publicized facts "can fairly be ascribed to prospective plaintiffs." *Id.*

As detailed in the factual background above, the major tenets of Plaintiffs' missile and government cover-up theory are not new. In fact, the missile theory and its alleged connection to the United States government, specifically the Navy, have been circulating since 1996. The coverage of this tragedy was orders of magnitude greater, broader, and deeper than what was present in the FBI informant or healthcare cases cited in this section. In those instances the courts were asked to evaluate discreet newspapers and determine their market share within relevant communities. Here, the Court need not engage in such a review as the media coverage was not just regional or national, but international and inescapable. In addition, coverage of the accident and investigation played out in depth over an extended period of time and resulted in a very public paper trial.

Allegations of a missile strike were so pervasive and well-documented that they motivated private citizens, Dr. Stalcup included, who had no connection with this tragedy, to engage in their own "investigations." This included undertaking actions that were illegal, in stealing evidence from a government facility, or incredibly time consuming and expensive in writing books, producing documentaries and engaging in decades long FOIA litigation.

Plaintiffs' allegations in the Second Amended Complaint that newly discovered evidence warrants the extreme measure of tolling the statute of

limitations for over 20 years are unpersuasive. Viewing the factual allegations of the alleged new evidence as true, the Court is left with what can be described, at best, as additional evidence of Plaintiffs' long-known missile theory. There is simply nothing in the pleading which demonstrates newly discovered evidence of a cause of action that was inherently unknowable until just recently. Dr. Stalcup's allegation that the military performed missile testing off the East Coast in 1996 was expressed in 2015 during his FOIA case. *See Stalcup*, 2015 WL 5545059, at *1. The best Plaintiffs can muster is the hearsay statement of an anonymous purported FBI official regarding aerial target drones. Pls.' 2d Am. Compl. ¶ 86. Based on the above analysis, there is no newly discovered evidence that would mandate the application of the discovery rule, much less such that would extend the accrual date until October 2019.

    d.  Plaintiffs' allegations do not support application of the fraudulent concealment doctrine.

      A court may only toll the statute of limitations under the doctrine of fraudulent concealment where two conditions are met: 1) the defendant must have engaged in fraud or deliberate concealment of material facts related to the wrongdoing; and 2) the plaintiff was not able to discover the concealment during the limitations period despite the exercise of due diligence. *Gonzalez*, 284 F.3d at 292 (citing *Demars v. General Dynamics Corp.*, 779 F.2d 95, 97 (1st Cir. 1985)). A plaintiff who does not exercise due diligence in the pursuit of a claim will not be able to benefit from tolling. *Gonzalez*, 284 F.3d at 292 (citing *Truck Drivers & Helpers Union, Local No. 170 v. NLRB*, 993 F.2d 990, 998 (1st Cir. 1993)).

A plaintiff must plead with particularity both the circumstances surrounding the concealment and their facts showing their due diligence trying to uncover the facts. *Callahan v. United States*, 337 F. Supp. 2d 348, 367 (D. Mass. 2004), *aff'd*, 426 F.3d 444 (1st Cir. 2005). The pleading particularity required should "include the time, place and content of the false or fraudulent representations made by the defendant." *Iconics, Inc. v. Massaro*, No. CV 11-11526-DPW, 2016 WL 199407, at \*7 (D. Mass. Jan. 15, 2016) (citing *Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 189-90 (1st Cir. 2006)).

Not all government conduct may count as a potential source of fraudulent concealment. *Callahan*, 337 F. Supp. 2d at 367. In order to count, the conduct "must consist of affirmative acts or representations which are calculated to, *and in fact do, prevent the discovery of the cause of action.*" *Id.* (quoting *Gonzalez-Bernal v. United States*, 907 F.2d 246, 250 (1st Cir. 1990)) (emphasis in original). This action by a defendant must be "some trick or contrivance tending to exclude suspicion and prevent inquiry." *Schwartz v. Indep. Appraisals, LLC*, No. CIV.A. 11-11051-RGS, 2001 WL 5593108, at \*5 (D. Mass. Nov. 17, 2011) (citing *Rx.com v. Medco Health Solutions, Inc.*, 322 F. App'x 394, 398 (5th Cir. 2009)). Even if such actions were taken, a plaintiff does not benefit automatically and perpetually from a stopped clock for statute of limitations purposes. Rather, a plaintiff seeking to invoke the doctrine must continue to pursue all reasonable avenues of inquiry and cannot abandon an investigation if one source of information is unproductive. *Callahan*, 337 F. Supp. 2d at 368.

