# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **RONALD KRICK, Individually and on Behalf of the Estate of Oliver Krick; MARGARETA KRICK; CHRISTOPHER KRICK; DOUGLAS KEVORKIAN, Individually and on Behalf of the Estate of Ralph Kevorkian; LISA MICHELSON, Individually and on Behalf of the Estate of Yonatan Rojany; ERIC ROJANY; JODELLE GEARON, Individually and on Behalf of the Estate of Daniel Gaetke; TODD GAETKE; CRAIG GAETKE; WANDA KEMP, Individually and on Behalf of the Estates of O. Lamar Allen and Ashton Allen; CHRISTINE GROGAN; EILEEN ZAHARIOUDAKIS, Individually and Behalf of the Estate of Donald Gough; and MICHAEL DETERESA,**<br><br>       **Plaintiffs**<br>v.<br><br>**RAYTHEON COMPANY; LOCKHEED MARTIN CORPORATION; UNITED STATES; and DOES 1 through 20, inclusive,**<br><br>       **Defendants.** | **Judge: Hon. Angel Kelley**<br><br>**Case No. 1:22-cv-11032-AK**<br><br><br>**[Leave to file granted on Feb. 2, 2023]** |

## PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS RAYTHEON COMPANY AND LOCKHEED MARTIN CORPORATION'S MOTIONS TO DISMISS AND REQUEST FOR ORAL ARGUMENT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................................................... i

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

II.     RELEVANT FACTS ................................................................................................ 4

        A.      The Crash ..................................................................................................... 4

        B.      The Coverup ................................................................................................. 4

        C.      The MDL Aviation Litigation Against Boeing and TWA ............................. 6

        D.      FOIA Litigation Relating to TWA 800 ......................................................... 6

III.    LEGAL STANDARD ............................................................................................. 9

IV.     THE STATUTE OF LIMITATIONS IS TOLLED BY THE DISCOVERY
        RULE AND FRAUDULENT CONCEALMENT DOCTRINE .............................. 10

        A.      Plaintiffs have alleged facts—including active concealment of
                evidence by the federal government—warranting the application of
                the discovery rule......................................................................................... 11

        B.      Plaintiffs have sufficiently alleged fraudulent concealment. ..................... 16

V.      PLAINTIFFS' CLAIMS AGAINST THE CONTRACTOR DEFENDANTS
        ARE JUSTICIABLE ............................................................................................. 19

        A.      The governing legal standard is exceedingly high where there is no
                discovery. .................................................................................................... 19

        B.      Plaintiffs' claims do not require adjudication of matters
                constitutionally committed to coordinate branches of government. ......... 21

        C.      Tort law, statutes, and regulations provide clear judicial standards
                upon which this Court can rely ................................................................... 25

        D.      Plaintiffs' claims do not involve an initial policy determination of non-
                judicial discretion. ...................................................................................... 32

        E.      The three remaining Baker factors are inapplicable. ................................. 33

        F.      The Contractor Defendants' potential defenses are not dispositive........... 33

        G.      It would be premature to dismiss Plaintiffs' case without allowing any
                discovery. .................................................................................................... 34

VI.     CONCLUSION ..................................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Air Crash Off Long Island, New York*,
   209 F.3d 200 (2d Cir. 2000) ...................................................................................6

*Aktepe v. U.S.*,
   105 F.3d 1400 (11th Cir. 1997) ...................................................................26, 27, 34

*Alvarez-Mauras v. Banco Popular of Puerto Rico*,
   919 F.3d 617 (1st Cir. 2019) ...................................................................................17

*Amedi v. BAE Systems, Inc.*
   782 F. Supp. 2d 1350, 1357 (N.D. Ga. 2011) .......................................................33

*In re Animation Workers Antitrust Litig.*,
   123 F. Supp. 3d 1175 (N.D. Cal. 2015) .................................................................18

*Arakaki v. Lingle*,
   477 F.3d 1048 (9th Cir. 2007) ................................................................................20

*In re Atl. Fin. Mgmt., Inc. Sec. Litig.*,
   718 F. Supp. 1003 (D. Mass. 1988) .......................................................................17

*Attallah v. United States*,
   955 F.2d at 780...........................................................................................................12

*Baker v. Carr*
   369 U.S. 186, 217 (1962).........................................................................................20

*Blackstone Realty LLC v. F.D.I.C.*,
   244 F.3d 193 (1st Cir. 2001)..............................................................................10, 16

*Carmichael v. Kellog, Brown & Root, Inc.*,
   572 F.3d 1271, 1283 ................................................................................................27

*Carmichael v. Kellog, Brown & Root, Inc.*,
   450 F. Supp. 2d 1373...........................................................................................27, 34

*Carpenter v. Sikorsky Aircraft Corp.*,
   101 F. Supp. 3d 911 (C.D. Cal. 2015)....................................................................32

*Est. of Castucci ex rel. Castucci v. United States,*
   311 F. Supp. 2d 184 (D. Mass. 2004)...........................................................................15

*Cook v. Avien, Inc.,*
   573 F.2d 685 (1st Cir. 1978)......................................................................................17

*Custer County Action Ass'n v. Garvey,*
   256 F.3d 1024 (10th Cir. 2001) ..............................................................................3, 29

*Druker v. Sullivan,*
   334 F. Supp. 861 (D. Mass. 1971) ...........................................................................10

*E.E.O.C. v. Peabody Western Coal Co.,*
   400 F.3d 774 (9th Cir. 2005) ....................................................................................20

*Bennett ex rel. Est. of Bennett v. F.B.I.,*
   278 F. Supp. 2d 104 (D. Mass. 2003).....................................................................12, 14

*Getz v. Boeing Co.,*
   2008 WL 2705099 (N.D. Cal. 2008) ........................................................................32

*Gilligan v. Murphy,*
   413 U.S. 1 (1973)............................................................................................. *passim*

*Hishon v. King & Spalding,*
   467 U.S. 69 (1984)...................................................................................................10

*Hospital Bldg. Co. v. Trustees of Rex Hosp.,*
   425 U.S. 738 (1976).................................................................................................10

*Iantosca v. Benistar Admin. Services, Inc.,*
   No. 08-11785, 2009 WL 2382750 (D. Mass. July 30, 2009) ...................................9

*Japan Whaling Ass'n. v. Am. Cetacean Soc.,*
   478 U.S. 221 (1986).................................................................................................19

*Kadic v. Karadzic,*
   70 F.3d 232 (2d Cir. 1995) .......................................................................................33

*In re KBR, Inc., Burn Pit Litigation*
   925 F. Supp. 752, 765 (D. Md. 2013), rev'd by 744 F.3d 326..................................33

*Kennedy v. Josephthal & Co.,*
   814 F.2d 798 (1st Cir. 1987).....................................................................................17

*Klinghoffer v. S.N.C. Achille Lauro,*
    937 F.2d 44 (2d Cir. 1991) ...................................................................................21

*Koohi v. U.S.,*
    976 F.2d 1328 (9th Cir. 1992) .................................................................19, 23, 24

*Laird v. Tatum*
    408 U.S. 1 (1972).................................................................................................23, 31

*Lessin v. Kellog, Brown & Root,*
    2006 WL 3940556 (S.D. Tex. 2006) ...................................................................20

*Limone v. United States,*
    336 F. Supp. 2d 18 (D. Mass. 2004)..............................................................12, 19

*McCay v. U.S.,*
    703 F.2d 464 (10th Cir. 1983) .............................................................................24

*McIntyre v. United States,*
    367 F.3d 38 (1st Cir. 2004)..............................................................................12, 16

*McMahon v. General Dynamics Corp.,*
    933 F. Supp. 2d 682 (D.N.J. 2013) .....................................................................32

*McMahon v. Presidential Airways, Inc.,*
    460 F. Supp. 2d 1315 (M.D.Fla. 2006), *aff'd*, 502 F.3d 1331 (11th Cir.
    2007) ......................................................................................................25, 33, 34

*In re Nazi Era Cases Against German Defendants Litig.,*
    129 F. Supp. 2d 370 (D.N.J. 2001) .....................................................................20

*Nollet, et al v. Justices of the Trial Court of Mass.,*
    83 F. Supp. 2d 204 (D. Mass. 2000)....................................................................10

*Norwood v. Raytheon Co.,*
    455 F. Supp. 2d 597 (W.D. Texas 2006).......................................................26, 32

*Ouellette v. Beaupre,*
    977 F.3d 127 (1st Cir. 2020).........................................................................11, 12, 13

*Peterson v. U.S.*
    673 F.2d 237, 238 ..................................................................................................30

*Rodriguez v. General Dynamics Armament and Technical Products, Inc*
    696 F. Supp. 2d 1163, 1185....................................................................................32

*Rotella v. Wood,*
    528 U.S. 549 (2000)............................................................................................15

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974)..................................................................................21, 22, 24

*Sephton v. F.B.I.,*
    365 F. Supp. 2d 91 (D. Mass. 2005)....................................................................7

*Skwira v. United States,*
    344 F.3d 64 (1st Cir. 2003)................................................................................11

*Stalcup v. CIA,*
    768 F.3d 65 (1st Cir. 2014)..................................................................................7

*Stalcup v. Dep't of Defense,*
    No. 13-11967-LTS, 2015 WL 5545059 (D. Mass. 2015) ..................................7, 8

*Stalcup v. Dep't of Defense,*
    No. 13-CV-11967-LTS, 2018 WL 4963169 (D. Mass. Oct. 15, 2018)..................7

*Taylor v. Babbitt,*
    673 F. Supp. 2d 20 (D.D.C. 2009) ......................................................................7

*United Air Lines, Inc. v. Wiener,*
    335 F.2d 379 (1964) ....................................................................................29, 30

*United States v. Kubrick,*
    444 U.S. 111 (1979)......................................................................................14, 15

*Ward v. U.S.*
    471 F.2d 667, 668 (3d Cir. 1973) ......................................................................30

*Warren Freedenfeld Assocs., Inc. v. McTigue,*
    531 F.3d 38 (1st Cir. 2008)............................................................................10, 11

**Statutes**

49 U.S.C. § 40101 *et seq.*......................................................................................22, 28

49 U.S.C. § 40103(b)(2-3)............................................................................................28

Federal Aviation Act of 1958 ......................................................................................28

Federal Tort Claims Act ....................................................................................... *passim*

Freedom of Information Act, 5 U.S.C. § 552 ................................................................ *passim*

Public Vessels Act ................................................................................................24

**Other Authorities**

14 CFR 73.3 ....................................................................................................22, 28

Fed. R. Civ. P. 9(b) ............................................................................................18

Fed. R. Civ. P. 12(b)(6) .....................................................................................9, 10

## I.     INTRODUCTION AND SUMMARY OF ARGUMENT

This lawsuit arises out of the crash of Trans World Airlines Flight 800 ("TWA 800"), one of the deadliest aviation incidents in the history of the United States. It also resulted in what may be considered one of the nation's biggest cover-ups.

