## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| |
|---|
| RONALD KRICK, Individually and on Behalf of the Estate of Oliver Krick; MARGARETA KRICK; CHRISTOPHER KRICK; DOUGLAS KEVORKIAN, Individually and on Behalf of the Estate of Ralph Kevorkian; LISA MICHELSON, Individually and on Behalf of the Estate of Yonatan Rojany; ERIC ROJANY; JODELLE GEARON, Individually and on Behalf of the Estate of Daniel Gaetke; TODD GAETKE; CRAIG GAETKE; WANDA KEMP, Individually and on Behalf of the Estates of O. Lamar Allen and Ashton Allen; CHRISTINE GROGAN; EILEEN ZAHARIOUDAKIS, Individually and Behalf of the Estate of Donald Gough; and MICHAEL DETERESA, |
| Plaintiffs, |
| v. |
| RAYTHEON COMPANY; LOCKHEED MARTIN CORPORATION; UNITED STATES; And DOES 1 through 20, inclusive, |
| Defendants. |

Civil Action No. 1:22-CV-11032-AK

### MEMORANDUM AND ORDER ON MOTIONS TO DISMISS

**A. KELLEY, D.J.**

Plaintiffs Ronald Krick (individually and on behalf of the estate of Oliver Krick),

Margareta Krick, Christopher Krick, Douglas Kevorkian (individually and on behalf of the estate

of Ralph Kevorkian), Lisa Michelson (individually and on behalf of the estate of Yonatan

Rojany), Eric Rojany, Jodelle Gearon (individually and on behalf of the estate of Daniel Gaetke),

Todd Gaetke, Craig Gaetke, Wanda Kemp (individually and on behalf of the estates of O. Lamar

Allen and Ashton Allen), Christine Grogan, Eileen Zahariousdakis (individually and on behalf of

1

the estate of Donald Gough), and Michael Deteresa (collectively "Plaintiffs") filed suit against

Raytheon Company ("Raytheon"), Lockheed Martin Corporation ("Lockheed Martin"), the

United States (collectively "Defendants"), and DOES 1 through 20, in connection with the crash

of Trans World Atlantic Flight 800 ("TWA 800"). [1]  Plaintiffs claim the explosion was not

caused by a defect in the TWA 800 airplane as proffered by the government officials, but instead

by the aircraft's collision with an errant United States missile.  [Dkt. 33 at ¶ 4].  Plaintiffs allege

negligence and gross negligence (count I), and wrongful death and survivorship (count II)

against all defendants.  [Dkt. 33 at ¶¶ 105-31].  Plaintiffs also allege product liability for failure

to warn and manufacturing defect against Raytheon, Lockheed Martin (collectively "Defendant

Contractors"), and DOES 1 through 20 (count III).  [Dkt. 33 at ¶¶ 132-48].  Plaintiffs request

relief through monetary damages (count IV).  [Dkt. 33 at 35-36].  Each Defendant filed separate

motions to dismiss [Dkts. 41; 43; 72], which Plaintiffs opposed [Dkts. 75 and 85].  For the

reasons set forth below, the Defendant Contractors' Motions to Dismiss and the United States'

Motion to Dismiss are **DENIED WITHOUT PREJUDICE** and the matter will be

**TRANSFERRED**.  Plaintiffs are **ORDERED** to file a statement stating their preference for

venue and the reason for why their preference should be granted.

## I.   BACKGROUND

The following summary is based upon allegations in the Plaintiffs' Second Amended

Complaint [Dkt. 33], which are accepted as true for the purpose of considering the instant

motions before the Court.  See Doe v. Town of Wayland, 179 F. Supp. 3d 155, 163 (D. Mass.

2016).

---

[1] The Court notes that Plaintiffs previously sued Boeing, TWA, and Hydro-Aire (fuel system manufacturer) in the Southern District of New York and received a settlement.  [Dkt. 74 at 14]; see In Re Air Crash off Long Island, No. 96 Civ. 7986, MDL No. 1161 (S.D.N.Y. Oct. 24, 1996).

On July 17, 1996, TWA 800 departed from John F. Kennedy International Airport in New York destined for Paris.  [Dkt. 33 at ¶¶ 1-2].  Within twelve minutes of takeoff, the plane exploded and crashed into the Atlantic Ocean, killing all 230 passengers and crew members aboard.  [Id. at ¶ 2].  According to the Federal Bureau of Investigations ("FBI"), the crash was caused by a "defect in the plane's center fuel tank."  [Id. at ¶¶ 47 and 54].  The FBI also dispelled rumors that the plane had been struck by a projectile or missile.  [Id. at ¶¶ 47-48].

Roughly twenty-five years later, Plaintiffs met with a physicist, Dr. Thomas Stalcup, who uncovered new evidence related to TWA 800's explosion through his 10-year Freedom of Information Act ("FOIA") litigation in this District, the United States District Court ("USDC") of Massachusetts.  [Id. at ¶¶ 4, 96].  This evidence reveals that the United States and its agencies, acting in concert with Contractor Defendants, conducted initial operational tests of the SPY-ID(V) radar upgrade with testing that involved firing at least one missile with a live warhead in May of 1996.  [Id. at ¶¶ 61, 70].  This testing—firing live warheads off the coast of New Jersey and New York—was "a departure from prior practices."  [Id. at ¶¶ 5, 32].  The Department of Defense urged the missile system to proceed "as quickly as possible to production and deployment" to increase defense capabilities.  [Id. at ¶ 56].  Consequently, the Senate Committee approved the funding and the Navy accelerated testing and development of the next-generation Aegis missile system.  [Id. at ¶ 58].  Instead of conducting testing away from potential flight paths of other aircrafts, SPY-ID(V) was tested on an expedited basis in and around a land-based testing site called the Combat Systems Engineering and Development Site ("CSEDS") in New Jersey, which is a highly congested area.  [Id. at ¶¶ 63-65].