Once a plaintiff ceases to diligently pursue an investigation the clock again starts running. *Id.* Especially if a plaintiff disbelieves or should disbelieve a

defendant's statements. *Id.* Or, where there are "sufficient storm warnings to alert a reasonable person to the possibility that there were either misleading statements or significant omissions involved." *Iconics*, 2016 WL 199407, at *7 (citing *J. Geils Band Employee Ben. Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1255 (1st Cir. 1996)).

As detailed above, assuming Plaintiffs' claims are true that the NTSB, CIA, and FBI lied about the cause and engaged in a massive cover-up of the deaths of 230 people, the facts do not support the application of the fraudulent concealment doctrine. Nothing in the Second Amended Complaint indicates any reasonable diligence on Plaintiffs' part. There are no facts pleaded that show the Plaintiffs engaged in any activity after July 1996 to investigate the "missile theory" cause of their injuries or why their own retained counsel, at that time, did not pursue it. Rather, the pleading leaves only the conclusion that Plaintiffs did nothing until approached by Dr. Stalcup who had been contending in court for over a decade that the government had been falsely reporting the cause of the explosion and covering up evidence of a missile strike.

The Second Amended Complaint sets forth no allegations of specific government statements regarding the cause of the explosion since the August 2000 NTSB Report. In fact, the only statements in the Second Amended Complaint that could be considered fraudulent, again viewing Plaintiffs' allegations as true, are the CIA animation, several press conferences, the NTSB report, and potentially some communications from the NTSB Office of Families, the substance of which are not detailed. *See* Pls.' 2d Am. Compl. ¶¶ 47, 50. These

communications took place more than 21 years before Plaintiffs submitted their administrative claim.

Since the NTSB released its allegedly false report, TWA 800 has hardly fallen out of public discourse or faded from collective memory. As stated above, there has been a long-running current of litigation regarding the cause of the explosion, the majority of it led by individuals seeking to expose an alleged widespread government cover-up involving large federal agencies and with salacious claims. Beyond the actions of these "truth seekers" are the publicly available FBI witness summaries and statements from eyewitnesses made to the media. These include eyewitnesses who have spoken publicly about how the CIA animation and the NTSB report did not accord with their observations regarding the flare or streak of light they saw on July 17, 1996. Were any of these lawsuits, media stories, or individuals to be credited, Plaintiffs absolutely should have been on notice that their beliefs based on the allegedly fraudulent reports were no longer justified. A reasonable person charged with notice of such facts would have been required to reevaluate their beliefs and seek professional advice.

     e.  Federal law prohibits Plaintiffs from relying on the NTSB's conclusion of the accident's probable cause as a basis for tolling the statute of limitations.

The Court should not toll the statute of limitations—under a fraudulent concealment theory, equitable estoppel, or otherwise—on the grounds that the NTSB Report's conclusion as to the cause of the TWA 800 explosion misled Plaintiffs or covered up evidence of a missile strike. Congress has directed that "no part of a report of the Board, related to an accident or investigation of an accident, may be admitted into evidence or used in a civil action for damages

resulting from a matter mentioned in the report." 49 U.S.C. § 1154(b). NTSB investigations are "fact-finding proceedings" and are not "conducted for the purpose of determining the rights or liability of any person." 49 C.F.R. § 831.4.

Courts have recognized that Congress has taken great care to separate NTSB investigations from civil litigation in order to prevent the Board's resources from being diverted from its principal mission and to protect its internal decision-making from controversy. *Chiron Corp. v. Nat'l Trans. Safety Bd.*, 198 F.3d 935, 940-42 (D.C. Cir. 1999) ("The simple truth here is that NTSB investigatory procedures are not designed to facilitate litigation, and Congress has made it clear that the Board and its reports should not be used to the advantage or disadvantage of any party in a civil lawsuit. In our view, this congressional mandate could not be clearer."). The Sixth Circuit has explained that "[t]he primary thrust behind the statute making the National Transportation Safety Board's reports of accidents inadmissible in actions arising out of such accidents is to exclude reports that express agency views as to the probable cause of the accident, a finding that should be the province of the jury or factfinder." *Hickson Corp. v. Norfolk S. Ry. Co.*, 124 F. App'x 336, 340 (6th Cir. 2005).