Shortly after the crash, the federal government publicly denied that the accident was caused by a missile. Four years later, after a purportedly exhaustive investigation, the federal government released a report contending that the explosion was the result of an electrical fire in the airplane's center fuel tank. *See* ECF No. 33, Second Amended Complaint ("SAC") at ¶¶ 2-3.

The United States government has stuck with that story to this day. Only recently has evidence emerged proving that TWA 800's explosion was not caused by any defect in the airplane, but instead by an errant United States missile fired at aerial target drones flying nearby. *Id*. at ¶4.

This lawsuit contends that defendants Raytheon Company ("Raytheon") and Lockheed Martin Corporation ("Lockheed") (collectively the "Contractor Defendants") worked hand-in-hand with the third defendant, the United States, in conducting the live missile testing on the East Coast, and in preventing the public from learning the true cause of the downing of TWA 800.

Even though this suit was filed within three years of the discovery of the crucial new information, the Contractor Defendants seek dismissal on statute-of-limitations grounds, arguing (inter alia) that the discovery rule is inapplicable because "the cause of the crash" was knowable shortly after the terrible accident, and it was incumbent on Plaintiffs to make diligent inquiry within the statutory period to identify the [crash's] cause." ECF No. 44 at 3 (Raytheon Mem. in Support of Motion to Dismiss); *see also* ECF No. 42 (Lockheed Mem. in Support of Motion to Dismiss) (arguing that Plaintiffs' "'new information' was not new at all and was always available via the Freedom of Information Act or other ordinary investigative means").

This argument fails to take account of the massive government cover-up, which Plaintiffs allege started immediately after the crash and continues to this case. Plaintiffs allege, among other things, that (1) the government publicly, repeatedly, and insistently represented that the crash was *not* caused by a missile; (2) actively concealed crucial evidence—such as radar data—showing that the accident *was* caused by a missile; and (3) hid the fact that targeting drones were found in the vicinity of the TWA wreckage. SAC at ¶¶48-50, 83-93. As explained below, numerous cases within this district and the First Circuit hold that allegations that the government actively concealed evidence are sufficient to defeat the statute of limitations defense at the motion to dismiss phase.

The Contractor Defendants' insistence that the cause of the crash "was knowable shortly after the terrible accident" (Raytheon Mem. at 3) lacks any basis in fact. As the Contractor Defendants well know, this evidence only emerged after over a decade of extraordinary, hard-fought litigation by physicist Dr. Thomas Stalcup, whose dogged pursuit of the truth both exposed the coverup and revealed damning evidence. The notion that "reasonably diligent" Plaintiffs could have easily unearthed this data in an ordinary FOIA suit within three years of the crash is fanciful, particularly in light of the fact that it took Dr. Stalcup over ten years to obtain it and it took the federal government itself four years to issue its report on the "probable cause" of the crash. *See* ECF No. 45-1, NTSB Aircraft Accident Report adopted Aug. 23, 2000.

To this day, no government official has publicly confirmed the presence of an active missile test in the vicinity of the crash. It was only Dr. Stalcup's discovery that the government admitted to transferring the Navy's radar records (which the NTSB has yet to access) to the FBI immediately after the crash that enabled subsequent revelations. This eventually led to confirmation from a high-level source that missile targets were flying near the jetliner at the time of the intercept. These revelations, along with the production of never-before-released FBI records in response to a nonparty FBI subpoena describing an object "heading straight for" TWA Flight 800 recorded on those

very radar records, led Dr. Stalcup to inform the families of the victims of his findings, via a Zoom meeting held on April 15, 2021, marking this as the earliest possible date for the statute of limitations to commence for this lawsuit.[1] SAC at ¶97.

In short: this suit is timely. It was brought on June 28, 2022, well within three years of discovery of critical information that forms the basis for Plaintiffs' claim—information that could not have been unearthed any sooner by any reasonably diligent plaintiff. This lawsuit was filed within one year and three months from the Plaintiffs' date of discovery. That alone should be sufficient to put the timeliness issue to bed.[2]

The only remaining question is whether, as the Contractors Defendants contend, Plaintiffs' claims are non-justiciable under the Political Question doctrine. The answer is no. Many cases recognize that damages cases like this one are singularly appropriate for resolution by the judicial branch of government. Because this is a tort action for damages, a verdict for Plaintiffs will not interfere with, or undermine, any military or foreign policy. And, as explained below, there is no lack of judicially manageable standards for evaluating whether military testing of defective missiles within civilian, commercial airspace is actionable. Indeed, numerous appellate cases have applied similar standards, establishing that courts "do not hesitate to review military action" to determine questions including "whether military officials have acted within the scope of their powers" and "whether military officials violated their own regulations." *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1031 (10th Cir. 2001).

---

[1] If the Court deems the SAC insufficient to show that Plaintiffs could not reasonably be expected to have uncovered this information on their own, Plaintiffs seek leave to amend to provide further details regarding the extent of the government cover-up and Dr. Stalcup's litigation against the U.S. Government.

[2] Even if it were not, the Contractor Defendants' fraudulent concealment of the true cause of the crash also tolls the statute of limitations, as explained *infra* at Argument Part IV(B).

Because Plaintiffs' claims are both justiciable and timely, the Contractor Defendants' Motions to Dismiss should be denied.

## II.        RELEVANT FACTS

### A.  The Crash

On July 17, 1996, a Boeing 747 headed for Paris took off from New York's John F. Kennedy International Airport at around 8:20 p.m. Within twelve minutes of takeoff, the plane exploded and crashed into the Atlantic Ocean off the coast of Long Island, New York. All 230 passengers and crew members perished. SAC at ¶ 2.

On that evening, many eyewitnesses described seeing a streak of light arcing from the surface of the ocean toward TWA 800 and then seeing an explosion and an object break apart and fall into the ocean. Twelve minutes after the plane took off, it broke apart and caught fire 13,800 feet over the Atlantic Ocean, precisely where the surface-originating streak observed by the eyewitnesses exploded. All 230 persons aboard died. *Id.* at ¶¶ 34-37.

### B.  The Coverup

In the wake of the TWA 800 tragedy, the federal government purported to investigate its cause. However, instead of allowing the National Transportation Safety Board ("NTSB"), the agency tasked with investigating all domestic aviation incidents, to lead the investigation of the TWA 800 incident, the Federal Bureau of Investigation ("FBI") took charge. The FBI also enlisted the assistance of the Central Intelligence Agency ("CIA"). *Id.* at ¶ 39.

Indeed, the FBI essentially froze the NTSB out of the investigation. The FBI removed nearly all copies of Navy radar tapes from the Navy, placing them out of the NTSB's reach, and refused to allow the NTSB to conduct eyewitness interviews that indicated the true cause of the TWA 800 crash. Eyewitnesses interviewed by the FBI recall being threatened. For example, one eyewitness recalls being told to keep quiet

about the "rocket" she saw in the sky or risk her citizenship application being denied. *Id.* at ¶¶ 40-41.

The CIA assisted in the coverup by concocting materials to discredit eyewitnesses who could confirm that TWA 800 had been downed by some kind of projectile. These materials included a video and animation that was displayed during a nationally televised FBI press conference that purported to show that a missile did not cause the crash and contained a scene with large, capitalized, and underlined words, "NOT A MISSILE." To ensure that audiences did not miss the point, a narrator read those words aloud. *Id.* ¶ 47-48.

Nearly three years after the FBI's press conference, the NTSB released a detailed report stating that the likely cause of the crash was an explosion of flammable vapors in the plane's center fuel tank. This became the publicly accepted view of what happened, and Plaintiffs relied upon this misinformation. *Id.* ¶ 50. *See also* ECF No. 45-1 (full copy of NTSB Report).

The NTSB report repeatedly rejected the theory that a missile was responsible for the crash of TWA 800. *See, e.g.,* ECF 45-1 at 259 ("the Safety Board concluded that the in-flight breakup of TWA flight 800 was not initiated by a bomb or a missile strike."); *id.* at 262 (dismissing eyewitness accounts "report[ing] seeing a streak of light before the appearance of a fireball" and stating that "because the physical evidence indicates that a missile did not strike the airplane, the witnesses must have been observing something other than a missile.") (footnotes omitted); *id.* at 264 (stating that helicopter pilot who reported seeing a missile "must have been observing the late stages of an airplane breakup and not a missile attack.") (footnotes omitted).