The evidence obtained through Dr. Stalcup's FOIA litigation also suggests that the FBI interfered with the National Transportation Safety Board ("NTSB") investigation.  [Id. at ¶¶ 84-

92].  Following the TWA 800 collision, the FBI led the investigation of the incident and enlisted the assistance of the CIA, rather than allowing NTSB— the agency tasked with investigating all domestic aviation incidents— to lead investigative efforts.  [Id. at ¶ 39].  Throughout the course of its investigation, the FBI removed all copies of Navy radar tapes and refused to allow the NTSB to conduct eyewitness interviews or review the FBI's results regarding the cause of the TWA 800 crash.  [Id. at ¶¶ 40-41].  These copies of the Navy radar tapes were finally released and show an object "heading straight for TWA 800."  [Id. at ¶ 84].  This information appears to corroborate previously discredited testimony from eyewitnesses, many of whom maintained that they saw something "arcing" toward TWA 800 before the plane exploded, but were not permitted to testify at any NTSB hearings.  [Id. at ¶¶ 41-46, 85].  Some eyewitnesses reported being threatened by the FBI to "keep quiet."  [Id. at ¶ 41].

Dr. Stalcup compiled the aforementioned evidence and hosted a meeting with Plaintiffs, where he shared what he had learned through his protracted FOIA lawsuit.  [Id. at ¶¶ 96-97].  Prior to this meeting on April 15, 2021, Plaintiffs were not aware of the information.  [Id. at ¶¶ 97-98].  With the belief that the information shared was "key evidence confirming" a U.S. missile caused the collision, Plaintiffs filed their first complaint on June 28, 2022 and later amended it.  [Dkts. 1; 6; and 33 at ¶¶ 96-97].  On November 17, 2022, Plaintiffs filed their Second Amended Complaint (hereinafter referred to as "Amended Complaint") alleging additional claims, to include, negligence and wrongful death claims under the Federal Torts Claim Act ("FTCA").  [Dkt. 33].  Defendants separately filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  [Dkts. 42; 43; 72].  Defendant Contractors move to dismiss on the grounds that all claims are barred by the statute of limitations and the claims present a nonjusticiable political question.  [Dkts. 41 and 43].  The United States moves to

dismiss on the grounds that the claims are untimely and the USDC of Massachusetts is not the proper venue, along with other arguments that will not be addressed in this decision.  [Dkt. 74].

## II.        LEGAL STANDARD

Federal courts are of limited jurisdiction, and on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(3), a court may only authorize dismissal when a venue is "wrong" or "improper" in the forum in which it was brought.  Atl. Marine Const. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Tex., 571 U.S. 49, 55 (2013).  Once a defendant raises the issue of venue through a motion to dismiss, the plaintiff has the burden to demonstrate that venue is proper. Cordis Corp. v. Cardiac Pacemakers, 599 F.2d 1085, 1086 (1st Cir. 1979).  Where one party makes a claim of improper venue and the other counterargues, a district court "may examine facts outside the complaint to determine whether its venue is proper."  Blacksmith Invs., LLC v. Cives Steel Co., 228 F.R.D. 66, 70 (D. Mass. 2005) (citation omitted).  If a court finds venue is improper, it "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."  28 U.S.C. § 1406(a).

## III.       DISCUSSION

The United States moves to dismiss Plaintiffs' Amended Complaint for improper venue in accordance with 28 U.S.C. § 1405(b), which limits the venue where an FTCA claim can be brought.  [Dkt. 74 at 2].  The United States also argues that the matter should be dismissed and not transferred due to the expiration of the statute of limitations.  [Id. at 29-31].  Defendant Contractors—Raytheon, with a principal place of business in Massachusetts, and Lockheed Martin—do not dispute the venue; however, they agree the Amended Complaint is untimely. [See Dkts. 33; 41 at 1; 43 at 1; 85 at 28; 91 at 1; 92 at 2-3].  While the United States' venue challenge is based upon the more constraining requirements of the FTCA, the Court notes the Defendants' passing comments that some of the claims are maritime torts and as such fall within

admiralty jurisdiction.[2]  This Court, however, bases its analysis on the parties' briefing and arguments that there is an FTCA claim here.  As requested by the United States, the Court must address the statute of limitations for the limited purpose of determining whether it is in the interest of justice or futile to transfer the matter for each Defendant, respectively.  "In performing this task, the court must credit the plaintiff's well-pleaded factual allegations (usually taken from the complaint …), draw all reasonable inferences from them in [plaintiffs'] favor, and dispose of the challenge accordingly."  Valentin v. Hosp. Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001).

### A.  Venue

"[C]ourts should ordinarily satisfy jurisdictional concerns before addressing the merits of a civil action."  Feinstein v. Resolution Trust Corp., 942 F.2d 34, 40 (1st Cir. 1991); see e.g., Call v. Czaplicki, No. 09-6561 (RBK/AMD), 2010 WL 3001395, at *3 (D.N.J. July 28, 2010) (stating that the "Court must address procedural issues before turning to the substantive challenges" that defendants raise); Hughes v. BCI Int'l Holdings, Inc., 452 F. Supp. 2d 290, 300 (S.D.N.Y. 2006) (addressing defendant's challenge to personal jurisdiction and venue before the "sufficiency of plaintiffs' substantive allegations"); Las Americas Immigrant Advoc. Ctr. v. Trump, 475 F. Supp. 3d 1194, 1202 (D. Or. 2020), on reconsideration sub nom.  Las Americas Immigrant Advoc. Ctr. v. Biden, 571 F. Supp. 3d 1173 (D. Or. 2021) (addressing venue first because "if venue were improper, there would be no reason to address substantive issues …").