Accordingly, federal courts do not permit plaintiffs to rely upon the conclusions of the NTSB as a basis for their causes of action. *See, e.g., Knous v. United States*, 981 F. Supp. 2d 1365, 1367 (N.D. Ga. 2013) (barring plaintiffs from referencing in their FTCA complaint for damages the NTSB's conclusion that the air traffic controllers' failure to report weather information to the pilots caused the crash); *Echevarria v. Caribbean Av. Maint. Corp.*, 839 F. Supp. 2d 464, 466 (D.P.R. 2012) (NTSB reports containing the probable cause of an accident are

inadmissible under 49 U.S.C. § 1154(b)). This Court, likewise, should not permit Plaintiffs to use the NTSB's conclusion as to the cause of the TWA 800 explosion as a basis for tolling the statute of limitations.

f. Plaintiffs' allegations do not support application of equitable estoppel or laches.

Plaintiffs' Second Amended Complaint also alleges equitable estoppel and laches in the summary paragraph of the "tolling of the statute of limitations" section. No allegations provide justification or a basis for equitable estoppel or laches. The Court should give no weight to either conclusory allegation. That being said the Second Amended Complaint does not support either principle on their merits.

Equitable estoppel is applicable *when a plaintiff knows of her cause of action* but reasonably relies on the defendant's conduct or statements in failing to bring a suit. *Ramirez-Carlo v. United States*, 496 F.3d 41, 48 (1st Cir. 2007) (citing *Vistamar, Inc. v. Fagundo-Fagundo*, 430 F.3d 66, 73 (1st Cir. 2005). As a predicate matter, the application of equitable estoppel has only been applied against the government in "exceptional situations" that the First Circuit has referred to as "hen's-teeth rare." *Holloway v. United States*, 845 F.3d 487, 493 n.5 (1st Cir. 2017). Plaintiffs bear the burden of showing 1) that the United States made a definite misrepresentation of fact to Plaintiffs having reason to believe that Plaintiffs would rely upon it; 2) that Plaintiffs relied upon that misrepresentation to their detriment; and 3) that the reliance was reasonable, in that Plaintiffs' did not know that the conduct was misleading. *Ramirez-Carlo*, 496 F.3d at 49 (citing *Heckler v. Comty. Health Serv.,* 467 U.S. 51, 59 (1984)). In

addition, Plaintiffs must demonstrate that the United States engaged in "affirmative misconduct." *Ramirez-Carlo*, 496 F.3d at 49 (citing *Dantran v. U.S. Dep't . of Labor*, 171 F.3d 58, 67 (1st Cir. 1999)). Affirmative misconduct requires either a misrepresentation or concealment of a "material fact by the government although it does not require that the government intended to mislead a party." *Id.* at 49.

Equitable estoppel is not an appropriate basis under which the expiration of the statute of limitations may be estopped in this case because it requires a plaintiff be aware of her cause of action but chose not to pursue it because of misrepresentations by a defendant. *Ramirez-Carlo*, 496 F.3d at 48. Plaintiffs claim that they were not aware of their cause of action until notified by Dr. Stalcup on April 21, 2021. Pls.' 2d Am. Compl. ¶ 97. Further, they provide no misrepresentation by the United States subsequent to April 21, 2021, which caused Plaintiffs to delay filing their administrative claim. Plaintiffs filed their claim on October 4, 2021, within two years of the pleaded conversation with Dr. Stalcup, which indicates that they misunderstand the mechanics of equitable estoppel.

The absence of a timely misrepresentation by the United States is fatal to the application of equitable estoppel. Without a definitive misrepresentation that caused them to delay filing their administrative claim after Dr. Staclup made them aware of their cause of action, the Court has nothing to address to determine if there was detrimental reliance, that it was reasonable, or that there was affirmative misconduct. Therefore, equitable estoppel does not save this untimely lawsuit.

Plaintiffs also plead laches as a basis for tolling the statute of limitations. Pls.' 2d Am. Compl. ¶ 100. Plaintiffs appear to misunderstand that laches is an affirmative defense under Fed. R. Civ. P. 8(c)(1), and is not a doctrine that protects plaintiffs who fail to timely file a complaint. Courts of equity developed laches to protect *defendants* against "unreasonable, prejudicial delay in commencing suit." *SCA Hygiene Prod. Aktibolag v. First Quality Baby Prod., LLC*, 580 U.S. 328, 333 (2017). It serves a similar function as a statute of limitation. *Id*. at 334. In contemporary practice laches is a gap-filling doctrine; but where an express statute of limitations exists, like here, there is no gap to fill and thus the doctrine is not applicable. *Id*. at 335. The Court need not further consider this matter.