The NTSB also formed a new NTSB "Office of Families," headed by a public relations expert, that successfully deceived the victims' families about the true cause of the crash. Through a series of misleading official communications, the Office of Families promoted a fuel tank scenario as the only possible explanation for the crash, and told

the victims' families that the idea that TWA 800 was brought down by a missile was an implausible "conspiracy theory" without any basis in fact. SAC ¶ 52. This same misinformation was provided to the press, which widely reported it to the public. SAC ¶ 53.

In short, for over 25 years, Plaintiffs and the public were led to believe— by their own government and the Defendants—that the victims of the TWA 800 crash were killed by a one-of-a-kind exploding fuel tank.

### C.  The MDL Aviation Litigation Against Boeing and TWA

In keeping with the U.S. Government's official position that the TWA 800 crash was caused by a defect in the aircraft's fuel system, multiple relatives and estate representatives of TWA crash victims filed suit against TWA, Boeing (the plane's manufacturer), and Hydro-Aire, Inc. (the manufacturer of the aircraft's fuel pumps). These cases alleged negligence, product liability, and warranty claims against Boeing, and negligence and warranty claims against TWA. *See* 96 Civ. 7986 (RWS), 97 Civ. 4254, 1998 WL 34778577 (July 13, 1998). In February 1997, the Judicial Panel on Multidistrict Litigation ("MDL") transferred these cases to the Southern District of New York for consolidated pretrial proceedings. *See In re Air Crash Off Long Island, New York*, 209 F.3d 200, 201 (2d Cir. 2000). The MDL cases were settled and dismissed with prejudice as to the named defendants. *See In Re Air Crash off Long Island*, No. 96 Civ. 7986, MDL No. 1161 (S.D.N.Y. Oct. 24, 1996).[3]

### D.  FOIA Litigation Relating to TWA 800

In the wake of the crash, some family members and victims' groups attempted to conduct their own investigations into the cause of the crash. In 1998, a group supported by family member of victims submitted requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking release of documents from the FBI concerning its

---

[3] Notably, the Contractor Defendants do not contend that the Plaintiffs' claims here were released in that litigation.

investigation. *See Sephton v. F.B.I.*, 365 F. Supp. 2d 91, 92 (D. Mass. 2005). As the District Court explained, "the process did not go smoothly" because of "rigidity and negligence" of the FBI. *Id.* at 92. After more than seven years of litigation, which included "three trips to the Court of Appeals and the death of the judge who originally presided," the Court reluctantly granted the government's motion for summary judgment, noting that "[t]he FBI's halting response to the plaintiffs' requests has exacerbated an already excruciating situation and undoubtedly deepened the mistrust felt by the grieving families who have supported this FOIA initiative." *Id.; see also id.* (noting that "[t]he families deserved better from their government.").

Several years later, after several unsuccessful attempts to obtain records via FOIA from other U.S. government agencies, *see Stalcup v. CIA*, 768 F.3d 65 (1st Cir. 2014), Dr. Stalcup submitted FOIA requests to three entities within the Department of Defense ("DoD") seeking information relating to any missile tests conducted off the East Coast of the U.S. between May 1996 and October 1996. *See Stalcup v. Dep't of Defense*, No. 13-11967-LTS, 2015 WL 5545059, at *1 (D. Mass. 2015). After extensive proceedings in the district court, one trip to the First Circuit (where Dr. Stalcup prevailed), *see Stalcup v. C.I.A.*, 768 F.3d 65 (1st Cir. 2014), and yet more extensive proceedings in the district court, *see Stalcup v. Dep't of Defense*, No. 13-CV-11967-LTS, 2018 WL 4963169 (D. Mass. Oct. 15, 2018), Dr. Stalcup was finally granted something that almost never occurs in FOIA litigation: permission to take discovery of high-level agency officials, including former Secretary of Defense William Perry. *See Stalcup v Department of Defense*, Case 1:13-cv-11967-LTS, ECF No. 231-1 at ¶ 13 (Supplemental Declaration of Thomas Stalcup describing discovery taken in case)); *see also Taylor v. Babbitt*, 673 F. Supp. 2d 20, 23 (D.D.C. 2009) (stating that "it is the exceptional case in which a court permits discovery in a FOIA action").[4]

---

[4] Dr. Stalcup also deposed former Director of the Office of Test and Evaluation at the Office of the Secretary of Defense Philip E. Coyle, *id.* at ¶ 14; Chief Technology Officer at Johns Hopkins

Ultimately, over 10 years after sending his FOIA requests to the DoD, Dr. Stalcup's efforts uncovered several records never released to the TWA 800 families or the public. One described an "original [Navy radar] tape" showing an object "heading straight for TWA 800." SAC at ¶ 84. Another indicates an object on radar "impact[ing]" TWA 800 and "spiral[ling] away," while also stating that witnesses described seeing a "flair (sic) going up. . . . , orbit/circle another object. Subsequently debris fell from the sky." *Id.* These records were never made part of the NTSB investigation, and no eyewitnesses were permitted to testify at any NTSB hearing. *Id.* at ¶ 85. As such, the Plaintiffs were never informed of this information.

In addition, on around October 2, 2019, Dr. Stalcup privately consulted with a former high-level FBI official who informed him that aerial target drones were flying in TWA 800's vicinity when TWA 800 went down—the very drones documented to have been used in East Coast missile tests of the Navy's Aegis System that very summer of 1996. Those target drones ultimately parachuted to the ocean below, unscathed and abandoned. *Id.* at ¶ 87. The FBI later ordered the Navy to retrieve these targets, which is contrary to the usual chain of command. *Id.* at ¶ 88.

In addition to the documentary evidence uncovered in the FOIA Litigation, Dr. Stalcup also deposed several government witnesses regarding the TWA 800 disaster. *Id.* at ¶ 88; *see also* n.4, supra. One of these witnesses, Steven Habeger, the Executive Director of an East Coast Navy land-based test site, testified that within minutes of the

---

Applied Physics Laboratory Dr. Jerry Krill, who co-invented the U.S. Navy's Cooperative Engagement Capability (or "CEC"), a missile defense system tested off the East Coast of the United States in 1996 in conjunction with the land-based test site the Aegis Combat Systems Center ("ACSC"), *id.* at ¶ 15; former CEC Program Manager Michael O'Driscoll, *id.* at ¶ 16; former ACSC Executive Director Steven Habeger, *id.* at ¶ 17; former Program Manager for the U.S. Navy's Aegis Weapons System (which was being tested with and integrated into the CEC) Rear Admiral George Hutching, *id.* at ¶ 18; Lockheed Martin's Vice President of Naval Combat and Missile Defense Systems James Sheridan, *id.* at ¶ 19; former Executive Director of the U.S. Navy's Operational Test and Evaluation Force Steven Whitehead, *id.* at ¶ 21; and former Captain of the U.S. guided missile cruiser the U.S.S. Normandy Frank DeMasi, *id.* at ¶ 22.

TWA 800 disaster, he was ordered to allow the FBI to remove all Navy radar tapes from his facility that might have recorded the TWA 800 incident. *Id*. at ¶ 89. This event was supported by Mr. Habeger's commanding officer and by FBI custody records obtained during the FOIA litigation. *Id*. at ¶ 90.

Dr. Stalcup also discovered that five days after the TWA 800 disaster, the Joint Terrorism Task Force directed the FBI to obtain another "original [Navy] radar tape" showing an object "heading straight for TWA 800" and to "prepare FD-302 re-procurement of this original tape." *Id*. at ¶ 91.

These radar tapes were confiscated by the FBI immediately after the crash of TWA 800. According to records obtained in the FOIA Litigation, they indicate an object "impact[ed]" TWA 800, which directly contradicts the FBI's, CIAs, and NTSB's public conclusions that what caused the incident was "NOT A MISSILE." *Id*. at ¶ 92.

Plaintiffs only learned of the evidence Dr. Stalcup compiled on April 15, 2021, when they attended a Zoom meeting he hosted. At that meeting, Dr. Stalcup informed Plaintiffs for the first time of the key facts he learned in his FOIA litigation. *Id*. ¶ 97. This evidence reveals that TWA 800 was brought down by a missile and the government hid this truth from Plaintiffs and the public at large for over twenty-five years.[5]

### III.   LEGAL STANDARD

"In order to survive a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a complaint must simply contain factual allegations sufficient 'to raise a right to relief about the speculative level'." *Iantosca v. Benistar Admin. Services, Inc.*, No.

---

[5] Plaintiffs anticipate that additional evidence of a missile explosion will be uncovered through this litigation. Plaintiffs' experts, including specialists in explosives and metallurgy, inspected the remaining wreckage of TWA 800 on January 26, 2023. Declaration of John Roddy ("Roddy Decl.") at ¶ 8. The experts identified portions of the wreckage, including fractured metallic components and apparent chemical residues, which with laboratory testing may confirm that a missile caused the explosion. *Id*. at ¶ 8. Plaintiffs have informally requested to collect samples and conduct that testing via emails sent to the NTSB and DOJ's counsel. *Id*. at ¶ 8.

08-11785, 2009 WL 2382750 at 4* (D. Mass. July 30, 2009) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, (2007)). At this stage of litigation, "[a] court may dismiss a complaint *only if* it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984) (emphasis added). If facts in a complaint are sufficient to state a cause of action, a motion to dismiss must be denied. *Nollet, et al v. Justices of the Trial Court of Mass.*, 83 F. Supp. 2d 204, 208 (D. Mass. 2000).

Courts disfavor motions to dismiss for failure to state a claim under Rule 12(b)(6). *Druker v. Sullivan*, 334 F. Supp. 861, 864 (D. Mass. 1971). Accordingly, in complex cases such as this, where "proof is largely in the hands of the alleged conspirators, dismissals prior to giving the non-moving party ample opportunity for discovery should be granted very sparingly." *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976) (quoting *Poller v. Columbia Broadcasting*, 368 U.S. 464, 473 (1962)) (cleaned up).