---

[2] "For a tort to be considered maritime, it must meet two tests: the situs of the tort must be maritime (the location test) and the tort must bear a significant relationship to traditional maritime activity (the nexus test)."  Carey v. Bahama Cruise Lines, 864 F.2d 201, 207 n. 4 (1st Cir. 1988) (citations omitted).  The crash of TWA 800 occurred over the Atlantic Ocean, a navigable waterway, and possibly had a disruptive impact on maritime commerce, thus arguably making this a maritime tort claim.  See id.; see also In re Air Crash at Belle Harbor, 2006 WL 1288298, at *10 (S.D.N.Y. May 9, 2006) ("Because . . . nearly all of the aviation cases governed by maritime law involve actual crashes of aircraft in navigable waters, the potential effects upon maritime commerce are very great, and these cases are properly included within admiralty jurisdiction."); see also In re Air Crash Into Java Sea on Jan. 9, 2021, No. 1:23-MD-3072, 2023 WL 5597824, at *4-5 (E.D. Va. Aug. 25, 2023) (finding where "a wrong occurred at least in part over navigable water" that caused a plane to crash into the sea fell within admiralty jurisdiction).

Where there are multiple defendants, venue must be proper as to each.  Stars for Art Prod. FZ, LLC v. Dandana, LLC, 806 F. Supp. 2d 437, 447 (D. Mass. 2011).  However, the FTCA claim against the United States is the determining factor here.[3]  The United States may only be prosecuted in the judicial district where (1) the plaintiff resides or (2) wherein the act or omission complained of occurred.  28 U.S.C. § 1402(b).  "Pursuant to pendent venue, federal courts may exercise their discretion to hear claims as to which venue is lacking if those claims arise out of a common nucleus of operative facts as the claims that are appropriately venued *and* the interests of judicial economy are furthered by hearing the claims together."  Omran v. United States, No. 1:14-CV-13881, 2016 WL 4158556, at *7 (D. Mass. June 22, 2016) (citation omitted).  However, the FTCA creates a "strong negative presumption against courts finding discretionary pendent venue" where venue would not be permitted under 28 U.S.C. § 1402(b).  Reuber v. United States, 750 F.2d 1039, 1049 (D.D.C. 1984) (overruled on other grounds).

Parties agree that none of the Plaintiff resides in Massachusetts.  [Dkts. 74 at 30; 85 at 27].  Thus, venue is dependent upon whether Plaintiffs' FTCA claim arises from acts or omissions occurring within this District of Massachusetts sufficient to provide proper venue.  See 28 U.S.C. § 1402(b).  If the selected venue is not where the plaintiff resides, courts carefully evaluate whether the act or omission is "sufficient" to give "rise" to where the plaintiff's cause of action took place to prevent forum shopping.  Zakiya v. United States, 267 F. Supp. 2d 47, 57-58

---

[3] Separate from the FTCA, under the basic tenets of venue, proper venue includes: 1) where the defendants reside if they are all residents of the state; 2) where "a substantial part of events or omissions giving rise to the claim occurred …"; 3) or where "any defendant is subject to the court's personal jurisdiction."  See 28 U.S.C. § 1391(b).  These same venue standards under Section 1391 apply to admiralty or maritime claims asserted under Rule 9(h).  Fed. R. Civ. P. 82.  Notwithstanding whether some or all claims against Contractor Defendants are within admiralty jurisdiction, Section 1391 venue requirements likely apply to them.  Accordingly, the current venue is proper under Section 1391 for the claims against the Contractor Defendants.  See 28 U.S.C. § 1391.  It is not proper for the FTCA, however, under Section 1402(b) for the forthcoming reasons stated herein.  For this reason, the FTCA is the determining factor here as to jurisdiction.

(D.D.C. 2003) (quoting <u>Franz v. United States</u>, 591 F.Supp. 374, 378 (D.D.C. 1984)).  "In other words, the plaintiff's choice of a forum is honored 'if the activities that transpired in the forum district were not insubstantial in relation to the totality of events giving rise to plaintiff's grievance.'"  <u>Franz</u>, 591 F.Supp. at 378 (quoting <u>Lamont v. Haig</u>, 590 F.2d 1124, 1134 n. 62 (D.C. Cir. 1978)); <u>see also</u> <u>Williams v. United States</u>, 932 F.Supp. 357, 363 (D.D.C. 1996).  The venue must be located where the "gravamen" of the alleged claims occurred.  <u>Zakiya</u>, 267 F. Supp. at 59.

In <u>Buchheit v. United Air Lines, Inc.</u>, for example, the plaintiff sued two airlines and the United States in the Southern District of New York on behalf of her decedent who was killed in a mid-air collision between two aircrafts.  202 F. Supp. 811, 812 (S.D.N.Y. 1962).  The court held that no act or omission occurred in the Southern District of New York—despite plaintiff's argument that negligent communications traveled through air waves over parts of New York within that court's jurisdiction.  <u>Id.</u> at 814-15.  Rather, the court focused on where the complaint alleged the crux of the negligent act or omission occurred, which was the government facilities where defendants negligently operated the radar, and where the collision occurred.  <u>Id.</u>

The "gravamen" of the allegations here is that the government engaged in reckless missile testing off the shore of New York and New Jersey that resulted in an errant missile strike of TWA 800 flight off the coast of New York.  Consequently, that is where the proper venue lies. See <u>Franz</u>, 591 F.Supp. at 378; <u>see also,</u> <u>Buchheit,</u> 202 F. Supp. at 812.

## B.  Statute of Limitations

Plaintiffs argue that if the venue is improper, then the Court should transfer the case to an alternative venue rather than dismiss the case.  [Dkt. 85 at 29].  The United States acknowledges that courts generally transfer the case, but argues that the Amended Complaint should be

dismissed because the claims are untimely.  [Dkt. 74 at 31].  The Court addresses the statute of limitations challenge solely to determine whether to completely dispose of the matter or transfer it for all substantive issues to be decided by the receiving court.