2.  PLAINTIFFS' SECOND AMENDED COMPLAINT SHOULD BE DISMISSED FOR IMPROPER VENUE.

Under Fed. R. Civ. P. 12(b)(3) a defendant may move to dismiss a complaint for improper venue. *See* 28 U.S.C. § 1406(a). The burden to establish proper venue falls on Plaintiffs. *Berklee Coll. Of Music, Inc. v. Music Indus. Educators, Inc.*, 733 F. Supp. 2d 204, 211 n.49 (D. Mass. 2010). The standard for the Court in ruling on a Rule 12(b)(3) motion is similar to that stated above for a Rule 12(b)(6) motion. *Universal Trading & Inv. Co. v. Bureau of Representing Ukrainian Interest in Int'l & Foreign Cts.*, 898 F. Supp. 2d 301, 317 (D. Mass. 2012); *see also Stars for Art Prod. FZ, LLC v. Dandana, LLC*, 806 F. Supp. 2d 437, 444 (D. Mass. 2011) (well-pleaded allegations bearing on venue are taken as true). Where there are multiple defendants, venue must be proper as to each. *Stars for Art Prod.*, 806 F. Supp. 2d at 447 (citing *Sullivan v. Tagliabue*, 785 F.

Supp. 1076, 1082 (D.R.I. 1992)). If venue is improper, the Court must dismiss or transfer the case. *Stars for Art Prod.*, 806 F. Supp. 2d at 448-49.

Plaintiffs have pleaded the FTCA as the applicable waiver of sovereign immunity.[5] *See* Pls.' 2d Am. Compl. ¶ 12. Under the FTCA, venue lies only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred." *See* 28 U.S.C. § 1402(b). The Second Amended Complaint lays out the state of residence for each Plaintiff—Missouri, California, Kansas, Georgia, and New Jersey. *See* Pls.' 2d Am. Compl. ¶¶ 15-27. Massachusetts is not listed. As none of the Plaintiffs reside in Massachusetts, the only proper basis for venue in the district would be if the act or omission complained of occurred therein. Plaintiffs' allegations make no such claim.

Plaintiffs' Second Amended Complaint arises from events that occurred within twelve minutes of takeoff from New York while the aircraft was off the coast of Long Island, New York, over the Atlantic Ocean. *See id.* ¶ 2. Plaintiffs allege that the explosion was the result of "an errant United States missile fired at aerial target drones flying nearby." *See id.* ¶ 4. The location of those aerial targets is again restated in the Second Amended Complaint as off the coast of New York. *See id.* ¶ 5. While the Second Amended Complaint does not allege the location from which the alleged missile was launched, it is replete with references to

---

[5] Even if analyzed under the Suits in Admiralty Act, the result would be no different. That Act, like the FTCA, has a specific venue provision, making venue appropriate 1) where the plaintiff resides; or 2) where the vessel or cargo is found. *See* 46 U.S.C. § 30906. Neither provision places venue appropriately in Massachusetts.

geographical locations in New York and New Jersey, but not Massachusetts. *See id.* ¶¶ 33-36.

The United States acknowledges that generally the course of action would be for the Court to transfer the case to an appropriate jurisdiction rather than to outright dismiss. *Stars for Art Prod.*, 806 F. Supp. 2d at 449. However, as shown above, the statute of limitations has long expired. As such, transfer to a new venue would be futile. Therefore, the United States respectfully requests the Court find venue inappropriate in Massachusetts and dismiss the Second Amended Complaint with prejudice.

## CONCLUSION

For the above-stated reasons, the United States respectfully requests the Court dismiss Plaintiffs' Second Amended Complaint with prejudice.

DATED: February 7, 2023

> Attorneys for Defendant
> UNITED STATES OF AMERICA
>
> Respectfully submitted,
>
> RACHAEL S. ROLLINS
> United States Attorney
> District of Massachusetts
>
> /s/ Robert Kelly
> ROBERT KELLY
> Trial Attorney
> Torts Branch, Civil Division
> U. S. Department of Justice
> RAYFORD A. FARQUHAR
> Assistant United States Attorney
> District of Massachusetts
> P.O. Box 14271
> Washington, D.C. 20044-4271
> (202) 616-4031
> Robert.Kelly@usdoj.gov

31

**CERTIFICATE OF SERVICE**

I hereby certify that on February 7, 2023, I filed the foregoing documents with the Clerk of the Court using the CM/ECF system. Notice of the filing will be sent electronically all counsel of record.

/s/ Robert Kelly
ROBERT KELLY
Trial Attorney
U. S. Department of Justice