## IV.   THE STATUTE OF LIMITATIONS IS TOLLED BY THE DISCOVERY RULE AND FRAUDULENT CONCEALMENT DOCTRINE

Raytheon and Lockheed contend that Plaintiffs' claims are barred by the applicable statute of limitations. Both are wrong. At the 12(b)(6) phase, a defendant may only prevail on a statute of limitations defense when the facts "'leave no doubt' that the plaintiff's action is barred by the asserted defense." *Blackstone Realty LLC v. F.D.I.C.*, 244 F.3d 193, 197 (1st Cir. 2001) (citation omitted). In other words, dismissal is only warranted where the facts "*mandate* a conclusion that a reasonable person would have suspected" the tort occurred. *Warren Freedenfeld Assocs., Inc. v. McTigu*e, 531 F.3d 38, 45 (1st Cir. 2008) (emphasis added). Absent facts showing that a plaintiff necessarily had "reasonable suspicion that skulduggery was afoot," parties must be permitted discovery to learn out the facts underlying defendants' statute of limitations defense. *See, e.g., id.* at 45. After all, the notice that starts the clock on the statute of limitations is

fact-bound, and "[c]ommon sense suggests . . . that an inquiring court must explore the idiosyncratic circumstances of each individual case." *Id.* at 44.

Despite the fact-bound nature of their statute of limitations defenses, the Contractor Defendants ask this Court to stop this case before it begins because, according to them, Plaintiffs' Second Amended Complaint "lacks the facts essential to toll the statute." Raytheon Mem. at 10; *see also* Lockheed Mem. at 9 ("Plaintiffs make no attempt to explain why they did not discover these 'key facts' previously through reasonable diligence, nor is there any description as to what the facts even are."). This defense lacks merit. As explained in more detail below, Plaintiffs have alleged numerous facts sufficient to show that the statute must be tolled in this case—either by the discovery rule, fraudulent concealment doctrine, or equitable tolling.

Accordingly, the Contractor Defendants' Motions to Dismiss must be denied.

### A. Plaintiffs have alleged facts—including active concealment of evidence by the federal government—warranting the application of the discovery rule.

Both Defendants argue that dismissal is warranted because Plaintiffs have not alleged facts sufficient to invoke the discovery rule and toll the three-year statute of limitations.[6] Not so. First Circuit precedent is unambiguous: "[T]he federal discovery rule delays accrual until 'a reasonably prudent person similarly situated' to the plaintiff would discover these two key pieces of factual information – namely, the existence of the injury *and* its probable cause." *Ouellette v. Beaupre*, 977 F.3d 127, 136 (1st Cir. 2020) (emphasis added); *cf. Skwira v. United States*, 344 F.3d 64, 78 (1st Cir. 2003) ("[A] claim accrues under the FTCA once a plaintiff knows, or in the exercise of reasonable diligence should know, (1) of her injury *and* (2) sufficient facts to permit a reasonable person to believe that there is a causal connection between the government and her injury." (emphasis added)). "[A] mere hunch, hint, suspicion, or rumor of a claim" is

---

[6] The Contractor Defendants both assert that maritime law, as opposed to Massachusetts law, controls this case. While Plaintiffs do not concede this point, they stand ready to amend their Complaint to specifically plead maritime torts if needed.

not sufficient to show knowledge sufficient to establish accrual of a claim[.]" *McIntyre v. United States*, 367 F.3d 38, 52 (1st Cir. 2004). Importantly, when considering due diligence, courts must be cognizant of the fact that "the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain." *Ouellette*, 977 F.3d at 136 (citation omitted).

The duty to inquire does not require a party to see through government attempts to "enable[e], encourage[e], and cover[] up the" wrongdoing. *Limone v. United States*, 336 F. Supp. 2d 18, 48 (D. Mass. 2004). Indeed, courts have repeatedly determined that governmental efforts to conceal wrongdoing render the facts underlying a tort "'inherently unknowable' even 'incapable of detection by the wronged party through the exercise of reasonable diligence.'" *Id.* (quoting *Gonzalez v. United States*, 284 F.3d 281, 288–89 (1st Cir. 2002)).

Consistent with these precepts, in cases where the government actively conceals key information regarding the tort at issue—such as the identity of the party who perpetrated the tort—courts routinely determine that the discovery rule bars dismissal at the 12(b)(6) phase. *See McIntyre*, 367 F.3d at 53 (determining that the discovery rule applies where "the government did not inform the plaintiffs of any investigation, appears to have held the facts revealed in its investigation confidential, and ultimately claimed to have cleared its agents of wrongdoing before the critical dates for accrual purposes"); *Attallah v. United States*, 955 F.2d at 780 (applying the discovery rule to toll the statute of limitations where the government actors responsible for a tort were indicted four years after the alleged tort); *Limone*, 336 F. Supp. 2d at 48 (determining the discovery rules applied because the plaintiff "could not have known—the facts as alleged are so shocking—that the FBI was enabling, encouraging, and covering up the perjury" at issue in the case). That makes good sense: the government is "generally thought to be concerned with law enforcement and not an outlaw itself." *Bennett ex rel. Est. of Bennett v. F.B.I.*, 278 F. Supp. 2d 104, 110 (D. Mass. 2003).

The Contractor Defendants ignore this authority and, by and large, attempt to evade the facts alleged by Plaintiffs showing that the government concealed key facts in this case. Lockheed, for example, argues that "Plaintiffs make no attempt to explain why they did not discover these 'key facts' previously through reasonable diligence, nor is there any description as to what the facts even are." Lockheed Mem. at 9. That is simply false. Plaintiffs devoted whole sections of their Second Amended Complaint alleging the key facts showing why, until very recently, they were unable to discover their claims because of the government's efforts to conceal evidence. *See, e.g.*, SAC ¶¶ 48-50, 83-93. For example, the Plaintiffs alleged that the FBI confiscated an "'original [Navy] radar tape' showing an object 'heading straight for TWA 800' and to 'prepare FD-302 re-procurement of this original tape.'" *Id.* at ¶ 91. Other records describing the confiscated radar tapes indicate that they show an object "impact[ed]" TWA 800. *Id.* at ¶ 92. As explained above, this key evidence was only recently unearthed in an unprecedented FOIA lawsuit by Dr. Stalcup and was not considered in the NTSB's public report that concluded what caused TWA 800 to explode was "NOT A MISSILE." *Id.* at ¶ 85. Put simply, Plaintiffs allege the government hid key evidence and provided a piecemeal report that assured Plaintiffs that the TWA 800 was not struck by a missile when the concealed evidence suggested otherwise. Lockheed's motion must be denied for overlooking the very facts it contends Plaintiffs did not allege.

Raytheon's motion fares no better. Indeed, Raytheon's motion asks this Court to ignore First Circuit precedent, contending that "[i]t is irrefutable that Plaintiffs' decedents sustained fatal injuries instantly because of the accident and, thus, their claims accrued on July 17, 1996." Raytheon Mem. at 14. According to Raytheon, the *only* factor that determines when a claim accrues under a wrongful death claim is discovery of the injury; indeed, it goes so far as to claim that "it does not matter that Plaintiffs did not know exactly who was responsible for the accident." Raytheon Mem. at 23. That misstates First Circuit law. The First Circuit was very clear in *Ouellette*, 977 F.3d at 136,

that the discovery rule hinges on *two* discrete pieces of information, "the existence of the injury *and* its probable cause." Raytheon's attempts to hinge accrual solely on the discovery of injury must be rejected—those attempts run sharply counter to the First Circuit's precedent.

Perhaps sensing that its misstatement of the law cannot carry the day, Raytheon asks this Court to engage in a series of hypotheticals about what could or could not have been determined through "reasonable diligence." *See, e.g.*, Raytheon Mem at 21. For example, it asks this Court to presume that Plaintiffs could have used FOIA or other investigation methods "decades earlier to ascertain the alleged cause of the accident." *Id.* That presumes too much. First, "'[s]omething else [is] needed to trigger accrual' where a reasonable—and seemingly final—explanation of the cause of the plaintiff's injury presents itself." *Bennett ex rel. Est. of Bennett*, 278 F. Supp. 2d at 111–12. Reasonable diligence does not require Plaintiffs to see through efforts to cover up the cause of an injury. And that is exactly what Plaintiffs have alleged here: the NTSB ignored key evidence and pinned the cause of the accident on a faulty fuel tank instead of a missile strike.

Raytheon relies primarily on *United States v. Kubrick*, 444 U.S. 111 (1979) to suggest that the date of the discovery of the injury alone begins the running of the statute of limitations. A cursory review of *Kubrick* shows that it does not say what Raytheon contends it does. In fact, it clearly states that the statute begins to run when a plaintiff becomes "aware of his injury *and* its probable cause." *Kubrick*, 444 U.S. at 118. Often, those two dates coalesce at the same time. Indeed, in medical malpractice cases like *Kubrick*, that is often the case. The Court stressed that once an injury manifests in a medical malpractice case, "[t]he prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask." *Id.*

This case is a sharp contrast. Plaintiffs *did* ask who wronged them, and the government and Contractor Defendants—the only parties capable of answering who wronged them—hid the truth. In *Kubrick*—and later in *Rotella v. Wood*, 528 U.S. 549 (2000)—the Supreme Court determined that mere ignorance did not toll the statute of limitations. This case involves more than mere ignorance—it involves concealment of crucial information.