The FTCA encompasses its own statute of limitations.  28 U.S.C § 2671 *et. seq.* "Pursuant to the FTCA, a tort claim against the United States is 'forever barred' unless it is presented in writing to the appropriate federal agency within two years after the claim accrues."  Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir. 2022) (quoting 28 U.S.C. § 2401(b)).  Plaintiffs filed their administrative claims on October 4, 2021, 25 years after the crash but less than 6 months following the April 15, 2021 meeting with Dr. Stalcup.  [Dkt. 74 at 13]. Their administrative claim was denied on December 28, 2021, and Plaintiffs filed suit exactly six months afterwards on June 28, 2022.  [Dkt. 74 at 13]; see Barrett ex. rel. Est. of Barrett v. United States, 462 F.3d 28, 37 (1st Cir. 2006) (stating plaintiffs must file a complaint within six months of final denial).

Generally, a tort claim accrues at the time of a plaintiff's injury.  Gonzalez, 284 F.3d at 288.  When the allegations in a complaint demonstrate that "the passage of time between the events giving rise to the claim and the commencement of the action exceeds the applicable limitations period" and fail to "sketch a factual predicate," such conditions provide cause to toll the statute of limitations.  Abdallah v. Bain Capital LLC, 752 F.3d 114, 119 (1st Cir. 2014) (citations omitted).  Here, Plaintiffs agree that their complaint would be untimely but for the tolling of the statute of limitations.  [Dkt. 33 at ¶ 94].  They argue, however, that a number of exceptions apply that toll or extend the statute of limitations including the discovery rule, the fraudulent concealment doctrine, the doctrine of equitable estoppel, and the doctrine of laches. [Id. at ¶¶ 98-100].  Ultimately, Plaintiffs claim that the statute of limitations should not have

begun to accrue until April 15, 2021—the date when Dr. Stalcup informed Plaintiffs of key facts revealed through his FOIA lawsuit that formed the basis of this complaint—nor could they have discovered the true cause of their injury prior to this date due to concealment efforts.  [See id. at ¶ 98].  Defendants argue, however, that there is no basis to toll the statute of limitations.  [Dkts. 42 at 8-12; 44 at 17-27; 74 at 10-29; 82 at 2-6; 83 at 4-7].

### 1.  The Discovery Rule

Plaintiffs assert that the statute of limitations was tolled by the discovery rule because the government concealed the information that formed the basis of their complaint.  [Dkt. 33 at ¶ 99].  Defendants, however, argue that the discovery rule is not applicable because Plaintiffs immediately knew of their family members' fatal injuries and that the factual basis for the cause of action could be determined through the exercise of reasonable diligence.  [See Dkts. 42 at 8-9; 44 at 21; 74 at 19].  Under the discovery rule, a claim accrues "when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the factual basis for the cause of action."  Gonzalez, 284 F.3d at 288 (citation omitted).  In United States v. Kubrick, 444 U.S. 111 (1979), the Supreme Court established that the FTCA's statute of limitations may be tolled by the discovery rule in medical malpractice cases.  The First Circuit has since extended the discovery rule to FTCA claims outside of medical malpractice matters, to include wrongful death actions.  Skwira v. United States, 344 F.3d 64, 74 (1st Cir. 2003).

For the statute of limitations to toll under the discovery rule, the factual basis for the cause of action must have been "inherently unknowable" at the time of injury such that it was "incapable of detection by the wronged party through the exercise of reasonable diligence."  Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 376 (1st Cir. 1991) (citations omitted).  "The knowledge which triggers accrual . . . is the discovery of sufficient facts about the injury and its

cause to prompt a reasonable person to inquire and seek advice preliminary to deciding if there is a basis for filing an administrative claim against the government." Skwira, 344 F.3d at 78 (holding that where the family was aware of an ongoing investigation into the high number of deaths at the ward where decedent died, the cause of action accrued after the autopsy, when the family first learned decedent's cause of death differed from that listed on the death certificate). A cause of action does not accrue when a person has "a mere hunch, hint, suspicion, or rumor of a claim, but such suspicions do give rise to a *duty to inquire* into the possible existence of a claim in the exercise of due diligence." McIntyre v. United States, 367 F.3d 38, 52 (1st Cir. 2004) (citation omitted). Once a duty to inquire is established, the court must determine what the plaintiff would have uncovered through a reasonably diligent investigation, and if the results of that investigation would be enough to permit a reasonable person to believe there is a causal connection between the government and their injury. Id. at 52, 55 ("Even assuming arguendo that the Boston Herald article was enough to lead the McIntyres to suspect that the FBI leaked McIntyre's identity, and thus trigger a duty to inquire, a reasonably diligent investigation would still not have revealed the necessary factual predicate for their claim before the accrual date.").

If a plaintiff becomes aware that they have been wronged, they should promptly bring suit. See Id. at 55. However, if "competently advised to the contrary, he may be dissuaded, as he should be, from pressing a baseless claim." United States v. Kubrick, 444 U.S. 111, 124 (1979). Where a reasonable and seemingly final explanation of the cause of a plaintiff's injury presents itself, something else is needed to trigger accrual. Bennett ex rel. Bennett v. F.B.I., 278 F. Supp. 2d 104, 111-12 (D. Mass. 2003) (citing Cutting v. United States, 204 F. Supp. 2d 216, 227 (D. Mass. 2002)). The degree of knowledge of injury and its cause sufficient to "prompt a

reasonable person" to seek advice (on whether to bring a claim for example) will vary with the circumstances, but "conclusive knowledge is not necessary." Skwira, 344 F.3d at 79.