Moreover, as explained above, it took Dr. Stalcup over *ten* years of FOIA litigation that is *still* ongoing (in which, through Herculean efforts, he deposed numerous DoD and FBI officials including former Secretary of Defense William Perry) to unearth proof that TWA 800 was downed by a missile. Only a plaintiff willing and able to dedicate her or his entire life to this type of litigation could have come even close to this information via FOIA. That is not what the discovery rule requires: "The discovery rule requires neither extraordinary insight nor extraordinary deductive powers; in the absence of actual knowledge of a claim, the discovery rule requires only the 'exercise of reasonable diligence' in discovering the claim." *Est. of Castucci ex rel. Castucci v. United States*, 311 F. Supp. 2d 184, 189 (D. Mass. 2004).

Beyond that, Raytheon's conjecture about what investigation might have been conducted, what information might have turned up, and Raytheon's baseless statement that "[t]he information was not beyond [Plaintiffs'] reach; they did not even try to reach for it" is not only improper, but also laughable in light of the extreme efforts it took to unearth the information that led to this lawsuit.[7]

---

[7] Raytheon's brief makes it clear that it has no evidence about what Plaintiffs knew and when they knew it. Instead, it relies on baseless conjecture about what Plaintiffs' attorneys in the MDL aviation litigation against Boeing and TWA did not unearth during discovery. For example, it contends that "[i]t is unlikely these experienced Plaintiffs' aviation lawyers did not pursue all theories and obtain all information about the accident." Raytheon Mem. at 13. But there would have been no reason for those "experienced aviation lawyers" to seek discovery about whether a missile downed

In any event, the *only* time dismissal on statute of limitations grounds is proper at the 12(b)(6) phase is where the "facts 'leave no doubt'" that the Plaintiffs' claim is time-barred. *Blackstone Realty LLC*, 244 F.3d at 197. Raytheon's speculation about what evidence Plaintiffs could have, should have, or would have discovered are woefully insufficient to meet the exacting "no doubt" standard. If Raytheon wants to continue to assert that Plaintiffs should have discovered information despite the government's attempts to hide it, it can explore that in discovery.

Finally, there is no merit to the Contractor Defendants' suggestion that the general publicity of the incident and the fact that "[a] commercial airplane does not normally crash" required Plaintiffs to see through the government's efforts to conceal evidence. Raytheon Mem. at 15. In *McIntyre*, the Court tolled the statute of limitations in a case where there were numerous news reports and a court hearing describing the decedent's murder, contentions that the FBI compromised an investigation of the decedent's murderer, and reports that the FBI had leaked other informant identities to the decedent's murderer. 367 F.3d at 54–57. The Court applied the discovery rule in that case because there—exactly as Plaintiffs have alleged here—the government was unwilling to release key information related to the case. Put simply, it does not matter how broadly publicized a case is—the government's efforts to conceal key evidence tolls the statute of limitations. Accordingly, the Contractor Defendants' arguments that the discovery rule does not apply to toll the statute of limitations fail, and their Motion to Dismiss must be denied.

**B. Plaintiffs have sufficiently alleged fraudulent concealment.**

Both Contractor Defendants also argue that Plaintiffs failed to allege facts sufficient to establish fraudulent concealment. Those arguments fail. According to the Contractor Defendants, Plaintiffs' fraudulent concealment claim fails primarily because

---

TWA 800, given that the theory of their case was based on the U.S. Government's official conclusion that the crash was caused by a flaw in the fuel tank system.

Plaintiffs did not specifically allege any affirmative acts on their part as related to the concealment of the cause of TWA 800 explosion. Relatedly, Raytheon goes so far as to contend that fraudulent concealment requires "some affirmative act of the defendant [that] conceals material facts about his wrongful conduct in causing plaintiff's injury and plaintiff could not discover these facts within the normal limitations period despite acting with due diligence." Raytheon Mem. at 15.

Once again, Raytheon misstates governing precedent. The First Circuit has specifically held that fraudulent concealment tolls the statute of limitations "even without affirmative acts on the part of the defendant unless the plaintiff, through reasonable diligence, discovered or should have discovered the fraud." *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 802 (1st Cir. 1987); *see also Cook v. Avien, Inc.*, 573 F.2d 685, 695 (1st Cir. 1978) ("Even without affirmative acts on the part of defendants, then, a federal cause of action will accrue at the time when plaintiff in the exercise of reasonable diligence discovered or should have discovered the fraud of which he complains."); *In re Atl. Fin. Mgmt., Inc. Sec. Litig.*, 718 F. Supp. 1003, 1011 (D. Mass. 1988) ("Although defendants argue for adoption of a different rule, it is clear that in the First Circuit, the doctrine of fraudulent concealment is available even without affirmative acts on the part of the defendant, when the plaintiff has been unable to discover the alleged fraud despite the exercise of reasonable diligence."). In 2019, the First Circuit was given the opportunity to revisit the proposition that fraudulent concealment can be established with little to no affirmative action on the part of the defendant in *Alvarez-Mauras v. Banco Popular of Puerto Rico*, 919 F.3d 617, 628 (1st Cir. 2019). The First Circuit did not overturn that rule, hinging its analysis of the fraudulent concealment doctrine on whether there were sufficient "telltale warning signs" for the plaintiff to appreciate that his cause of action accrued.

The rule makes good sense in a case like this where one co-defendant (in this case, the United States) conceals evidence and actively misdirects plaintiffs regarding

the cause of the incident, and the other defendants sit silently by while their co-defendant misdirects plaintiffs. The Contractor Defendants should not be permitted to escape the fraudulent concealment doctrine where they failed to dispel the misinformation and concealment perpetrated by their co-defendant. Holding otherwise creates a perverse incentive: it enables parties to avail themselves of deception perpetrated by others to hide wrongdoing.

The court in *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1207 (N.D. Cal. 2015), recognized as much, noting that limiting application of fraudulent concealment to only those individuals who actively committed the concealment was particularly odd in cases involving conspiracy and "joint and several liability." If liability is imputed to those involved in the common course of conduct or scheme, it makes little sense not to also impute fraudulent concealment as well.

Indeed, courts have recognized that "it is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage, particularly when the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the alleged conspirators." *Id.* at 1194. That is true here. Plaintiffs have more than adequately alleged that the United States concealed facts—including the Contractor Defendants' role in—the TWA 800 crash under Federal Rule of Civil Procedure 9(b). *See, e.g.*, SAC ¶¶ 48-50, 83-93.

The Contractor Defendants also parrot their earlier arguments regarding Plaintiffs' purported failure to exercise due diligence. Those arguments fail for the same reason they fail as it relates to the discovery rule. Due diligence means little when it is thwarted by the government's concealment of evidence. Accordingly, the Contractor Defendants' arguments related to fraudulent concealment fail, and their Motions should be denied.[8]

---

[8] Lockheed Martin also argues that equitable tolling does not apply. But equitable tolling is functionally the same as the fraudulent concealment doctrine and "suspends

## V.   PLAINTIFFS' CLAIMS AGAINST THE CONTRACTOR DEFENDANTS ARE JUSTICIABLE

The Contractor Defendants incorrectly assert that tort claims for damages arising from the military shootdown of a civilian airplane in commercial airspace are non-justiciable under the political question doctrine. This expansive interpretation of the doctrine reaches far beyond any prior holding by any court. In fact, the only federal appellate court decision to consider the doctrine under similar circumstances unambiguously rejected the Contractor Defendants' position. *See Koohi v. U.S.*, 976 F.2d 1328, 1332 (9th Cir. 1992) (the political question doctrine *did not* preclude negligence and product liability claims against the United States and military contractors after a U.S. Navy missile downed a passenger jet).

As discussed below, this is an ordinary tort case that presents justiciable issues. Plaintiffs allege negligence and product liability claims for monetary damages. SAC at ¶¶ 108-128, 134-148. Resolution of Plaintiffs' claims will require adjudication of ordinary tort questions, including whether the testing was conducted in accordance with statutes, FAA regulations and orders, and the Navy's own policies and specifications. Courts routinely adjudicate such issues, and the political question doctrine has no application to them. Accordingly, Plaintiffs' claims are justiciable and the Court should deny Contractor Defendants' motions on political question grounds.

### A.  The governing legal standard is exceedingly high where there is no discovery.

The political question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to" other branches of government. *Japan*

---

the running of the statute of limitations if a plaintiff, in the exercise of reasonable diligence, could not have discovered information essential to the suit." *Limone*, 336 F. Supp. 2d at 48 (citation omitted). Indeed, "[t]he equitable tolling and fraudulent concealment analyses are parallel." *Id.* at n.44. Therefore, Lockheed Martin's reasons fail for the same reasons argued above.

*Whaling Ass'n. v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986). In *Baker v. Carr*, the

Supreme Court set forth six factors indicative of a nonjusticiable political question:

> (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department;
>
> (2) a lack of judicially discoverable and manageable standards for resolving it;
>
> (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;
>
> (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;
>
> (5) an unusual need for unquestioning adherence to a political decision already made; and
>
> (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186, 217 (1962). "Unless one of these formulations is inextricable from the case

at bar, there should be no dismissal for non-justiciability on the ground of a political

question's presence." *Id*.

    To dismiss Plaintiffs' tort claims under the political question doctrine, a court

must conclude that resolution of these claims would interfere with the constitutional

duties of one of the political branches. *Arakaki v. Lingle*, 477 F.3d 1048, 1068 (9th Cir.

2007). "A nonjusticiable political question exists when, to resolve a dispute, the court

must make a policy judgment of a legislative nature, rather than resolving the dispute

through legal and factual analysis." *E.E.O.C. v. Peabody Western Coal Co.*, 400 F.3d 774,

784 (9th Cir. 2005). Importantly, "the [political question] doctrine must be cautiously

invoked, and the mere fact that a case touches upon the political process does not

necessarily create a political question beyond courts' jurisdiction." *In re Nazi Era Cases

Against German Defendants Litig.*, 129 F. Supp. 2d 370, 374 (D.N.J. 2001) (citing *Nixon v.