Obviously, Plaintiffs here immediately knew of their family members' fatal injuries, but argue that the cause of action was "inherently unknowable" at the time of the injury. [Dkt. 33 at ¶ 98]. Plaintiffs explain that although they were made aware of "the idea that TWA 800 was brought down by a missile" through official NTSB communications, NTSB—a government-adjacent, aviation agency—described the theory as an "'implausible conspiracy theory' without any basis in fact." [Dkt. 33 at ¶¶ 39, 52]. It instead explained that "a fuel tank scenario" was the true cause of the crash. [Id. at ¶ 52]. Generally, Plaintiffs' exposure to at least the idea of this missile theory would suffice as notice inquiry that would trigger the accrual of the statute of limitations. It would also activate the expectation that Plaintiffs exercise due diligence to further investigate. However, Plaintiffs argue—and the Court agrees—that the government's efforts to delegitimize the theory (through official communications and its own investigative reports) and dissuade Plaintiffs from exercising any further due diligence, is what distinguishes this case. [Dkt. 33 at ¶¶ 51-54]. After a thorough investigation by a number of agencies, the government told Plaintiffs the only possible cause of the crash was an explosion of flammable vapors in the plane's center fuel tank. [Id.]. It is reasonable that Plaintiffs trusted and believed that federal agencies and law enforcement such as the CIA, FBI, NTSB, and NTSB Office of Families were providing truthful information and competent advice. As the court in Bennett ex rel. Bennett v. F.B.I emphasized, "[a]fter all, the FBI is generally thought to be concerned with law enforcement and not an outlaw itself." 278 F. Supp. 2d 104, 110 (D. Mass. 2003). It is reasonable for the obligation to engage in further due diligence or investigation to end there.

Raytheon relies upon United States v. Kubrick, 444 U.S. 111 (1979) to argue that the statute of limitations runs regardless of whether Plaintiffs were correctly advised as to who was responsible for the crash. [Dkt. 44 at 22].  The Kubrick court holds that negligent or mistaken advice by a presumably competent advisor does not toll the statute of limitations; it only tolls for "a plaintiff in *possession of the critical facts* that he has been hurt and who has inflicted the injury."  Kubrick, 444 U.S. at 120 n.7, 122 (emphasis added).  Plaintiffs in the instant matter claim they were missing precisely what the Kubrick plaintiff had at the time of the crash: the critical facts about who in fact inflicted the injury.  Kubrick also does not account for intentional (not negligent or mistaken) and fraudulent efforts to conceal critical facts.

Defendants argue that, through reasonable diligence, Plaintiffs could have determined the key facts constituting their cause of action.  [Dkts. 42 at 9; 44 at 23; 74 at 19-21].  In support of this argument, Defendants attach several exhibits, including newspaper articles, to demonstrate how pervasive the missile theory was several years prior to Plaintiffs' meeting with Dr. Stalcup.  See e.g., Dkt. 45 at Exhibits 2-7.  First, the Court is unwilling to take judicial notice of this volume of materials outside the four corners of the complaint at the pleading stage, and to infer facts based upon these documents prior to discovery.  Additionally, this argument is especially unconvincing, as the extent to which information regarding the missile strike theory was available to the Plaintiffs and when, are questions of fact that may warrant discovery.  See Lawson v. Affirmative Equities Co., L.P., 341 F. Supp. 2d 51, 68 (D. Mass. 2004) ("Whether a plaintiff knew or should have known of an injury so as to trigger the running of a statute of limitations is, with rare exception, a jury issue."); see also Santiago Hodge v. Parke Davis & Co., 909 F.2d 628, 633 (1st Cir.1990) ("The determination of when appellees had knowledge of 'both the injury and its connection with the act of defendant,' . . . is a question of fact.") (quoting

Lavellee v. Listi, 611 F.2d 1129, 1131-32 (9th Cir. 1980); Riley v. Presnell, 565 N.E.2d 780, 783 (Mass. 1991) ("[T]he question when a plaintiff knew or should have known of his cause of action is one of fact which in most instances will be decided by the trier of fact."); cf. Young v. Lepone, 305 F.3d 1, 8–9 (1st Cir. 2002) (deciding whether "storm warnings" were sufficient to place plaintiff on inquiry notice should be determined as a matter of law *only* when the underlying facts are either admitted or undisputed).

Additionally, Dr. Stalcup only obtained the relevant information after, in the United States' own words, "undertaking actions that were … incredibly time consuming and expensive … engaging in decades long FOIA litigation." [Dkt. 74 at 21]. Even assuming *arguendo* that allegations of a missile strike were sufficiently well documented to the extent to trigger a duty to inquire, a "reasonably diligent investigation" would still not have revealed the necessary factual predicate for their claim before the accrual date. See McIntyre, 367 F.3d at 52, 55.

The United States points to three cases involving airplane crashes to argue that "airplane crash litigation does not turn on latent or unknowable causes," because the incident is "almost always a result of negligence." [Dkt. 74 at 16]. These cases are factually distinguishable from the allegations here, as in each, it is undisputed that the incident was a result of negligence by employees or staff responsible for the safety and operation of the aircraft, or a malfunction of the aircraft itself.[4] "The determination as to *when* a plaintiff has such knowledge is necessarily-fact intensive;" therefore, these factual distinctions are especially significant to the analysis here. Hertz v. United States, 560 F.3d 616, 619 (6th Cir. 2009). As Hertz discusses, "[p]lane crashes by their nature typically involve negligence somewhere in the causal chain," so the incident itself

---

[4] The United States relies upon Hertz v. United States, 560 F.3d 616 (6th Cir. 2009), Ressler v. United States, No. 11-cv-02253, 2012 WL 4328662, at *3 (D. Colo. Sept. 20, 2012), and Rademacher v. United States, Ex. 5, 3:19-cv-00157- TSL-RHW (N.D. Miss. Mar. 19, 2020), all involving the negligence of the air traffic controllers.

is "typically" sufficient for inquiry notice. 560 F.3d at 619. That is not the case here. It is reasonable that one would trust and believe the government reports and official communications advising Plaintiffs of negligence "in the causal chain." Plaintiffs "had little reason to suspect anything other than" what the government officials confirmed as an engine malfunction, and even less reason to seriously consider far-fetched (and denounced) rumors of a missile striking the aircraft. Hertz, 560 F.3d at 619. Similar to the medical malpractice cases, something more is needed to indicate the cause of death is due to other phenomena outside of the foreseeable or anticipated cause to trigger inquiry notice. See e.g., Drazan v. United States, 762 F.2d 56, 59 (7th Cir.1985) (concluding that plaintiff's mere knowledge that her spouse died of cancer did not trigger accrual of malpractice claim).