Hernon*, 273 U.S. 536, 540 (1927)).

    The bar for dismissing a case on political-question grounds is exceedingly high,

especially where, as here, the case is at the earliest stage of litigation and there has been

no discovery. *See Lessin v. Kellog, Brown & Root*, 2006 WL 3940556 (S.D. Tex. 2006) ("A

finding that this case will necessarily involve nonjusticiable political questions,

particularly before discovery has been completed and all parties properly joined, would expand the political question doctrine beyond its current applications and boundaries.").

**B.  Plaintiffs' claims do not require adjudication of matters constitutionally committed to coordinate branches of government.**

The first reason Defendants' political-question argument fails is that damages cases like this one are appropriate for resolution by the judicial branch of government. The first *Baker* factor provides that an issue is nonjusticiable if it is textually committed to another branch of government. That is not true here, because Plaintiffs merely assert negligence and product liability claims for monetary damages arising from the alleged testing naval testing of Raytheon's SM-2 missile and Lockheed's Aegis SPY-1 radar system in commercial airspace, in close proximity to human populations and commercial aircraft. SAC at ¶ 108-128, 134-148. Importantly, Plaintiffs do *not* seek declaratory or injunctive relief. SAC at ¶ 148. Rather, this case is "an ordinary tort suit, alleging that the defendants breached a duty of care owed to the plaintiffs or their decedents." *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 49 (2d Cir. 1991) (holding that the political question doctrine did not bar claims against Palestine Liberation Organization relating to seizure of vessel and killing of passenger thereon). Resolution of such tort matters is unquestionably the province of the judiciary. *Id*. ("The department to whom this issue has been 'constitutionally committed is none other than our own—the Judiciary.").

Two cases arising from the killing of anti-war protestors at Kent State University by members of the Ohio National Guard—*Gilligan v. Murphy*, 413 U.S. 1 (1973) and *Scheuer v. Rhodes*, 416 U.S. 232 (1974)—illustrate why the political question doctrine does not bar Plaintiffs' claims. After the incident at Kent State, the plaintiffs in *Gilligan* sued for declaratory and injunctive relief, seeking "judicial evaluation of the appropriateness of the training, weaponry, and orders of the Ohio National Guard." 413 U.S. at 5-6. The

21

plaintiffs further demanded that the court establish standards governing the same topics, and exercise continuing judicial surveillance over the Guard to ensure compliance with the standards adopted. *Id*. The Supreme Court held that this "broad call on judicial power to assume continuing regulatory jurisdiction over the activities of the Ohio National Guard" exceeded the limits of justiciability. But the Court took pains to make clear that its ruling would *not* bar a damages suit arising from the same incident. *Id*. at 5. ("It is important to note at the outset that this is not a case in which damages are sought for injuries sustained during the tragic occurrence at Kent State.") Indeed, years later in *Scheuer*, the Court in fact *did* allow such a suit for damages to proceed, explaining that its opinion in *Gilligan* did not prohibit judicial review of wrongful conduct by military personnel and, thus, was "by no means indicates a contrary result." 416 U.S. at 247-49.

The Contractor Defendants selectively quote *Gilligan* to advance the incorrect conclusion that virtually all suits for private damages arising from military activity are beyond the scope of judicial review. *See* Raytheon Mem. at 21-22; Lockheed Mem. at 13, 16. This is not the law, and the *Gilligan* Court explicitly declined to adopt such a sweeping construction. 413 U.S. at 11 ("[W]e neither hold not imply that conduct [related to the military] is always beyond judicial review or that there may not be accountability in a judicial forum for violations of law or specific unlawful conduct by military personnel."[9]). To the contrary:

> "*when presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury*; there is nothing in our Nation's history or in [Supreme Court decisions] that can properly be seen as

---

[9] As discussed below, a comprehensive statutory and regulatory scheme governs airspace usage in the United States and renders missile tests within commercial airways unlawful. *See* 49 U.S.C. § 40101 *et seq.*; 14 CFR part 73; FAA Order 7400.8; OPNAVINST 3770.2.

giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied."

*Laird v. Tatum* 408 U.S. 1, 15-16 (1972) (emphasis added).

First Circuit cases considering the applicability of the political question doctrine to military conduct are limited, but a review of the relevant authorities nationally reveals that courts do not hesitate to review military actions in tort cases for damages. In *Koohi v. U.S.*, the Ninth Circuit considered an action by heirs of passengers of Iran Air Flight 655, a civilian passenger jet shot down in 1988 by the guided missile cruiser *USS Vincennes*. 976 F.2d at 1330. While operating in the Persian Gulf during the Iran-Iraq war, the *Vincennes* crew mistook a civilian Airbus for a hostile F-14 and shot it down using an early version of the Aegis missile system at issue here, killing all 290 onboard. *Id.* Like this case, the *Koohi* plaintiffs presented negligence and product liability theories against the United States and weapons manufacturers, asserting "that the defendants were, for differing reasons and to differing degrees, each responsible for the misidentification of the civilian airbus as an F-14 and the consequent decision to shoot it down." *Id.* at 1331-32.

In a directly on-point analysis of the political question doctrine, the Court held that the claims were justiciable,[10] recognizing that for more than a century, "the Supreme Court has made clear that the federal courts are capable of reviewing military decisions, particularly when those decisions cause injury to civilians." *Koohi*, 976 F.2d at 1331 (citing *The Paquete Habana*, 175 U.S. 677 (1900) (holding that the question of whether seizure of fishing vessels during naval blockade was militarily justified was reviewable by the Court); *United Air Lines, Inc. v. Wiener*, 335 F.2d 379, 392-395 (1964)

---

[10] The *Koohi* Court dismissed the case against the United States and the military contractors under the "combatant activities" exception to the Federal Tort Claims Act. That portion of the ruling has no application here because, unlike *Koohi*, the present case does not arise out of combatant activities during time of war.

(allowing suit against United States after Air Force jet on training mission collided with airliner within civilian airway); *U.S. v. United Tuna Corp.*, 425 U.S. 164, 181-182 (1976) (holding that suit alleging that naval vessel negligently collided with a merchant ship may be brought against United States if requirements of Public Vessels Act are satisfied)).

In so holding, the Ninth Circuit in *Koohi* noted that "the fact that an action is taken in the ordinary exercise of discretion in the conduct of war does not put it beyond the judicial power." *Id*. (internal quotes omitted). "The claim of military necessity will not, without more, shield governmental operations from judicial review." *Id*. Further, recognizing the distinctions drawn by *Gilligan* and *Scheuer*, the Court noted that "[a] key element in our conclusion that the plaintiffs' action is justiciable is the fact that the plaintiffs seek only damages for their injuries. *Id*. at 1332. Moreover, "because the plaintiffs seek only damages, the granting of relief will not draw the federal courts into conflict with the executive branch." *Id*. The political question doctrine therefore did not apply. *Id*.

The Tenth Circuit similarly rejected Raytheon's view of the political question doctrine in *McCay v. U.S.*, 703 F.2d 464 (10th Cir. 1983). In that case, the plaintiffs were owners of land adjacent to the Rocky Flats Plant, which manufactured nuclear weapons for the United States government. *Id.* at 465. After their land became "infested with nuclear material" from the plant, the plaintiffs sued the government and its contractors for damages in tort. *Id.* at 466. The District Court dismissed the case, ruling it was nonjusticiable because it involved executive and legislative decisions as to the necessity of nuclear weapons, the location the weapons should be produced, and existence and acceptability of hazards related to their manufacture.

On appeal, the Tenth Circuit reversed the dismissal, holding that "the political question theory and separation of power doctrines do not ordinarily prevent individual tort recoveries." *Id*. at 470. The *McCay* Court noted that the political branches had "also

determined that antitank explosives, highly explosive photo-flash cartridges, and nighttime illuminants (flares) are necessary to national defense. Nonetheless, the Third, Fifth, Eight, and Ninth Circuits have not hesitated to hold the government responsible under the Federal Tort Claims Act for injuries arising out of the production of such hazardous materials." *Id.* (citing *Madison v. United States,* 679 F.2d 736 (8th Cir.1982) (explosion of photo-flash cartridges); *Aretz v. United States, 604 F.2d 417* (5th Cir.1979) (trip flare fire); *Toole v. United States,* 588 F.2d 403 (3d Cir.1978) (explosion of antitank munition); *United States v. Babbs,* 483 F.2d 308 (9th Cir.1973) (combustible cartridge fire); *Pigott v. United States,* 451 F.2d 574 (5th Cir.1971) (damage caused by NASA rocket test); *H.L. Properties, Inc. v. Aerojet-General Corp.,* 331 F. Supp. 1006 (S.D.Fla.1971), *aff'd,* 468 F.2d 1397 (5th Cir. 1972) (per curiam) (hydrochloric acid caused by rocket emissions resulting in damage to crops); *Kuhne v. United States,* 267 F. Supp. 649 (E.D.Tenn.1967) (exposure to radiation while manufacturing nuclear bomb material)).

As the above cases demonstrate, courts applying *Baker* and *Gilligan* routinely hold that the political question doctrine has no application to suits, like this one, which seek monetary damages in tort from the United States or civilian contractors for injuries arising from military-related activities. Accordingly, Plaintiffs' tort claims for damages are not "constitutionally committed to coordinate branches of government," and the first *Baker* factor is not present.