     Contractor Defendants similarly argue that the discovery rule does not toll the statute of limitations because the causes of action here were not "inherently unknowable" if Plaintiffs would have exercised due diligence and that definitive knowledge of the harm is not required to trigger accrual. [See Dkts. 44 at 11-14; 42 at 8-9]. Indeed, definitive knowledge is not required, and even decades after the incident, it does not appear Plaintiffs have in fact gained "definitive" knowledge of the details surrounding the crash. What Contractor Defendants have failed to account for are the government's efforts to conceal and delegitimize the missile theory within the discovery rule analysis. The message from the government regarding the missile theory was loud and clear: this is not a tenable theory and there is nothing to support the missile theory. This message was backed by the authority and legitimacy that is inherent to nearly every agency or arm of the federal government. Thus, it is reasonable for Plaintiffs to need "something more" than a blog or article on the internet, for example, to trigger an accrual period. In contrast, the radar tapes the government produced as a result of Dr. Stalcup's FOIA litigation, display an

object colliding with the plane, carries more weight than a circulated story containing a presumably debunked rumor.

It is true that Plaintiffs have not alleged with specificity that Contractor Defendants engaged in efforts to conceal the missile strike.  It is also inconsequential to Plaintiffs' success under the discovery rule.  While the government's concealment efforts are inextricably linked to the reasons Plaintiffs likely prevail under the discovery rule, Defendants have failed to provide case law holding that Contractor Defendants are required to have personally engaged in those efforts for the discovery rule to apply.  See United States v. Rockland Tr. Co., 860 F. Supp. 895, 904 (D. Mass. 1994) (the discovery rule analysis concerns whether the cause of action was "inherently unknowable").  Accordingly, application of the discovery rule resulting in a transfer of all claims here, would not be futile.

### 2.  The Fraudulent Concealment Doctrine

Plaintiffs claim that Defendants, led by the United States government, took active steps to mislead the public and families of the victims, as well as conceal information that the TWA 800 crash was caused by a missile.  [Dkt. 33 at ¶ 99].  Defendants argue that Plaintiffs failed to plead specific allegations of fraudulent concealment with particularity and failed to act with reasonable due diligence to obtain the alleged concealed facts.  [See Dkts. 42 at 10; 44 at 27; 74 at 24].  The fraudulent concealment doctrine, codified in Mass. Gen. Laws ch. 260, § 1, tolls the statute of limitations "where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part."  Salois v. Dime Sav. Bank, FSB, 128 F.3d 20, 25 (1st Cir. 1997) (citations and internal quotations omitted).  Thus, tolling of the statute of limitations under the fraudulent concealment doctrine requires the completion of two conditions: (1) "the defendant raising the limitations defense must have engaged in fraud or deliberate

concealment of material facts related to the wrongdoing," and (2) "the plaintiff must have failed to discover these facts within the normal limitations period despite his or her exercise of due diligence." Gonzalez, 284 F.3d at 292 (citations omitted).

### a. Particularity of Alleged Fraud or Deliberate Concealment

Pursuant to Federal Rule of Civil Procedure 9(b), facts giving rise to a fraudulent concealment claim must be pled with particularity. J. Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1255 (1st Cir. 1996). In the First Circuit, where multiple defendants are involved, "Rule 9(b) requires that fraud be alleged particularly as to each defendant." Goebel v. Schmid Bros., Inc., 871 F. Supp. 68, 73 (D. Mass. 1994). For *governmental* conduct to be considered fraudulent concealment it must "consist of affirmative acts or representations which are calculated to, and in fact do, prevent the discovery of the cause of action." Gonzalez-Bernal v. United States, 907 F.2d 246, 250 (1st Cir. 1990) (citation omitted). To plead with particularity, plaintiffs should include the time, place, and content of the false or fraudulent representations made by the defendant. Epstein v. C.R. Bard, Inc., 460 F.3d 183, 189-90 (1st Cir. 2006).

Under the first prong of the fraudulent concealment doctrine, Plaintiffs must demonstrate Defendants engaged in fraud or deliberate concealment of material facts related to the wrongdoing. See Gonzalez, 284 F.3d at 292, as corrected (May 8, 2002). Plaintiffs have failed to plead with any particularity, fraudulent concealment allegations against Contractor Defendants, so the analysis for those respective defendants ends here. Plaintiff's strongest argument for fraudulent concealment by the United States, however, is the standard set forth by the First Circuit, stating that the mere affirmative act of denying wrongdoing may constitute fraudulent concealment where the circumstances make it reasonable for a Plaintiff to rely upon

such denial.  Kennedy v. Josephthal & Co., Inc., 814 F.2d 798, 802 (1st Cir.1987); see also In re Atl. Fin. Mgmt., Inc. Sec. Litig., 718 F. Supp. 1003, 1011 (D. Mass. 1988).  Given the number of government agencies and personnel involved in the crash investigation, and as the United States pointed out in oral argument, a very thorough investigation was conducted, it was reasonable for Plaintiffs to rely upon the United States' denial that the crash was caused by a missile.