### C. Tort law, statutes, and regulations provide clear judicial standards upon which this Court can rely

The second *Baker* factor, which renders nonjusticiable cases where there is "a lack of judicially discoverable and manageable standards for resolving it," *Baker*, 369 U.S. at 217, is inapplicable to the present matter because Plaintiffs' negligence and product liability claims are firmly rooted in ordinary tort principles. *See McMahon v. Presidential Airways, Inc.*, 460 F. Supp. 2d 1315, 1322 (M.D.Fla. 2006), *aff'd*, 502 F.3d 1331 (11th Cir. 2007) ("[C]ases involving traditional tort liability—even if they relate to the military or

occur during a time of war—are capable of judicial resolution. The judicial standards required are no different than in ordinary tort actions; it is simply the context that has changed.")

In *Norwood v. Raytheon Co.*, 455 F. Supp. 2d 597 (W.D. Texas 2006), the Court considered and rejected the same arguments and authorities that Raytheon and Lockheed present anew here. As here, the case involved negligence and product liability claims against Raytheon and other manufacturers, including allegations related to radar systems. *Id*. at 599-600. The plaintiffs were American and German army veterans who were exposed to ionizing radiation due to inadequate shielding within Raytheon's radar. *Id*. The Court held that such tort claims for damages are easily manageable "because the common law of tort provides clear and well-settled rules on which the district court can easily rely[.]" *Id*. at 605 (*quoting Klinghoffer*, 937 F.2d 44, 49.) As noted above, a tort case for damages is "[u]nlike the request for injunctive relief in the *Gilligan* case" because "Plaintiffs' request for damages from defense contractors would in no way require judicial oversight of military decisions." *Id*.

The *Norwood* Court also held *Aktepe v. U.S.*, 105 F.3d 1400 (11th Cir. 1997) – a case relied on by both Contractor Defendants – was "inapposite" to negligence and product liability claims against weapons manufacturers. *Norwood,* 455 F. Supp. 2d at 605. The same is true here. *Aktepe* considered claims that the U.S. Navy negligently conducted a simulated battle scenario in which the *USS Saratoga* inadvertently fired two live missiles at a Turkish warship, killing two and injuring hundreds of allied sailors. *See* 105 F.3d at 1402. During the wargame, the American and Turkish ships were assigned to different "teams" that were both under orders to actively "seek and 'destroy' each other" using "all warfare assets at their disposal to achieve victory" in simulated confrontations. *Id*. at 1401. The *Saratoga*'s commanders initiated what they intended as a simulated assault on the Turkish vessel, but did not inform all missile system operators that they were taking part in a drill rather than actual combat. *Id*. at 1402. The commanders also failed

26

to understand terms a missile operator used to inform them he was preparing to fire live missiles, and the *Saratoga* inadvertently fired on the Turks as a result. *Id*. Considering the negligence claims, the Second Circuit held that there were no judicially manageable standards a court could apply to the questions presented, including whether "the Navy behaved negligently when it declined to advise each member of the [missile] team that the firing was a drill without regarding the necessity of simulating actual battle conditions." *Id*. at 1404. The Eleventh Circuit reached a similar conclusion in *Carmichael v. Kellogg, Brown & Root, Inc.*, holding that a negligence claim alleging that excessive speed caused a truck accident in a warzone was non-justiciable because the truck was driving in accordance with the Army's orders and policies. 572 F.3d 1271, 1283.

Plaintiffs' case is fundamentally different. Unlike *Aktepe* and *Carmichael*, this case will not delve into the weeds of a training exercise or warzone to determine whether the military's goals or policies were reasonable. It also does not turn on "questions about what is necessary to prepare our nation defend itself against foreign threats" or "decisions that the Department of Defense made to advance the security of our nation" as Raytheon contends. Raytheon Mem. at 22-23. Nor must the Court second-guess military policy decisions concerning the Navy's funding priorities, development timelines of the relevant systems, or threats from rogue nations. *See* Lockheed Mem. at 15. Instead, as explained below, Plaintiffs' negligence claims are about whether the alleged missile testing that took down TWA 800 *complied* with rules established by Congress, the FAA, and the Navy concerning the use of airspace. Their product liability claims concern whether the equipment used *complied* with Navy specifications. As a result, these questions do not require any second-guessing of military strategy or policy. They are justiciable according to well-established and manageable standards.[11]

---

[11] Plaintiffs' Second Amended Complaint discusses contextual facts relating to military policy decisions. SAC at ¶¶ 32-93. These facts merely provide background information

First, Plaintiffs' allegations that the defendants negligently tested a defective missile system *in commercial airspace* implicate Congressional and regulatory mandates, and the Navy's own operational instructions and specifications. *See* SAC at ¶ 5, 108-110, 138, 140. For example, Congress passed the Federal Aviation Act of 1958 "to provide for the safe and efficient use of the airspace by both civil and military aircraft." PL 85-726, Aug. 23, 1958. The Act, now codified under 49 U.S.C. § 40101 *et seq.*, requires the Federal Aviation Administrator to "assign by regulation or order the use of the airspace necessary to ensure the safety of aircraft," including provisions designed to "prevent[] collision [. . .] between aircraft and airborne objects" and "encourage and allow maximum use of the navigable airspace by civil aircraft consistent with national security." 49 U.S.C. § 40103(b)(2-3). Under the Act's authority, the Federal Aviation Administration ("FAA") has established for military and national security purposes special use airspace ("SUA") "wherein activities must be confined because of their nature, or wherein limitations are imposed upon aircraft that are not a part of those activities, or both." 14 CFR 73.3. Published FAA and Navy orders further define the categories, boundaries, and allowable uses of such airspace. *See* Roddy Decl. at ¶ 5, Exhibit 1, OPNAV Instruction 3770.2, Department of the Navy Airspace Procedures and Planning ("OPNAVINST 3770.2"); Roddy Decl. at ¶ 6, Exhibit 2, FAA Order 7400.8, Special Use Airspace ("Order 7400.8"). Notably, the Navy lacks the authority to unilaterally establish SUAs, and must instead request approval from the FAA. OPNAVINT 3770.2 at 4-3, 4-7, 4-8, 4-9, 4-10.

The Navy stresses that "it is imperative military air operations be constrained to assigned or delegated airspace except in cases of emergency or military necessity."

---

and establish the applicability of the Discovery Rule and fraudulent concealment doctrine to toll the statute of limitations. They do not concern the gravamen of Plaintiffs' causes of action, which arise from the testing of missile systems in commercial airspace. *Id.* at 108-128; 134-148.

OPNAVINST 3770.2 at 3-9. Furthermore, Navy and FAA policies require that civilian pilots are afforded notice of airspace closures through aeronautical charts and the Notice to Airmen ("NOTAM") system. *Id*. at 3-5, 4-9, 4-10; Roddy Decl. at ¶ 7, Exhibit 3, FAA Aeronautical Information Manual at 3-4-1. It follows that routine, non-emergency developmental testing of live missiles, outside of the Navy's assigned or delegated airspaces specifically established for such purposes, without providing notice via charted airspace closures or NOTAMs, *violates* these policies and constitutes negligence.

The precise nature and application of these mandates must be determined through discovery.[12] But at this early stage, the mere existence of such a comprehensive body of airspace usage rules, coupled with traditional tort law concepts, means that there is no lack of judicially manageable standards for evaluating whether military testing of missiles within civilian, commercial airspace is actionable. Indeed, numerous appellate cases have applied similar standards, establishing that courts "do not hesitate to review military action" to determine questions including "whether military officials have acted within the scope of their powers" and "whether military officials violated their own regulations." *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1031 (10th Cir. 2001).

For example, in *United Air Lines, Inc. v. Wiener*, the Ninth Circuit evaluated negligence claims under the FTCA after an Air Force F-100 jet on a training mission collided with a civilian DC-7 airliner within commercial airspace, killing all passengers and crew of both aircraft. 335 F.2d 379, 384. The Court held that "the United States was under a duty to control the operation of its airplanes with due regard for the safety of other users of the airspace," and that the breach of said duty was actionable in light of

---

[12] For example, Plaintiffs attach as Exhibits 1 and 2 the earliest versions of OPNAVINST 3770.2 and Order 7400.8 available publicly on the internet. Although Plaintiffs do not anticipate that prior versions of these orders will include material changes, Plaintiffs will need discovery to obtain the versions in effect in 1996.

Air Force regulations requiring that the training exercises be conducted "outside populous areas" in "the least congested airspace." *Id.* at 393-95.

Similarly, in *Ward v. U.S.*, the Third Circuit reviewed a negligence claim for injuries allegedly suffered as a result of sonic booms caused by supersonic B-58 bombers operating in air corridors over Pittsburgh. 471 F.2d 667, 668 (3d Cir. 1973). The Air Force submitted affidavits stating that the highest civilian and military authorities had determined that the security of the Nation depended on operating the aircraft over populated areas. *Id.* at 669. In rejecting that argument, the Third Circuit held that such evidence did not preclude a finding of negligence and reversed the District Court's award of summary judgment for the United States. *Id.*

The Eighth Circuit reached a similar result in *Peterson v. U.S.* after an Air Force B-52 aircraft on a training mission flew too low over the plaintiff's farm, startling his dairy cows and causing bodily injury. 673 F.2d 237, 238. After a bench trial, the District Court found that the plaintiff did not prove liability under the Federal Tort Claims Act despite presenting evidence that that the pilot's low altitude violated Air Force test procedures, FAA regulations, and state law. *Id.* at 238. The Eighth Circuit reversed, holding that violations of such policies amounted to actionable negligence, and directed the District Court to enter a verdict for the plaintiff on remand. *Id.* at 240-42.