Other than the denial in and of itself, Plaintiffs include specific details outlining fraudulent concealment efforts.  For example, the CIA produced materials to discredit the eyewitnesses by including a video that was displayed during a nationally broadcasted FBI press conference which stated: "What Did The Eyewitnesses See?  NOT A MISSILE."  [Dkt. 33 at ¶¶ 47-49].  As alleged in the Amended Complaint, the FBI removed all copies of the radar tapes from the Navy immediately following the crash and used threats to silence eyewitnesses.  [Dkt. 89].  It also prohibited the NTSB from following regular protocol or drafting analysis reports, and instead the FBI and CIA ran the investigation.  [Dkt. 33 at ¶¶ 39-41, 51].  The United States argues that the NTSB report may not be used as a basis for tolling the statute of limitations for the purpose of fraudulent concealment.  [Dkt. 74 at 25-27].  While Plaintiffs cannot use the final probable cause report from the Board, they can, however, use any individual investigator's investigation of the incident.[5]  Notwithstanding this distinction, the other allegations in the

---

[5] Other courts in the First Circuit—as we will here—have adopted the position in Chiron Corp. v. Nat'l Trans. Safety Bd., 198 F.3d 935 (D.C. Cir. 1999) that pursuant to 49 U.S.C. § 1154, "the statute means what it says: No part of the Board's actual report is admissible as evidence in a civil suit."  Fleming v. Robinson Aviation (RVA), Inc., No. CV 18-1511 (DRD), 2020 WL 12182613, at *1 (D.P.R. Oct. 7, 2020) (quoting Chiron Corp., 198 F. 935, 941 (D.C. Cir. 1999); see West v. Bell Helicopter Textron, Inc., 967 F. Supp. 2d 479, 501 (D.N.H. 2013).  However, 49 C.F.R. § 835.2 distinguishes between the use of the final report including the conclusion of the Board (not admissible) and the individual factual reports from the investigator's investigation of the incident (admissible).  See 49 C.F.R. § 835.2; see also Lidle v. Cirrus Design Corp., No. 08 CIV. 1253 BSJHBP, 2010 WL 1644958, at *2 (S.D.N.Y. Apr. 22, 2010).

Amended Complaint suffice to establish the "time, place, and content"[6] of affirmatively false or fraudulent representations made by the United States.

### b.  Reasonable Due Diligence to Obtain Alleged New Information

Even if allegations are pleaded with the necessary specificity, plaintiffs are still required to exercise reasonable diligence.  See Truck Drivers & Helpers Union, Loc. No. 170 v. NLRB, 993 F.2d 990, 998 (1st Cir. 1993).  "[I]rrespective of the extent of the effort to conceal," the fraudulent concealment doctrine will not extend to a party that has failed to exercise diligence. Truck Drivers, 993 F.2d at 998; Geils Band Employee Ben. Plan, 76 F.3d at 1255.  This is especially true where a plaintiff does not or should not believe a defendant's false representations.  Callahan v. United States, 337 F. Supp. 2d 348, 368 (D. Mass. 2004) (citation omitted).  Normally, the party seeking to toll the statute through the fraudulent concealment doctrine has the burden of showing due diligence.  Truck Drivers, 993 F.2d at 998 (citing Hobson v. Wilson, 737 F.2d 1, 35 (D. D.C. 1984)).  However, if plaintiffs allege the statute is tolled by a self-concealing[7] wrong, defendants have the burden of showing plaintiff could have, with due diligence, discovered the cause of action.  Id.  When an injury is "self-concealing," parties may be unaware they have been harmed.  Gabelli v. S.E.C., 568 U.S. 442, 450 (2013). Accordingly, the law does not require people to "spend [their] days looking for evidence that [they] were lied to or defrauded."  Id. at 450-51.  The First Circuit has not set forth a standard for determining when a plaintiff has sufficiently alleged a self-concealing wrong such that it shifts the burden, but "the standard is met where the facts alleged demonstrate the wrongful act was

---

[6] See Epstein, 460 F.3d at 189-90.
[7] Courts describe "self-concealing" to mean when the fraud or wrong "is of such character as to conceal itself" (Hobson v. Wilson, 737 F.2d 1, 33 (D.C. Cir. 1984)) or is "commit[ed] . . . in a manner that it concealed itself" (Bailey v. Glover, 88 U.S. 342, 349 (1874)).

done in a way that made it difficult to discover." Kearney v. Rexam Pension Plan, No. 17-30073, 2018 WL 11469560, at *6 (D. Mass. Sept. 25, 2018).

Plaintiffs' Amended Complaint demonstrates that the alleged wrongful act was "done in a way that made it difficult to discover." Id. For example, the government put forth the engine malfunction explanation as the verified cause of the crash after thorough investigations by several different government agencies; it took actions to delegitimize the missile theory as a tenable cause for the crash; and it concealed evidence supporting the missile theory. [See e.g., Dkt. 33 at ¶¶ 47, 48, and 54]. Thus, the burden shifts to the United States to show Plaintiffs could have discovered the cause of action. Kearney, 2018 WL 11469560, at *6; see Truck Drivers, 993 F.2d at 998 (when tolling is justified due to concealment, the burden normally shifts to defendants to produce facts showing plaintiff could have discovered the cause of action).

The United States argues that sources covered the missile theory and had Plaintiffs exercised due diligence, they would have been made aware of the missile theory as a cause of their injury. [Dkts. 42 at 11; 44 at 27; 74 at 24]. The United States further argues that the alleged evidence was readily available through FOIA requests, and that Plaintiffs' previous retainment of legal counsel established that they had the means to seek out such information. [Id.]. Plaintiffs' response is convincing, when they point to the 10 years of FOIA litigation that Dr. Stalcup engaged in to unearth the new evidence used as a basis of this Amended Complaint, belying the notion that such information was "readily available." [Dkt. 85 at 23]. Plaintiffs' strongest argument, as discussed above, is that they had no reason to distrust the representations made by these government agencies that were allegedly engaging in due diligence on the families' behalf. See Callahan, 337 F. Supp. 2d at 368. Despite the dwindling public trust and confidence in the government, it has always been an honored value of our democracy.

Once the requirements for fraudulent concealment are met, the statute of limitations is tolled until there are "sufficient storm warnings to alert a reasonable person to the possibility that there were either misleading statements or significant omissions involved." Iconics, Inc. v. Massaro, No. 11-11526-DPW, 2016 WL 199407, at *7 (D. Mass. Jan. 15, 2016) (quoting J. Geils, 76 F.3d at 1255). Plaintiffs consider Dr. Stalcup's presentation as the "sufficient storm warning" alerting Plaintiffs that Defendants engaged in fraudulent concealment of the cause of action. [Dkt. 33 at ¶ 97]. Accordingly, the statute of limitations likely began to toll from the date Plaintiffs attended Dr. Stalcup's presentation, April 15, 2021, providing further indication a transfer would not be futile.