As in *United Air Lines*, *Ward*, and *Peterson*, Plaintiffs' negligence claims here are premised on allegations that defendants "owed a duty not to negligently test missiles in commercial airspace," and "breached that duty by negligently testing missiles in commercial airspace." SAC at ¶¶ 108-110. Moreover, the evidence will show that at the time of explosion, TWA 800 was indeed operating in commercial airspace known as the Sardi sector, which was not subject to any charted or noticed closures. Roddy Decl. at ¶ 8, Exhibit 4, NTSB Docket No. SA-516, Exhibit No. 3-A, Air Traffic Control Factual Report at 15. The plane did not venture into the nearest SUAs delegated for military

use, a Warning Area[13] termed W-105 and an Altitude Reservation[14] called Tango Billy. *Id*.; Roddy Decl. at ¶ 9, Exhibit 5, NTSB Docket No. SA-516, Exhibit No. 3-4 at (Q), Special Use Airspace. These negligence claims do not ask the Court to evaluate the wisdom of any military policy, but rather seek damages for *violations of existing policies*. Such claims have always been recognized as justiciable. *Laird*, 408 U.S. at 15-16 (holding that nothing in the history or decisional law of the United States indicates that actual or threatened injury by reason of unlawful activities of the military is nonjusticiable); *Gilligan*, 413 U.S. at 11 (endorsing "accountability in a judicial forum for violations of law or specific unlawful conduct by military personnel").

Second, ample judicially manageable standards exist to evaluate Plaintiffs' product liability claims against the Contractor Defendants. Plaintiffs allege that the Contractor Defendants failed to warn Plaintiffs and the United States that their missile and radar systems could not be used "in a highly congested area that included commercial aircraft[.]" SAC at ¶¶ 139, 141. Accordingly, adjudication of these claims requires largely the same inquiry focused on airspace usage rules described above and no military policy decisions need be second-guessed.

Plaintiffs' allegations that weapons manufactured by the Contractor Defendants, including the SM-2 missile, Aegis SPY-1 radar, and associated systems "were flawed due to manufacturing defects, and did not conform to their specifications" also do not implicate the reasonableness of any military standards. SAC at ¶¶ 143-146. After all, the manufacturing defect claims are expressly premised on the *failure* to manufacture the

---

[13] Warning Areas are established for the military over waters more than 3 nautical miles from the coast and "contain[] activity that may be hazardous to nonparticipating aircraft." OPNAVINST 3770.2 at 3-7. "The purpose is to warn nonparticipating pilots of the potential danger." *Id*. They are depicted on aeronautical charts. *Id*. at 3-5.

[14] Altitude Reservations support utilization of airspace "under prescribed conditions normally employed for [military operations including] rocket and missile activities[.]" OPNAVINST 3770.2 at 3-9. The Navy issues warnings to steer clear of Altitude Reservations via NOTAMs. *Id*. at 4-9, 4-10.

relevant systems in accordance with military standards. Courts have repeatedly held that such manufacturing defect claims based on failure to meet military specifications are justiciable.

For example, in *Rodriguez v. General Dynamics Armament and Technical Products, Inc*, the Court held that no political question lies where "liability turns on whether the [weapon] was or was not defectively manufactured, a matter unrelated to any [military] policy or the wisdom of military operations and decision-making. Instead, this court will merely examine the manufacturer's performance." 696 F. Supp. 2d 1163, 1185 (internal quotation omitted). Because the case involved whether a mortar system was manufactured in violation of government requirements, no political question was implicated. *Id*. at 1186. Courts reached the same conclusions as to product liability claims arising from military hardware in *Norwood*, 455 F. Supp. 2d 597, 605 (radar system), *Getz v. Boeing Co.*, 2008 WL 2705099 at *9 (N.D. Cal. 2008) (helicopter engines); *Carpenter v. Sikorsky Aircraft Corp.*, 101 F. Supp. 3d 911, 928 (C.D. Cal. 2015) (helicopter tail rotor); *McMahon v. General Dynamics Corp.*, 933 F. Supp. 2d 682, 695 (D.N.J. 2013) (machine guns). Similarly, here, Plaintiffs' allegation that the "manufacturing process was faulty is not a political question; it is a routine issue of civil, and civilian, tort law." *McMahon*, 933 F. Supp. 2d at 695.

As these authorities make clear, the Contractor Defendants' arguments that courts lack competence to review military activities is false. The second *Baker* factor is inapplicable in light of tort law, airspace usage standards, and design specifications.

**D. Plaintiffs' claims do not involve an initial policy determination of non-judicial discretion.**

This suit does not implicate the third *Baker* factor, because it does not "require an initial policy determination of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217. Plaintiffs merely seek damages for wrongful death caused by negligent use of a defective weapon system. They are not seeking injunctive relief or challenging any

policy of the military. "Because this is an ordinary tort suit, there is no 'impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion.'" *McMahon*, 502 F.3d at 1364-65 (*quoting Baker*, 369 U.S. at 217.)

**E.  The three remaining Baker factors are inapplicable.**

The final three *Baker* factors—the impossibility of a court's undertaking independent resolution without expressing lack of the respect due a coordinate branch of government, an unusual need for an unquestioning adherence to a political decision already made, or the potentiality of embarrassment from multifarious pronouncements by various departments on one question—are also not present here. These factors are interrelated, and "appear to be relevant only if judicial resolution of a question would contradict prior decisions taken by political branch in those limited contexts where such contradiction would seriously interfere with important governmental interests." *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995). Again, Plaintiffs do not challenge any military policy decision and these factors are also inapplicable.

**F.  The Contractor Defendants' potential defenses are not dispositive.**

Both Lockheed and Raytheon extensively rely on *Amedi v. BAE Systems, Inc.*, in which the Court dismissed claims that *did not* present a political question because, the Court reasoned, the defendant's likely defenses inevitably would. 782 F. Supp. 2d 1350, 1357 (N.D. Ga. 2011). In *Amedi*, the plaintiff alleged manufacturing defects after an armored vehicle was destroyed by an improvised explosive device, killing a contractor inside. *Id.* at 1351-52. *Amedi* is not just factually distinguishable—it arose in an active warzone and not in a commercial airway a few minutes away from one of the busiest civilian airports in the county—it also has never been relied upon by any valid subsequent case.[15] *Amedi* is not binding and should not even be seen as persuasive. It is

---

[15] The only subsequent decision to even reference *Amedi* was a District Court order in *In re KBR, Inc., Burn Pit Litigation* that itself was subsequently reversed on appeal. 925 F. Supp. 752, 765 (D. Md. 2013), rev'd by 744 F.3d 326.

too broad, giving defendants too much power to define the issues. Indeed, its reasoning would bar virtually any claim against a military contractor because the contractor would only need to blame the military to invoke absolute immunity under the political question doctrine. This Court should ignore *Amedi*'s aberrant holding.

### G. It would be premature to dismiss Plaintiffs' case without allowing any discovery.

Plaintiffs submit that the Contractor Defendants' motions should be denied outright. But even if the Court is not inclined to do so, their requests are premature. Plaintiffs' negligence and product liability claims do not call into question any strategic military decisions, but rather focus on issues long held to be justiciable including airspace use policies and manufacturing defects. In such circumstances, "it would be inappropriate to dismiss the case on the mere chance that a political question may eventually present itself." *McMahon*, 502 F.3d 1331, 1365. Indeed, even the cases which the Contractor Defendants rely upon most, including *Aktepe* and *Carmichael*, were decided in light of a complete factual record after completion of discovery. *Aktepe*, 105 F.3d at 1401 (granting summary judgment based on uncontested facts); *Carmichael*, 572 F.3d at 1279 (granting motion to dismiss "after completion of discovery); *cf. Carmichael v. Kellog, Brown & Root, Inc.*, 450 F. Supp. 2d 1373, 1376 ("*Carmichael I*") (denying motion to dismiss on political question grounds as premature prior to commencement of discovery). Plaintiffs here should be afforded the same opportunity to conduct discovery as the litigants in cases that the Contractor Defendants assert are controlling.

## VI.   CONCLUSION

For the reasons set forth above, Plaintiffs respectfully ask the Court to deny the Contractor Defendants' motions to dismiss. In the event the Court is inclined to grant any part of their motions, Plaintiffs respectfully request that they be granted leave to amend.

Respectfully submitted,

Dated: February 10, 2023            BAILEY & GLASSER LLP

By: */s/ John Roddy*
John Roddy (BBO. No. 424240)
*jroddy@baileyglasser.com*
**Bailey & Glasser LLP**
176 Federal Street, 5th Floor
Boston, MA 02110
Telephone: (617) 439-6730
Facsimile: (617) 951-3954

Todd A. Walburg (*Admitted Pro Hac Vice*)
*twalburg@baileyglasser.com*
Leslie A. Brueckner (*Pro Hac Vice Pending*)
*lbrueckner@baileyglasser.com*
Scott B. Baez (*Admitted Pro Hac Vice*)
*sbaez@baileyglasser.com*
**Bailey & Glasser LLP**
1999 Harrison Street, Suite 660
Oakland, CA 94612
Telephone: (510) 272-8000
Facsimile: (510) 463-0291

Benjamin L. Bailey (*Admitted Pro Hac Vice*)
*bbailey@baileyglasser.com*
Eric B. Snyder (*Admitted Pro Hac Vice*)
*esnyder@baileyglasser.com*
Christopher D. Smith (*Admitted Pro Hac Vice*)
*csmith@baileyglasser.com*
**Bailey & Glasser LLP**
209 Capitol Street
Charleston, West Virginia 25301
Telephone: (304) 345-6555
Facsimile: (304) 342-1110

***Attorneys for the Plaintiffs***

35

**<u>Certificate of Service</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF) on February 10, 2023.

*/s/ John Roddy*
John Roddy