### 3. Equitable Estoppel and the Doctrine of Laches

Plaintiffs also argue that the doctrines of equitable estoppel and laches tolls the statute of limitations; the United States and Lockheed Martin counter that equitable tolling does not apply. [Dkts. 33 at ¶ 100; 42 at 11-12; 74 at 27-29]. The Court declines to address equitable estoppel or the doctrine of laches at this juncture, as it is not necessary for the purpose of determining whether to transfer the matter. Plaintiffs have sufficiently demonstrated to this Court that the transfer of their claims against the United States would not be futile.

### C. Transferal

Many courts have held that transfer is "generally preferable to dismissal" and routinely transfer, rather than dismiss cases, in accordance with 28 U.S.C. § 1406(a). Stars for Art Prod., 806 F. Supp. 2d at 449 (quoting Cormier v. Fisher, 404 F. Supp. 2d 357, 363 (D. Me. 2005)); see e.g., Rodriguez Aragones v. Pompeo, No. CV 19-055 WES, 2019 WL 6133957, at *2 (D.R.I. Nov. 19, 2019); Gibson v. Ecoquest, Inc., No. CV 16-2702 (BJM), 2017 WL 2859744, at *7 (D.P.R. July 5, 2017); Schiller v. Mit-Clip Co., 180 F.2d 654, 655 (2nd Cir. 1950); Norris v. Yates, 109 F. Supp. 436, 437 (W.D. Pa. 1953); Scaramucci v. FMC Corp., 258 F. Supp. 598, 602

(W.D. Okla. 1996).  The language of Section 1406(a) is "'amply broad enough to authorize the transfer of cases' when the district court in which the plaintiff filed the case lacks personal jurisdiction over the defendant." Get In Shape Franchise, Inc. v. TFL Fishers, LLC, 167 F. Supp. 3d 173, 206 (D. Mass. 2016) (quoting Goldlawr, Inc. v. Heiman, 369 U.S. 463, 466-67 (1962)); see, e.g., Brenner v. Rubin, 240 F. Supp. 467, 469 (D. Mass. 1965).  In enacting Section 1406(a), Congress recognized that "the interest of justice may require that the complaint not be dismissed but rather that it be transferred in order that the plaintiff not be penalized by… time-consuming and justice-defeating technicalities." Goldlawr, Inc., 369 U.S. at 467 (internal quotations omitted).

Some factors that courts have considered when determining whether the interests of justice warrant transfer include whether the statute of limitations precludes plaintiffs from refiling if a dismissal is granted, whether the allegations are serious, and whether plaintiff is seeking to remedy a substantial financial loss. Bearse v. Main St. Invs., 170 F. Supp. 2d 107, 117 (D. Mass 2001); see Shultz v. McAfee, 160 F.Supp. 210, 213 (D. Me. 1958) ("Because . . . the statutes of limitation and other legal bars may well preclude the bringing of a new action . . . in another jurisdiction[,] [dismissal] at this late date . . .  would most certainly result in a great injustice."); see also Mulcahy v. Guertler, 416 F. Supp. 1083, 1086 (D. Mass. 1976) (dismisses case for improper venue where plaintiff furnished no reason why the interest of justice would warrant transfer instead, and statute of limitations had not expired).

The United States requests dismissal rather than transfer because it claims the statute of limitations has run.  [Dkt. 72 at 1-2].  For the reasons previously explained, the Court does not agree.  Out of respect for the province of the receiving the court, this Court does not reach a final determination on the accrual date for calculation of the statute of limitations.  Should the Court

dismiss the claim in 2023, Plaintiffs will surely be precluded from refiling their claims against the United States.  See 28 U.S.C. § 2401(b); Gonzalez, 284 F.3d at 288 (barring a few narrow exceptions, an FTCA tort claim against the United States will be "forever banned" unless "presented in writing to the appropriate federal agency within two years after the claim accrues.").  Transfer is further supported by the seriousness of the allegations, to include the several lives lost, the substantial injuries incurred by the loved ones of those lost, and the alleged actions of the United States and Defendant Contractors that led to the crash of the plane and its alleged efforts to cover it up.  See Bearse, 170 F. Supp. 2d at 117; Shultz, 160 F. Supp. at 213; Mulcahy, 416 F. Supp. at 1083.

The Court must transfer the matter to a venue where the plaintiff could have originally filed.  28 U.S.C. § 1404(a).  The Court acknowledges that while the current venue is likely proper for both Contractor Defendants,[8] it considers the tenants of judicial economy in declining to sever the action and solely transfer the United States.  The United States is alleged to have deployed the missiles off the Navy destroyer ships near New Jersey, Staten Island, and Long Island.  [Dkt. 33 at ¶¶ 2, 72, 78].  The TWA 800 took off from New York's John F. Kennedy International Airport, and it exploded and crashed into the Atlantic Ocean off the coast of Long Island, New York.  [Dkt. 33 at ¶¶ 1-2].  The Eastern District of New York appears to be an appropriate venue for all Defendants.  See 28 U.S.C. § 1406(a); see also 28 U.S.C. § 1390.  The Court however extends an opportunity to Plaintiffs to state its preferred venue.

---

[8] Parties were given the opportunity to submit briefing on the issue of venue and Defendant Contractors declined to take a position.

**IV.    CONCLUSION**

For the aforementioned reasons, the current venue is improper and the claims against all Defendants will be transferred.  Accordingly, Defendants' Motions to Dismiss [Dkts. 41; 43; 72] are **DENIED WITHOUT PREJUDICE** and the matter will be **TRANSFERRED** to a proper venue to be determined.  Plaintiffs have seven (7) days to state the district it wishes this court to transfer this matter to pursuant to the FTCA's venue requirements.

Dated: September 29, 2023                        /s/ Angel Kelley_____
                                                 Hon. Angel Kelley
                                                 United States District Judge